No. 16-15141

IN THE

# United States Court of Appeals for the Ninth Circuit

CTIA – THE WIRELESS ASSOCIATION®,

*Plaintiff-Appellant*,

v.

THE CITY OF BERKELEY, CALIFORNIA, AND CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, IN HER OFFICIAL CAPACITY,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
The Honorable Edward M. Chen | Case No. 3:15-cv-02529-EMC

**BRIEF FOR APPELLANT CTIA – THE WIRELESS ASSOCIATION®**

Joshua S. Lipshutz
Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone: 415.393.8233
Facsimile: 415.374.8469

Theodore B. Olson
Helgi C. Walker
Michael R. Huston
Jacob T. Spencer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff-Appellant CTIA – The Wireless Association®*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, CTIA – The Wireless Association® states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# Table of Contents

**Page**

Introduction .................................................................................. 1

Jurisdictional Statement................................................................ 5

Issue Presented.............................................................................. 5

Statutory Addendum ..................................................................... 5

Statement of the Case ................................................................... 5

    A. The Science Of Cell Phones............................................... 5

    B. The FCC's Program Of Cell Phone Testing And
       Regulation ............................................................................ 7

    C. Berkeley's Ordinance....................................................... 10

    D. CTIA's Suit...................................................................... 12

Summary of the Argument .......................................................... 13

Standard of Review ..................................................................... 16

Argument ..................................................................................... 16

    I. CTIA Is Likely To Succeed On The Merits ...................... 17

    A. Berkeley's Ordinance Violates The First Amendment ............ 17

        1. The Ordinance Is A Presumptively Unconstitutional
           Burden On Commercial Speech ............................................ 19

           a. Berkeley's Ordinance Is Content-, Viewpoint-, And
              Speaker-Based .................................................................. 20

           b. Heightened Scrutiny Applies To Compelled
              Disclosures And Speech Restrictions Alike...................... 21

           c. Berkeley's Ordinance Cannot Survive Heightened
              Scrutiny............................................................................ 22

i

**Table of Contents**
(continued)

**Page**

2. Less Exacting Forms Of Scrutiny Do Not Apply To The Ordinance ................................................................ 25

   a. The Ordinance Is Not Subject To *Zauderer*, Because It Does Not Correct Misleading Advertising ................... 25

   b. Rational Basis Review Does Not Apply ........................... 28

   c. No Lesser Form Of Scrutiny Applies ............................... 30

3. The Ordinance Is Unconstitutional Under *Zauderer* ........... 32

   a. The Ordinance Is Not Purely Factual ............................. 32

   b. The Ordinance Is Not Uncontroversial ........................... 38

   c. The Ordinance Does Not Advance A Legitimate Governmental Interest ................................................... 41

   d. The Ordinance Is Unduly Burdensome ........................... 44

B. Berkeley's Ordinance Is Preempted ......................................... 45

1. The Ordinance Conflicts With The FCC's Goals Of Encouraging Wireless Technology And Uniform National Regulation ............................................................. 46

2. The Ordinance Does Not Merely Amplify The FCC's Pronouncements Or Recommendations On RF Energy ....... 49

II. The Other Preliminary Injunction Factors Tip Sharply In Favor Of CTIA ............................................................................ 52

A. CTIA Will Suffer Irreparably Without An Injunction ............. 52

B. The City Has No Legitimate Countervailing Interests ........... 53

C. The Public Interest Favors An Injunction ................................ 55

Conclusion .......................................................................................... 57

ii

# Table of Authorities

**Pages**

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)............................................................21

*A&M Records, Inc. v. Napster, Inc.*,
    284 F.3d 1091 (9th Cir. 2002)..........................................16

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)....................................16, 17

*Am. Meat Inst. v. USDA*,
    760 F.3d 18 (D.C. Cir. 2014) (en banc)................26, 28, 29, 39, 40, 43

*Am. Trucking Ass'n v. City of L.A.*,
    559 F.3d 1046 (9th Cir. 2009)..........................................53

*Arc of Cal. v. Douglas*,
    757 F.3d 975 (9th Cir. 2014)............................................17

*Brooks v. Howmedica, Inc.*,
    273 F.3d 785 (8th Cir. 2001) (en banc)............................56

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*
    *Comm'n of N.Y.*, 447 U.S. 557 (1980).........................19, 26

*CTIA – The Wireless Ass'n v. City & Cty. of S.F.*,
    827 F. Supp. 2d 1054 (N.D. Cal. 2011)............................32

*CTIA–The Wireless Ass'n v. City & Cty. of S.F.*,
    494 F. App'x 752 (9th Cir. 2012)................................*passim*

*Disc. Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012).......................................39, 40

*Doe v. Miles Labs., Inc.*,
    927 F.2d 187 (4th Cir. 1991)............................................56

*Dwyer v. Cappell*,
    762 F.3d 275 (3d. Cir. 2014) ......................................26, 33

# Table of Authorities
(continued)

**Pages**

*Edenfield v. Fane*,
  507 U.S. 761 (1993)....................................................... 26, 41, 43

*Entm't Software Ass'n v. Blagojevich*,
  469 F.3d 641 (7th Cir. 2006)........................................ 40, 44

*Evergreen Ass'n v. City of N.Y.*,
  740 F.3d 233 (2d Cir. 2014) ......................................... 31, 40

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ...........................1, 10, 46, 47, 48, 49, 51, 54

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982)............................................................... 46

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
  648 F.2d 956 (5th Cir. Unit B June 1981)........................... 57

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)............................................................... 46

*Glickman v. Wileman Bros. & Elliott, Inc.*,
  521 U.S. 457 (1997)......................................................... 21, 27

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*,
  512 U.S. 136 (1994)............................................................... 27

*Inst. of Cetacean Research v. Sea Shepherd
  Conservation Soc'y*,
  725 F.3d 940 (9th Cir. 2013)................................................ 16

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) ...................... 18, 23, 31, 42, 43, 52

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
  601 F. App'x 469 (9th Cir. 2015)......................................... 53

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010)............................................... 25, 26, 27

iv

**Table of Authorities**
(continued)

**Pages**

*Nat'l Ass'n of Mfrs. v. SEC,*
    748 F.3d 359 (D.C. Cir. 2014)........................................ 34, 44

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015)........................... 29, 34, 39, 44

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
    *Pension Fund,*
    135 S. Ct. 1318 (2015)......................................................... 32

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,*
    475 U.S. 1 (1986)................................................... 22, 44, 52

*Planned Parenthood Ass'n of Cincinnati, Inc. v.*
    *City of Cincinnati,*
    822 F.2d 1390 (6th Cir. 1987)............................................. 57

*R.J. Reynolds Tobacco Co. v. FDA,*
    696 F.3d 1205 (D.C. Cir. 2012)........................................... 34

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015).......................................................... 20

*Retail Digital Network, LLC v. Appelsmith,*
    810 F.3d 638 (9th Cir. 2016)..................18, 19, 20, 21, 22, 23, 42

*Riley v. Nat'l Fed'n of Blind,*
    487 U.S. 781 (1988)............................................................... 20

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995).......................................................... 22, 24

*Sammartano v. First Judicial Dist. Court,*
    303 F.3d 959 (9th Cir. 2002)........................................... 16, 52

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011)............................................. 19, 20, 21

**Table of Authorities**
(continued)

**Pages**

*Stuart v. Camnitz*,
   774 F.3d 238 (4th Cir. 2014)................................................................39

*Thompson v. W. States Med. Ctr.*,
   535 U.S. 357 (2002)...........................................................................24

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)...........................................................................17

*United States v. Schiff*,
   379 F.3d 621 (9th Cir. 2004)..............................................................20

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001)..................................................... 21, 22, 27, 44

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013)..............................................................17

*Video Software Dealers Ass'n v. Schwarzenegger*,
   556 F.3d 950 (9th Cir. 2009)................................. 19, 26, 28, 29, 31, 44

*Vivid Entm't, LLC v. Fielding*,
   774 F.3d 566 (9th Cir. 2014)..............................................................16

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   135 S. Ct. 2239 (2015).......................................................................17

*Williamson v. Mazda Motor of Am., Inc.*,
   131 S. Ct. 1131 (2011).......................................................................51

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................ 16, 17

*Wooley v. Maynard*,
   430 U.S. 705 (1977).................................................................. 17, 31, 44

*Wyeth v. Levine*,
   555 U.S. 555 (2009)...........................................................................46

## Table of Authorities
(continued)

**Pages**

*Zauderer v. Office of Disciplinary Counsel of S. Ct. of Ohio*,
471 U.S. 626 (1985) ...................................................... *passim*

**Statutes**

28 U.S.C. § 1292(a)(1) ................................................................. 5

28 U.S.C. § 1331 ....................................................................... 5

Berkeley Municipal Code § 9.96 ...................................... 1, 5, 57

Berkeley Municipal Code § 9.96.010 ................................. 20, 23, 42, 47

Berkeley Municipal Code § 9.96.030 ...................... 12, 18, 23, 33, 35, 48

Telecommunications Act of 1996, Pub. L. No. 104-104,
§ 704(b), 110 Stat. 56, 152 ..................................................... 46

**Legislative Authorities**

H.R. Rep. No. 86-1861 (1960) ................................................. 56

H.R. Rep. No. 103-111 (1993) ................................................ 48

H.R. Rep. No. 104-204 (1995) ................................................ 47

**Regulations**

47 C.F.R. § 2.915 ...................................................................... 10

47 C.F.R. § 2.919 ...................................................................... 10

47 C.F.R. § 2.1033 .................................................................... 10

47 C.F.R. § 2.1093 ............................................................. 36, 49, 50

**Administrative Authorities**

EPA, *Non-Ionizing Radiation from Wireless Technology*
(last updated Feb. 22, 2016) ............................................... 6, 7

**Table of Authorities**
(continued)

**Pages**

FCC, KDB 447498, *General RF Exposure Guidance*
§ 4.2.2(d) (2015)....................................................................36

FCC, *Radiofrequency Safety: RF Safety FAQ*
(last updated Nov. 25, 2015).............................................6, 36

FCC, *Specific Absorption Rate (SAR) for Cell Phones: What It Means for You* (last updated Nov. 4, 2015) .......................9, 10, 35, 38

FCC, *Wireless Devices and Health Concerns*
(last updated Nov. 7, 2015)..........................................7, 37, 38

FCC, *Wireless Emergency Alerts (WEA)*
(last updated Nov. 13, 2015)...............................................55

*In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*,
18 FCC Rcd. 13187 (2003) ...................................................50

*In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*,
28 FCC Rcd. 3498 (2013) ...........................................*passim*

*In re Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*,
26 FCC Rcd. 5411 (2011) ....................................................55

*Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*,
73 Fed. Reg. 49,603 (2008)...................................................56

**Other Authorities**

Anand Veeravagu, *Berkeley Says Cell Phones Cause Tumors*,
The Daily Beast (May 13, 2015).............................................33

**Table of Authorities**
(continued)

**Pages**

Anita Chabria, *City of Berkeley to Require Cellphone Sellers to Warn of Possible Radiation Risks*, The Guardian (May 16, 2015) ............................................................ 33

*Berkeley, California, to Require Cellphone Health Warnings*, CBSNews (May 13, 2015) .................................................... 33

David Lazarus, *Berkeley's Warning About Cellphone Radiation May Go Too Far*, L.A. Times (June 26, 2015) .............................................. 33

Inst. of Electrical & Electronics Eng'rs, *IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz*, IEEE Std C95.1-2005 (2006) ...................................... 6, 7

Jane L. Levere, *FEMA Promotes Its Wireless Emergency Alert System*, N.Y. Times (May 28, 2013) .............................................. 55

Josh Harkinson, *Berkeley Votes to Warn Cellphone Buyers of Health Risks*, Mother Jones (May 13, 2015) .......................................... 33

Lars Noah, *The Imperative to Warn: Disentangling the "Right to Know" from the "Need to Know" About Consumer Product Hazards*, 11 Yale J. on Reg. 293 (1994) ...................................... 56, 57

Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867 (2015) ...................................... 32

## Introduction

The City of Berkeley, California, is free to proclaim whatever anti-science views it wishes. But the City may not conscript private businesses who disagree into disseminating those opinions. That is precisely what Berkeley is trying to do with its Ordinance, Berkeley Municipal Code ("BMC") Chapter 9.96. The Ordinance compels retailers to convey Berkeley's inaccurate, misleading, inflammatory opinion that cell phones pose a "safety" hazard because they emit "radiation."

In addition to being scientifically baseless and alarmist, the Ordinance's compelled speech also contradicts the federal government's position. The radiofrequency ("RF") energy emitted by cell phones is the same type of energy that emanates from baby monitors and Wi-Fi networks. The Federal Communications Commission ("FCC"), which regulates all cell phones manufactured for sale in this country, has concluded, based on the overwhelming consensus of health and safety authorities, "that any cell phone legally sold in the United States is a 'safe' phone." *Farina v. Nokia Inc.*, 625 F.3d 97, 105 (3d Cir. 2010). Although the FCC advises cell phone manufacturers to include in user manuals, in words of their own choosing, some basic information about RF energy testing procedures, the FCC has decidedly *not* required a "warning" to consumers about RF energy. And the FCC has cautioned that referring to the inflammatory term "radiation" is misleading to consumers.

1

Notwithstanding the FCC's conclusions and careful regulatory balance between simultaneously protecting health and promoting widespread use of wireless technology, Berkeley's Ordinance would require all cell phone retailers to distribute to their customers, at the point of sale, a government-scripted warning that includes the City's opinion about "how to use your phone safely." The Ordinance, which is based—according to the City *itself*—not on any science but on a supposed "right to know," recommends that consumers avoid carrying their phones in certain ways lest they "exceed the federal guidelines for exposure to RF radiation." That is a deliberately misleading and inflammatory message. Its purpose is not to provide accurate information to consumers, but to scare them into thinking that cell phones are dangerous.

This Ordinance is illegal for at least two reasons. First, its compelled-speech mandate violates the First Amendment. The Constitution protects the right not to speak, and the government cannot force anyone, including a commercial business, to spread a misleading and controversial opinion. Second, the Ordinance is preempted by the FCC's comprehensive system of cell phone testing and regulation, which rejected just the sort of consumer warning that Berkeley now imposes. Congress intended that cell phones be subject to a single set of uniform federal regulations. If Berkeley's Ordinance is allowed to stand, other municipalities will follow suit, resulting in the very patchwork of state and municipal disclosure obligations that Congress sought to avoid.

Just a few years ago, this Court enjoined a very similar municipal ordinance because it "could prove to be interpreted by consumers as expressing San Francisco's opinion that using cell phones is dangerous"—an opinion that this Court found to be contrary to the FCC's determinations. *CTIA–The Wireless Ass'n v. City & Cty. of S.F.*, 494 F. App'x 752, 753 (9th Cir. 2012) (mem.) ("*San Francisco*"). Berkeley has attempted to write around this Court's decision, but its Ordinance conveys the same opinion and is equally unconstitutional.

The district court in this case nonetheless refused to enjoin the Ordinance. It adopted an unprecedented standard of review under the First Amendment that would allow the government to require businesses to convey scientifically disputed statements. It held that there is no meaningful harm to a business in being forced to counter and correct government-mandated disclosures. And it further held that the government can compel a business to repeat even statements of *opinion* so long as the statement does not concern core political speech and the government attaches its own name to the message. Those extreme holdings cannot be squared with Supreme Court or Circuit precedent. What is more, the district court shifted the preemption inquiry to whether the FCC's *testing procedures* have anything to do with safety, rather than asking whether Berkeley's *message*—that cell phones sold to the public are hazardous when used in certain ways—is consistent with the FCC's views (it is not).

3

Plaintiff-Appellant CTIA – The Wireless Association® is likely to succeed in showing that the Ordinance violates the First Amendment and is preempted. Absent a preliminary injunction, the Ordinance will irreparably harm CTIA's members by abridging their First Amendment rights and by forcing them to disparage their products to their customers. CTIA's members do not agree with Berkeley's message because it contravenes the FCC's findings, which are based on broad scientific consensus. Sales are likely to diminish, and the loss of goodwill will be permanent, even if consumers later learn that Berkeley's safety warning was unfounded. An injunction, on the other hand, will merely preserve the status quo (including the FCC's well-established RF energy testing standards), so that the Ordinance's legality can be determined in an orderly fashion. Berkeley cannot demonstrate that it will suffer any harm from an injunction, as evidenced especially by the fact that it has voluntarily stayed enforcement of the Ordinance since its adoption.

Berkeley is entitled to its opinions, however unfounded. And Berkeley may broadcast its own message about cell phones, however inaccurate. But the City may not demand that CTIA's members hand over their voices, property, and customer relationships in order to mislead the public. This Court should enjoin Berkeley's Ordinance.

## Jurisdictional Statement

The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. On January 27, 2016, the district court entered an order dissolving a preliminary injunction against BMC Chapter 9.96. ER 36. CTIA filed a timely notice of appeal on February 1, 2016. ER 119. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## Issue Presented

Whether the district court erred in refusing to preliminarily enjoin Berkeley's Ordinance, either because it is an unconstitutional compelled-speech mandate, or because it is preempted by federal law.

## Statutory Addendum

Pursuant to Ninth Circuit Rule 28-2.7, all pertinent statutory authorities are included in an addendum that is bound with this brief.

## Statement of the Case

### A. The Science Of Cell Phones

Cell phones send and receive wireless signals to and from base stations in order to enable voice, text, and internet communications. ER 54. Those signals are radio waves, a form of electromagnetic energy called radiofrequency or "RF energy." ER 55. RF energy is ubiquitous and used not only by cell phones, but also by, for example, pacemakers, Wi-Fi, garage door openers, the global satellite positioning system, radio, and over-the-air television broadcasts. "Between Wi-Fi, cellphones

5

and other networks, people are in a nearly constant cloud of wireless signals." EPA, *Non-Ionizing Radiation from Wireless Technology*, http://goo.gl/wt95zI (last updated Feb. 22, 2016).

The radio waves used by cell phones are a form of electromagnetic radiation—energy radiating through space as a series of electric and magnetic waves. ER 55–56. There are two basic types of electromagnetic radiation: (low frequency) non-ionizing radiation and (high frequency) ionizing radiation. Although "radiation" is often used, "colloquially, to imply that ionizing radiation (radioactivity), such as that associated with nuclear power plants, is present," the two types of radiation differ significantly and "should not be confused" as to their "possible biological effects." FCC, *Radiofrequency Safety: RF Safety FAQ*, https://goo.gl/lZ67Xl (last updated Nov. 25, 2015) ("*RF Safety FAQ*").

RF energy is a form of *non-ionizing* radiation, like the infrared energy produced by our bodies, or visible light. ER 55–56. Unlike ionizing radiation (such as X-rays or nuclear energy), RF energy is not capable of breaking chemical bonds in the body, damaging biological tissues, or affecting DNA. *Id.* The *only* known adverse health effect of RF energy is heat. ER 56. Some people are skeptical, but the overwhelming "scientific consensus is that there are no accepted theoretical mechanisms that would suggest the existence of [non-thermal] effects." Instit. of Electrical & Electronics Eng'rs, *IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields*,

6

*3 kHz to 300 GHz*, IEEE Std C95.1-2005, 35 (2006) ("*Safety Levels*").

Moreover, RF energy poses no known health risk until it reaches a certain threshold. ER 56; *see*, *e.g.*, *Safety Levels*, at 33. Exposure to "very high levels" of RF energy "can heat the body's tissues." *Non-Ionizing Radiation from Wireless Technology*. But no matter how much RF energy the body encounters below that threshold, there is no known health effect, heat-related or otherwise. *See Safety Levels*, at 33. A higher level of exposure below the threshold is thus not more dangerous than a lower level of exposure below the threshold. ER 56. "Cellphones and wireless networks produce RF [energy], but not at levels that cause significant heating." *Non-Ionizing Radiation from Wireless Technology*.

The FCC has definitively stated that "currently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses." FCC, *Wireless Devices and Health Concerns*, https://goo.gl/5mUjeo (last updated Nov. 7, 2015). And while some people remain concerned, "the weight of scientific evidence has not effectively linked exposure to radio frequency energy from mobile devices with *any known health problems*." *Id.* (emphasis added).

## B. The FCC's Program Of Cell Phone Testing And Regulation

Congress directed the FCC to ensure that all cell phone models approved for sale in the United States are safe. ER 57–58. At the same time, Congress tasked the FCC with striking an appropriate balance be-

tween the need to protect public health and encouraging the efficient provision of telecommunications services to the public. *See id.* Congress also wanted *uniform* federal regulation of cell phones, not a patchwork of potentially conflicting state and local regulations. *See id.*

Pursuant to these mandates, the FCC requires that each cell phone model be tested for RF emissions and certified for compliance with applicable limits before it is marketed, distributed, or sold in the United States. ER 62. The FCC's extensive testing procedure includes a limit on RF emissions (the "Specific Absorption Rate" or "SAR" limit) that is *50 times* below the threshold where RF energy has shown an adverse biological effect in laboratory animals. ER 56, 59; *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*, 28 FCC Rcd. 3498 (2013), ¶ 236 ("*Reassessment*"). This "conservative," 50-fold "'safety' factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities—and even the potential for exposures to occur in excess of [FCC] limits without posing a health hazard to humans." *Reassessment*, ¶¶ 236, 237.

For testing SAR absorption by the body (as opposed to by the head), the FCC has long suggested that manufacturers maintain separation between the phone and the body to account for "body-worn" devices, such as belt clips or holsters. *Reassessment*, ¶ 248. But the FCC is aware that body-worn devices are not used as frequently as they once were and that consumers sometimes carry their phones in their pockets.

8

*Id.*, ¶ 249. In 2013, the FCC opened a Notice of Inquiry concerning this change in consumer behavior. *See id.*, ¶¶ 7, 248–52. Its calculations "suggest[ed] that some devices may not be compliant with [its] exposure limits without the use of some spacer," although it could not verify that conclusion for any individual cell phone model. *Id.*, ¶ 251.

"Yet" the FCC possessed "no evidence that this poses any significant health risk." *Reassessment*, ¶ 251. "[E]xceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation." *Id.* That is because the FCC's "limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature. As a result, exposure well above the specified SAR limit should not create an unsafe condition." *Id.*

Also, "[t]he FCC requires that cell phone manufacturers conduct their SAR testing to include the *most severe, worst-case (and highest power) operating conditions for all the frequency bands* used in the USA for that cell phone." FCC, *Specific Absorption Rate (SAR) for Cell Phones: What It Means for You* (emphasis in original), https://goo.gl/3dXhkB (last updated Nov. 4, 2015) ("*SAR for Cell Phones*"). Thus, "using a device against the body without a spacer will generally result in actual SAR below the maximum SAR tested; moreover, a use that possibly results in non-compliance with the SAR limit should not be viewed with significantly greater concern than compliant use." *Reassessment*, ¶ 251.

9

When a manufacturer tests a cell phone model next to the body by using a holster clip or other accessory, the FCC advises that the manufacturer inform users about the distance at which the phone was tested so that the consumer can hold or use the phone the same way if she wants to replicate the testing conditions. ER 65–66. But the FCC has made clear that these are not "safety" instructions. ER 66. The manufacturer submits to the FCC each cell phone model's "operating instructions"—including how the manufacturer describes the FCC's RF testing procedure—when it applies to have the phone certified. *See* ER 65; 47 C.F.R. § 2.1033(b)(3). The FCC may not approve a cell phone without an affirmative finding based on all data and information in the application—including the operating instructions—that the public interest would be served by approval. *See* ER 65; 47 C.F.R. §§ 2.915(a), 2.919; *see also* 47 C.F.R. § 2.1033(b)(3).

The FCC has confidently stated that every phone it approves is "safe." ER 60–61; *Farina*, 625 F.3d at 105; *see generally SAR for Cell Phones*.

### C. Berkeley's Ordinance

Nevertheless, some people are skeptical of the science. A few years ago, San Francisco passed an ordinance mandating that cell phone retailers provide information about RF energy at the point of sale. This Court struck down the ordinance because the mandatory notice "could

10

prove to be interpreted by consumers as expressing San Francisco's opinion that using cell phones is dangerous," a view that is contrary to the FCC's findings. *San Francisco*, 494 F. App'x at 753. Consequently, this Court held that the disclosure was not "purely factual and uncontroversial." *Id.* at 754 (quotation marks omitted). San Francisco subsequently repealed its law.

Berkeley took up the cudgel. Contrary to the FCC's explicit findings regarding cell phone safety, the City Council heard impassioned pleas from residents who believe that cell phones cause cancer and other ailments: "My friend died of [a] brain tumor a couple years ago at age 49. ... [S]he was sure that it was the cell phone that caused her brain tumor." "[D]amage from cell phones can occur to sperm." "I'm electromagnetically sensitive and I urge you to pass this ordinance." ER 102, 105, 107.

Berkeley officials admitted they have no scientific evidence to support the contention that cell phones pose a health risk. ER 107–08 (statement by sponsor of the Ordinance that Berkeley did no scientific (or any other) studies and "[t]he issue before us tonight is not the science itself"). Their "consultant" on the Ordinance—who is also their counsel in this litigation—stated that "however significant that debate is" over RF energy, the Ordinance "is not related to that debate." ER 99. Instead the Council invoked its "moral and ethical role ... in [our] society." ER 108. The Ordinance originally required cell phone retailers to

11

provide the following notice to every customer who purchases or leases a cell phone, either by displaying it on a poster or distributing it on a handout:

> The City of Berkeley requires that you be provided the following notice:

> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

BMC § 9.96.030(A), (B) (May 26, 2015).

### D. CTIA's Suit

CTIA brought this suit contending that the Ordinance violates the First Amendment and is preempted by federal law. The district court held that the Ordinance was preempted because the sentence about the risk "to children" was contrary to the FCC's statements, and it enjoined the Ordinance. ER 14–15. But the district court held that the remainder of the Ordinance was permissible because it allegedly merely repeated statements that the FCC has made itself or already recommends.

Berkeley promptly passed a new ordinance that simply removed the sentence about children, but left intact the remainder of the Ordinance, including "[t]o assure safety" and "radiation." Over CTIA's objec-

tion, the district court granted the City's motion to dissolve the injunction on January 27, 2016. ER 48.

## Summary of the Argument

The district court erred in refusing to preliminarily enjoin Berkeley's Ordinance. All four of the relevant factors favor relief.

**I.** CTIA is likely to succeed on the merits because the Ordinance is unlawful for two independent reasons.

**A.** Berkeley's compelled speech mandate violates the First Amendment. The Ordinance requires cell phone retailers to convey the City's *opinion* that cell phones are dangerous when carried in a particular manner. Heightened scrutiny applies, and the Ordinance does not have the "fit" that is required by this Court's precedents. Even if a less exacting form of scrutiny were to apply, the Ordinance still violates all of the requirements that the Supreme Court has imposed for compelled commercial speech mandates: the Ordinance's compelled notice is misleading and inaccurate, not "purely factual"; it is one-sided, disputed, and inflammatory, not "uncontroversial"; it is based on skepticism about well-established science, not any "legitimate" government interest; and it is unnecessarily invasive, and thus "unduly burdensome."

The district court erred when it upheld the Ordinance on the grounds that it "only" compelled rather than prohibited speech, that core political speech is not at issue, and that Berkeley's mandated disclosure identifies the City as its author. ER 37; *see also* ER 16–21,

13

23–26. According to the district court, the government may compel a business to speak an *inaccurate* statement *of opinion*, on a provocative topic, so long as core speech is not involved and the government admits authorship. That is not consistent with this Court's or the Supreme Court's decisions. Indeed, just a few years ago, this Court preliminarily enjoined a very similar municipal ordinance because it "could prove to be interpreted by consumers as expressing San Francisco's opinion that using cell phones is dangerous"—an opinion this Court found to be contrary to the FCC's determinations. *San Francisco*, 494 F. App'x at 753. This Court should similarly invalidate Berkeley's effort to write around that decision.

**B.** The Ordinance is preempted by federal law. The FCC's comprehensive program of cell phone regulation exists in order to balance the need for consumer safety against encouraging the deployment of wireless technology, and to regulate cell phones using a single, nationwide, uniform standard. Berkeley's compelled notice—which urges safety precautions that the FCC does not endorse—would frustrate both of those goals. The message conveyed by the Ordinance is contrary to the FCC's repeated findings regarding RF energy, and that message is not at all like the balanced, non-alarming disclosures that manufacturers write themselves and currently include in cell phone user manuals.

If Berkeley's effort to second-guess the FCC's decisions on RF emissions is upheld, then mandatory disclosure obligations from other

14

state and local governments will soon follow, creating the crazy-quilt of cell phone regulation that Congress tried to eliminate.

**II.** All of the other factors for a preliminary injunction favor CTIA.

**A.** CTIA will suffer irreparable harm without a preliminary injunction. This Court has recognized that the loss of First Amendment freedoms, even for a short time, constitutes *per se* irreparable harm. Similarly, being forced to comply with a preempted ordinance is irreparable injury. Moreover, if Berkeley can force CTIA's members to disparage their products to their own customers at the point of sale, then customer relationships and goodwill will be irreparably damaged.

**B.** The City has no interest in avoiding an injunction until the legality of this Ordinance can be fully determined. The City has repeatedly acknowledged, as it must, that cell phones approved for sale by the FCC pose no threat to public safety. In fact, the City has effectively conceded that there is no harm in waiting to enforce the Ordinance by voluntarily staying its enforcement for over ten months, while the preliminary injunction and subsequent stay proceedings in this Court played out. Moreover, the FCC's regulations governing cell phones' emission of RF energy have been in place for nearly twenty years, and the City by its own admission has no evidence that they will not be sufficient while this litigation is pending.

**C.** The public interest favors enjoining this misleading, unconstitutional, and preempted Ordinance. The Ordinance is designed to have

15

the effect, and will have the effect, of unnecessarily scaring consumers into changing their behavior with a product that is a useful part of their everyday lives.

## Standard of Review

This Court generally reviews the denial of a preliminary injunction for abuse of discretion. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013). But review of "the legal premises underlying a preliminary injunction" is "de novo." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002). That is because a "district court abuses its discretion … if it applies an incorrect legal standard." *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014).

## Argument

"'A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), *abrogated on other*

16

*grounds by Winter*, 555 U.S. 7.

All four factors weigh in favor of a preliminary injunction here. Alternatively, CTIA is entitled to an injunction because it has, at the very least, raised "serious questions going to the merits." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quotation marks omitted). That is all that is necessary for an injunction where, as here, the "hardship balance … tips sharply" for CTIA and "the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies*, 632 F.3d at 1132.

## I. CTIA Is Likely To Succeed On The Merits

### A. Berkeley's Ordinance Violates The First Amendment

The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). A law that "requires the utterance of a particular message favored by the Government … contravenes this essential right." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). For this reason, "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015).

"Commercial speech merits First Amendment protection," so long as "the communication is neither misleading nor related to unlawful activity." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013)

17

(quotation marks omitted). And "[t]he right not to speak inheres in political and commercial speech alike." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996).

Berkeley's Ordinance requires cell phone retailers to convey the City's *opinion* that cell phones are dangerous when carried in a particular manner. Because the Ordinance is a content-, viewpoint-, and speaker- based burden on protected speech, it must be reviewed under heightened scrutiny. *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 648 (9th Cir. 2016). Berkeley does not contend—and cannot contend—that the Ordinance is necessary to correct any deceptive or misleading commercial advertising. As a result, this case is not controlled by *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). And despite the district court's unprecedented holding, neither the Supreme Court nor this Court has ever applied rational basis review in the First Amendment context.

But *whatever* the standard of review, the Ordinance is unlawful because it forces cell phone retailers to convey an inaccurate, misleading, and controversial message to their customers. The Ordinance instructs consumers that: cell phones emit dangerous RF "radiation"; exposure to RF radiation in excess of federal guideline creates a "safety" concern; and consumers should, in order to use their phone safely, refrain from carrying it against the body while powered on and connected. BMC § 9.96.030(A). CTIA's members do not wish to convey any of those

18

opinions, because they are misleading, contrary to the FCC's express statements, and will needlessly stoke consumer anxiety.

This Court has already struck down a highly similar compelled-speech requirement, holding that it misrepresented the FCC's position. *See San Francisco*, 494 F. App'x at 753. And this Court has declared that there is *never* a "legitimate reason to force retailers to affix false information on their products." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd by* 131 S. Ct. 2729 (2011). Under this Court's precedents and those of the Supreme Court, Berkeley's Ordinance cannot stand.

## 1. The Ordinance Is A Presumptively Unconstitutional Burden On Commercial Speech

This Court recently held that after *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), "courts must first determine whether a challenged law burdening non-misleading commercial speech about legal goods or services is content- or speaker-based. If so, heightened judicial scrutiny is required." *Retail Digital*, 810 F.3d at 648. Whereas content-neutral regulations of commercial speech face the traditional "intermediate" standard from *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980), *Sorrell* holds that content- and viewpoint-based burdens on commercial speech are subject to a "more demanding form of scrutiny." *Retail Digital*, 810 F.3d at 650.

19

### a. Berkeley's Ordinance Is Content-, Viewpoint-, And Speaker-Based

Berkeley's Ordinance is content-, viewpoint-, and speaker-based, and, as such, it is "presumptively unconstitutional." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). The Ordinance "'on its face' draws distinctions based on the message" that cell phone retailers convey. *Id.* at 2227 (quoting *Sorrell*, 131 S. Ct. at 2664). By "[m]andating speech that [CTIA] would not otherwise make," Berkeley "necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). The Ordinance is also content-based because the City's "stated purpose" for the Ordinance, *Sorrell*, 131 S. Ct. at 2663, is its objection to cell phone manufacturers' existing choices about what to say and how to say it: The City criticized the disclosures that exist in current user manuals as "buried in fine print, [and] not written in easily understood language." BMC § 9.96.010(H). And the Ordinance is viewpoint- and speaker-based because it takes only one side (the scientifically unsupported side) of the RF energy debate, and it regulates the speech of cell phone retailers but no other groups, including providers of other common sources of RF energy. *See Sorrell*, 131 S. Ct. at 2663–64. Accordingly, heightened scrutiny applies. *Retail Digital*, 810 F.3d at 650.[1]

---

[1] Although "[c]ommercial speech traditionally has been granted less protection than political speech and expressive speech," *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004), the same constitu-

### b. Heightened Scrutiny Applies To Compelled Disclosures And Speech Restrictions Alike

The City has argued that, because the Ordinance is a compelled commercial *disclosure* (as opposed to a speech *restriction*), *Retail Digital* does not apply. Not so. For commercial speech as for speech of any other type, "the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans," because "the distinction between laws burdening and laws banning speech is but a matter of degree." *Sorrell*, 131 S. Ct. at 2664 (quotation marks omitted). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). When the government regulates "commercial speech," a mandate "compelling cognizable speech officially is just as suspect as suppressing it, and is typically subject to the same level of scrutiny." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 480–81 (1997) (Souter, J., dissenting).

As the Supreme Court has explained, "requir[ing a speaker] to as-

---

tional protection should apply to commercial speech as to any other category of protected speech. *See*, *e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and in the judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech.").

sociate with speech with which [the speaker] may disagree" is onerous because it forces the speaker "either to appear to agree" with another party's "views or to respond." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 15 (1986) (plurality opinion). It is *precisely* this "pressure to respond" that is "antithetical to the free discussion that the First Amendment seeks to foster." *Id.* at 15–16. "The fact that the speech is in aid of a commercial purpose does not deprive [it] of all First Amendment protection." *United Foods*, 533 U.S. at 410. Instead, "First Amendment concerns apply" *whenever* the government requires commercial speakers to endorse "speech with which they disagree." *Id.* at 410–11.

### c. Berkeley's Ordinance Cannot Survive Heightened Scrutiny

To survive the heightened scrutiny that applies here, Berkeley "bears the burden of showing 'that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Retail Digital*, 810 F.3d at 648 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)). Berkeley also "bears a heavier burden of showing that the challenged law 'is drawn to achieve [the government's substantial] interest.'" *Id.* (quoting *Sorrell*, 131 S. Ct. at 2668 (alteration in original)). The reviewing court examines "the legislative purposes that the court finds actually animated a challenged law," and then requires a "'fit between the legislature's ends and the means chosen to accomplish

those ends.'" *Id.* (quoting *Sorrell*, 131 S. Ct. at 2668).

Berkeley has never seriously attempted to show that its Ordinance has the "fit" to survive heightened scrutiny. Nor could it. The Ordinance purports to provide information so that consumers can "make their own choices about the extent and nature of their exposure to radio frequency radiation." BMC § 9.96.010(I); ER 94 ("Consumers have the right to know!"). But courts have consistently held that "the public's 'right to know'" is "insufficient to justify compromising protected constitutional rights." *Amestoy*, 92 F.3d at 73 (quotation marks omitted). "Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose." *Id.* at 74.

Nor is the Ordinance premised on any real health or safety concern. Berkeley's Ordinance warns consumers that their phones are unsafe if carried in a particular manner because they might exceed the FCC's guidelines for "exposure" to "RF radiation." BMC § 9.96.030. But according to the FCC itself, there is "*no evidence* that [exceeding the SAR limit] poses any significant health risk." *Reassessment*, ¶ 251 (emphasis added). Indeed, "exposure *well above* the specified SAR limit should not create an unsafe condition." *Id.* (emphasis added). Berkeley has never attempted to rebut the FCC's views on the safety of cell phones. Indeed, the sponsor of the Ordinance admitted that it "is not [about] the science itself," as "[t]he science itself will be debated and will resolve itself as the momentum [of] scientific discovery and re-

23

search presents itself." ER 107. He further admitted that the City has not done "studies that would yield the information" necessary to regulate even as a "precautionary" matter. ER 108. Instead he asked his colleagues to compel cell phone retailers to engage in government-prescribed speech based on a generalized and undefined notion of the Council's "moral and ethical role." *Id.*

Even if Berkeley had some legitimate objective here, it could accomplish that goal without burdening CTIA's members' freedom of speech by simply distributing its own message. That the City could so easily achieve its supposed goals using its own platform, without conscripting CTIA's members to do the talking for it, is sufficient by itself to doom the Ordinance. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002) ("[W]e have made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so."); *Rubin*, 514 U.S. at 491 ("[T]he availability of these options … which could advance the Government's asserted interest in a manner less intrusive to [the plaintiff's] First Amendment rights[ ] indicates that [the Government's preferred approach] is more extensive than necessary" and therefore unconstitutional). Without a demonstrated substantial government interest and an appropriate fit, the Ordinance is unconstitutional.

### 2. Less Exacting Forms Of Scrutiny Do Not Apply To The Ordinance

#### a. The Ordinance Is Not Subject To *Zauderer*, Because It Does Not Correct Misleading Advertising

Berkeley contends that the Ordinance is subject to less exacting scrutiny under *Zauderer*, 471 U.S. 626. The statute at issue there, however, attempted to cure an attorney's misleading advertisement by requiring the attorney to disclose "purely factual and uncontroversial information." *Id.* at 651. The State had a substantial interest in preventing deception of consumers. *Id.* And because the attorney had no constitutional right to put out deceptive advertising—meaning the State could ban the attorney's message entirely if it wished—the attorney's interest in avoiding factual and uncontroversial disclosures in his advertising was minimal. *Id.* Only in that context, where *all* of those factors were met, did the Supreme Court hold that an "advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* And even then, the Supreme Court noted that an unjustified or unduly burdensome disclosure requirement could offend the First Amendment. *Id.*

The Supreme Court has been clear in later cases that *Zauderer* applied less exacting scrutiny "[f]or [the] reason" that the statute at issue in *Zauderer* was "directed at *misleading* commercial speech." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010);

25

*see also Schwarzenegger*, 556 F.3d at 966 ("Compelled disclosures, justified by the need to 'dissipate the possibility of consumer confusion or deception,' are permissible if the 'disclosure requirements are reasonably related to the State's interest in preventing deception of customers.'" (quoting *Zauderer*, 471 U.S. at 651)); *Dwyer v. Cappell*, 762 F.3d 275, 282 (3d. Cir. 2014) ("[*Milavetz*] explained that *Zauderer* applied because the provision in question was 'directed at misleading commercial speech' *and* 'imposed a disclosure requirement rather than an affirmative limitation on speech.'" (emphasis added; citation omitted)). Combating misleading commercial speech is recognized as a substantial government interest, and the uncontroversial, purely factual disclosure required in *Zauderer* was narrowly drawn to that interest.

Thus, *Zauderer* is "an application of *Central Hudson*, where several of *Central Hudson*'s elements have already been established." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (quotation marks omitted). It is not a different test altogether. *Id.*; *see also Zauderer*, 471 U.S. at 657 (Brennan, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("I agree with the Court's somewhat amorphous 'reasonable relationship' inquiry only on the understanding that it comports with the standards more precisely set forth in our previous commercial-speech cases."). That is why the Supreme Court's subsequent cases have cited *Zauderer* as an *example* of how *Central Hudson*'s requirements operate. *See Edenfield v. Fane*, 507

26

U.S. 761, 770–71 (1993); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994).

No Supreme Court opinion has ever suggested that *Zauderer* is relevant in cases that do not involve deceptive commercial advertising. Rather, in *United Foods*, the Supreme Court distinguished *Zauderer* as a case in which "substantial numbers of potential clients might be misled by omission of the explanation," and the disclosure requirement was "consistent with the State's interest in 'preventing deception of consumers.'" 533 U.S. at 416 (quoting *Zauderer*, 471 U.S. at 651). The compelled subsidy for commercial speech at issue in *United Foods* was not "somehow necessary to make voluntary advertisements nonmisleading for consumers," so *Zauderer* did not apply. *Id.* Multiple Justices have also written separately to deny that *Zauderer* is relevant in cases, like this one, that do not concern deceptive advertising. *See Glickman*, 521 U.S. at 491 (Souter, J., dissenting, joined by Rehnquist, C.J., and Scalia, Thomas, JJ.) ("*Zauderer* carries no authority" for a compelled speech mandate "unrelated to the interest in avoiding misleading or incomplete commercial messages."); *Milavetz*, 559 U.S. at 257 (Thomas, J., concurring in part and in the judgment) (*Zauderer* means that "a disclosure requirement passes constitutional muster only to the extent that it is aimed at [misleading] advertisements," and Justice Thomas "d[id] not read the [majority] opinion to hold otherwise").

The City does not (and cannot) argue that cell phone retailers' ad-

27

vertising—or any other communications with customers, such as the information contained in user manuals—is in any way misleading. So *Zauderer* is inapplicable.

### b. Rational Basis Review Does Not Apply

In any event, even *Zauderer* did not remotely endorse Berkeley's argument below for a highly deferential, rational basis test for all compelled commercial speech mandates. Nor has any other Supreme Court opinion before or since. On the contrary, *Zauderer* imposed several *limits* on the government's ability to compel commercial speech. Those "fit requirements are far more stringent than mere rational basis review." *American Meat*, 760 F.3d at 33 (Kavanaugh, J., concurring). Even those courts that take a broader view of *Zauderer* are clear that it applies only "*to the extent that* the pre-conditions to application" are satisfied: at minimum, a substantial government interest in disclosure, and a mandate limited to the disclosure of purely factual, uncontroversial information. *Id.* at 26 (maj. op.) (emphasis added). And that is why federal courts, including this one, have routinely struck down compelled commercial speech mandates for failure to comply with *Zauderer*'s multiple, independent requirements.

In *Schwarzenegger*, this Court invalidated a mandate that video game manufacturers attach a notice label to their package, because the compelled speech mandate failed "under the factual information and de-

ception prevention standards set forth in *Zauderer*." 556 F.3d at 966. The label (which said "18") conveyed an opinion, not factual information. *Id.* It also failed *Zauderer* because the state could not show that its notice was necessary to prevent deception of consumers. *Id.* at 967.

Similarly, in *San Francisco*, this Court applied *Zauderer* to invalidate the compelled disclosure regarding cell phones' RF emissions because "there is a debate in the scientific community about the health effects of cell phones." 494 F. App'x at 753–54 (quotation marks and alteration omitted). So the mandate was not "both 'purely factual and uncontroversial.'" *Id.* (citation omitted).

In *National Association of Manufacturers v. SEC*, 800 F.3d 518, 526, 530 (D.C. Cir. 2015), the court struck down a compelled commercial disclosure mandate regarding so-called conflict minerals under *Zauderer* because the government failed to show that the mandate would alleviate the government's stated problem, and because the government's requirement that companies stigmatize their own products was not uncontroversial, as *Zauderer* requires.

Even when courts have upheld compelled commercial speech mandates, they have done so only after rigorously examining the regulation to ensure that it is justified by a substantial government interest, that it will actually advance that interest, and that it requires the disclosure only of purely factual, uncontroversial information. *See*, *e.g.*, *American Meat*, 760 F.3d at 25–27.

Berkeley's error, at bottom, is its contention that there is no constitutional right *at all* to be free from compelled commercial disclosures. That view finds no support in *Zauderer* or any other precedent of the Supreme Court. *Zauderer* held that there is no constitutional right to put out deceptive advertising. 471 U.S. at 651. CTIA's members, by contrast, have a well-recognized right simply to remain silent at the point of sale about RF emissions. If Berkeley wishes to strip them of that right, then it must carry its burden to demonstrate that its mandate is justified by some substantial government interest and satisfies the other requirements established by the Supreme Court.

### c. No Lesser Form Of Scrutiny Applies

The district court held—without any precedential support—that something even *less* than *Zauderer* review should apply here because Berkeley's mandated disclosure identifies the City as its author. ER 26. According to the district court, so long as the Ordinance attributes its message to the City, it "need not be cabined by ... *Zauderer*'s requirement that the compelled disclosure be 'purely factual and uncontroversial.'" *Id.*

To call this theory "radical" would be polite understatement. According to the district court, the government may compel a business to speak an *inaccurate* statement *of opinion*, on a provocative topic, so long as the government admits authorship. That is not the law. This Court

has already held that, under *Zauderer*, "*any* governmentally compelled disclosures to consumers must be purely factual and uncontroversial." *San Francisco*, 494 F. App'x at 753 (emphasis added; quotation marks omitted); *see also Schwarzenegger*, 556 F.3d at 966 ("The [Supreme] Court has upheld compelled commercial speech where the state required inclusion of purely factual and uncontroversial information in advertising." (quotation marks omitted)). And this Court invalidated *San Francisco*'s RF energy ordinance even though it "contain[ed] *San Francisco's* recommendations." 494 F. App'x at 753 (emphasis added). Other courts have also explicitly rejected the district court's reasoning. *See*, *e.g.*, *Evergreen Ass'n v. City of N.Y.*, 740 F.3d 233, 250 (2d Cir. 2014) ("[A] law that requires a speaker to advertise on behalf of the government offends the Constitution even if it is clear that the government is the speaker."); *id.* at 245 n.6 (disclosure was not "uncontroversial," *because* it required the speaker "to state the City's preferred message"); *Amestoy*, 92 F.3d at 70 (invalidating a compelled speech mandate attributed to "the law of Vermont" (quotation marks omitted)).

It is black-letter law that the government may not compel speakers to "use their private property as a ... 'billboard'" for the government's preferred message. *Wooley*, 430 U.S. at 715. There is no justification for denying that protection to private commercial property just because the government labels the message as its own.

31

### 3. The Ordinance Is Unconstitutional Under *Zauderer*

Even applying *Zauderer*, the Ordinance is still unconstitutional. The Supreme Court there approved compelled disclosures *provided that* they are "purely factual," "uncontroversial," "reasonably related to" the government's interest, and not "unduly burdensome." 471 U.S. at 651. The Ordinance cannot satisfy any of *Zauderer*'s requirements.

### a. The Ordinance Is Not Purely Factual

Read as a whole, as an average consumer would read it, the Ordinance is not purely factual—it is misleading and inaccurate. *See CTIA – The Wireless Ass'n v. City & Cty. of S.F.*, 827 F. Supp. 2d 1054, 1062 (N.D. Cal. 2011) ("Although each factoid in isolation may have an anchor in some article somewhere, … [t]he overall impression left is that cell phones are dangerous."), *aff'd*, 494 F. App'x 752; Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 905 (2015) ("[F]rom a constitutional perspective the meaning of the statement must be determined from the perspective of a reasonable member of the public."). The Supreme Court has recognized, in other contexts involving compelled disclosures, that a "literally accurate" statement can be "misleadingly incomplete." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327–28, 1331 (2015). In fact, *Zauderer* itself concerned speech that was deceptive "for … failure to include" key facts. 471 U.S. at 650.

The Ordinance requires an inflammatory warning about unfound-

32

ed safety risks that "could prove to be interpreted by consumers as expressing [Berkeley's] opinion that using cell phones [in certain ways] is dangerous." *San Francisco*, 494 F. App'x at 753. From its first clause—"[t]o assure safety"—to its last—"how to use your phone safely"—the Ordinance misleadingly conveys to average citizens the City's opinion that they should be concerned about the "radiation" emitting from their cell phones. BMC § 9.96.030; *see also* David Lazarus, *Berkeley's Warning About Cellphone Radiation May Go Too Far*, L.A. Times (June 26, 2015), http://goo.gl/kQQHwE (describing the Ordinance as requiring "that cellphone retailers warn customers that mobile devices may emit cancer-causing radiation").[2]

Just as the First Amendment allows the government to ban "potentially misleading" commercial speech, *Dwyer*, 762 F.3d at 280, it forbids the government from foisting potentially misleading messages on private speakers. Even if the Ordinance merely *potentially* misleads consumers, therefore, that is enough to doom it under *Zauderer*'s "*pure-*

---

[2] *See also*, *e.g.*, Anita Chabria, *City of Berkeley to Require Cellphone Sellers to Warn of Possible Radiation Risks*, The Guardian (May 16, 2015), http://goo.gl/irR550; Josh Harkinson, *Berkeley Votes to Warn Cellphone Buyers of Health Risks*, Mother Jones (May 13, 2015), http://goo.gl/9calwS; Anand Veeravagu, *Berkeley Says Cell Phones Cause Tumors*, The Daily Beast (May 13, 2015), http://goo.gl/qhe8UI; *Berkeley, California, to Require Cellphone Health Warnings*, CBSNews (May 13, 2015), http://goo.gl/uSi9qM.

ly factual" requirement. *See San Francisco*, 494 F. App'x at 753 (concluding that ordinance "*could* prove to be interpreted by consumers as expressing San Francisco's opinion that using cell phones is dangerous" (emphasis added)); *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 371 (D.C. Cir. 2014) (striking down compelled commercial speech requirement because "*it is far from clear* that the description at issue—whether a product is 'conflict free'—is factual and non-ideological" (emphasis added)), *adhered to on reh'g*, 800 F.3d at 530; *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012) (concluding that the required images were not purely factual and uncontroversial in part because "many of the images chosen by FDA *could* be misinterpreted by consumers" (emphasis added)), *overruled on other grounds by American Meat*, 760 F.3d 18. The First Amendment does not permit Berkeley to enact a mandate-to-mislead.

Berkeley argues that the Ordinance merely reinforces the FCC's own statements (or those that the FCC requires from cell phone manufacturers) about RF energy. *E.g.*, ER 15. The district court adopted that characterization of the Ordinance as the principal reason for upholding it. ER 14, 28, 31.

But that is not what the Ordinance does. Rather, the Ordinance clearly and deliberately suggests that the federal RF energy testing guideline (the SAR limit) is the demarcation point of "safety" for cell phones, such that "exposure" to RF energy above that limit creates a

safety hazard. In essence, the Ordinance communicates that carrying a phone "in a pants or shirt pocket or tucked into a bra" is unsafe. ER 46. But the FCC's view, which the language of the Ordinance intentionally obscures, is precisely the opposite: The FCC has "*no evidence* that [exceeding the SAR limit] poses any significant health risk." *Reassessment*, ¶ 251 (emphasis added). That is because RF energy is not like tobacco smoke or other dangerous substances; it poses no known health risk until it reaches a threshold, and the FCC set its testing guideline "with a large safety factor, to be well below [that] threshold." *Id.* "As a result, exposure well above the specified SAR limit should not create an unsafe condition." *Id*.; *see also id.* ("[E]xceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply "safer" operation."). And in any event, the FCC has stated that when a phone has been tested and approved for sale, even using it "against the body without a spacer will generally result in an actual SAR below the maximum SAR tested." *Id.*, ¶¶ 248, 251; *see also SAR for Cell Phones* ("FCC approval means that the device will never exceed the maximum levels of consumer RF exposure permitted by federal guidelines[.]").

The Ordinance is misleading for the additional reason that it uses the inflammatory term "radiation," which is fraught with negative associations, in order to stoke consumer anxiety. BMC § 9.96.030. The district court dismissed as "unlikely" the contention that consumers may have "a negative association with nuclear radiation (ionizing radia-

tion)." ER 32. But the FCC explicitly disagrees and has warned that the term radiation "is used, colloquially, to imply that ionizing radiation (radioactivity), such as that associated with nuclear power plants, is present." *RF Safety FAQ*.

Nor can the City contend that its scripted message simply repeats the same information that the FCC recommends be included in cell phone user manuals. Indeed, the City already admitted that the Ordinance does not do so. *See* ER 113 ("[T]he Ordinance does not repeat the statements in manufacturers' existing consumer disclosures."). The district court nevertheless concluded that "the upshot of [Berkeley's] notice" simply "tracks what the FCC requires." ER 28. That is demonstrably wrong. The FCC does not require manufacturers: to talk about "ensur[ing] safety" related to RF energy; to use the alarming term "radiation"; to refer to the FCC's testing metrics as "exposure" guidelines; or to warn consumers that carrying a phone in particular ways creates a safety risk.

Instead, the FCC recommends only basic information in order "to enable users to select body-worn accessories" that put space between their body and their phone. FCC, KDB 447498, *General RF Exposure Guidance* § 4.2.2(d) (2015); *see also* 47 CFR 2.1093(d)(3). The FCC recognizes (in a portion of its Consumer Guide that the district court ignored) that some consumers are "skeptical of the science," so it offers them "simple steps" that can reduce their exposure to RF energy. Un-

like Berkeley, "**[t]he FCC does not endorse the need for these practices**[.]" *Wireless Devices and Health Concerns* (emphasis in original). The FCC also leaves the particular phrasing up to individual manufacturers.

The balanced and non-alarming advice contained in user manuals is intended to *inform* skeptical consumers, not to *scare* them about RF "radiation." Berkeley cannot defend the Ordinance as supposedly "consistent with the FCC's directive," ER 31, when the City uses methods and terminology that the FCC deliberately avoids because they tend to alarm and confuse, omits context that the FCC and manufacturers consistently include, and warns of a safety risk that the FCC rejects and the science does not support.

To uphold Berkeley's Ordinance, the district court shrank the scope of what it means to be "purely factual" by denying that a government-mandated notice could be misleading by omission. The district court dismissively stated that "practically any speech on the matter could be deemed misleading unless there were a disclosure of everything on each side of the scientific debate—an impossible task." ER 30. That is a caricature of the City's *Zauderer* obligation. The Ordinance is carefully worded in order to raise the alarm for consumers about RF energy, whereas the FCC's statements to the public on that topic are meant to do exactly the opposite.

When the FCC's own Consumer Guide speaks directly to consum-

37

ers, the agency informs them that SAR testing includes "the *most severe, worst-case (and highest power) operating conditions*." *SAR for Cell Phones* (emphasis in original); *see also id.* (stating that "FCC approval means that the device will never exceed the maximum levels of consumer RF exposure permitted by federal guidelines"). It further advises them that "ALL cell phones must meet the FCC's RF exposure standard, which is set at a level well below that at which laboratory testing indicates, and medical and biological experts generally agree, adverse health effects could occur." *Id.* (emphasis in original). And the FCC insists that "[c]onsumers *should remember* that all wireless devices are certified to meet the FCC maximum SAR standards, which incorporate a considerable safety margin." *Wireless Devices and Health Concerns* (emphasis added). A mandated message on RF energy is not purely factual when it omits critical information that the federal regulator studiously includes.

### b. The Ordinance Is Not Uncontroversial

As this Court has already said, "there is a debate in the scientific community about the health effects of cell phones." *San Francisco*, 494 F. App'x at 753–54 (quotation marks and alteration omitted); *see also* ER 107 (Berkeley Councilmember stating that "[t]he issue before us tonight is not the science itself. The science itself will be debated and will resolve itself[.]"). The fact that the City would force retailers to present

38

its favored, fringe side of that debate is enough to prevent the City's compelled disclosure from being "uncontroversial," which is necessary under *Zauderer* for it to be constitutional. Moreover, the Ordinance is neither straightforward nor evenhanded; it is misleading, one-sided, and likely to confuse. *See, e.g.*, *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) (government may not require even factual disclosures where the required facts "all fall on one side" of a public debate).

Compelled commercial disclosures are also impermissibly controversial when they use "innuendo" to evoke emotion. *American Meat*, 760 F.3d at 27 ("the word 'slaughter'" could be controversial); *see also National Ass'n of Manufacturers*, 800 F.3d at 530 (required disclaimer that product was not "conflict-free" was controversial). That is just the case here, where Berkeley uses the inflammatory terms "radiation," "exposure," and "safety" in order to stoke anxiety.

While purporting to apply *Zauderer*, the district court watered down the meaning of "uncontroversial." First, the district court held that "the term 'uncontroversial' should generally be equated with the term 'accurate.'" ER 30 (citing *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012)). But that would make the "uncontroversial" requirement duplicative, effectively reading it out of existence. The D.C. Circuit has explained that "'uncontroversial,' as a legal test, must mean something different than 'purely factual.'" *National Ass'n of Manufacturers*, 800 F.3d at 528. Multiple circuits have

39

invalidated speech mandates as controversial because the targeted business disagreed with the compelled message. *See Evergreen*, 740 F.3d at 245 n.6 (government mandate was not "uncontroversial" where it required a company to "state the City's preferred message" and "mention controversial services" the company opposes); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652–53 (7th Cir. 2006) (mandate "to give significant space to a third party whose message potentially conflicts with the plaintiff's" was "neither purely factual nor uncontroversial"). *At the very least*, to be uncontroversial, a compelled notice must be "factually straightforward, evenhanded, and readily understood." *American Meat*, 760 F.3d at 34 (Kavanaugh, J., concurring).[3]

Second, to make the *Zauderer* test even more generous for the government, the district court denied that a health warning can be controversial *even if* "*there is a disagreement* about the science behind [it]," because "science is almost always debatable at some level." ER 45 (emphasis added). That view is unprecedented: even the Sixth Circuit in *Discount Tobacco*—which took a particularly government-friendly view of *Zauderer*—acknowledged that it could uphold the State's mandated disclosure only because the required content was "undisputed." 674

---

[3] Even if the district court were correct that "uncontroversial" means only "accurate," Berkeley Ordinance is *inaccurate* because its message is contrary to the FCC's determinations. *See supra* 32–38.

F.3d at 558. If "uncontroversial" means anything, it must mean that the government's message is not contrary to the overwhelming consensus of scientists and regulators. This Court already held in *San Francisco* that, *precisely because* "there is a debate in the scientific community about the health effects of cell phones," it was not possible to say that the city's message was purely factual and uncontroversial. 494 F. App'x at 753–54 (quotation marks and alteration omitted). CTIA's members similarly dispute Berkeley's message, and their view aligns with the FCC and the overwhelming weight of scientific authority.

### c. The Ordinance Does Not Advance A Legitimate Governmental Interest

Berkeley also "must demonstrate that the harms it recites are real" and that the Ordinance "will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771. Berkeley cannot meet that test, because its Ordinance was designed to appease residents who disbelieve the scientific consensus that cells phones are safe, not to protect public health. ER 107–08; *see also* ER 102, 105. And Berkeley has never demonstrated any "real" "harms" that could result without a point-of-sale warning about the FCC's testing procedures and limits, which are deliberately set low enough to make RF energy *irrelevant* to consumers.

This Court recently held that in commercial speech cases, what matters are "the legislative purposes that … *actually animated* a challenged law, as made explicit in the statute's text or evidenced by its his-

41

tory or design," not "[p]ost hoc rationalizations" in litigation. *Retail Digital*, 810 F.3d at 648 (emphasis added). The record here overwhelmingly shows that the purpose actually animating Berkeley was the opinion of some community members that cell phones cause tumors, sperm damage, and other problems. *See* ER 102, 105, 107. Indeed, even in the midst of litigation, Berkeley's responsive pleading refused to admit "that the only known adverse health effect of non-ionizing radiation is a 'thermal effect.'" ER 112. And Berkeley could not keep itself from arguing below that cell phones "can be harmful to humans," even as it loudly insisted that "[n]othing in this case turns on this issue." ER 115 n.2 (emphasis omitted). But as this Court has already held, that opinion is scientifically baseless and contrary to the FCC's conclusions based on hundreds of studies. *San Francisco*, 494 F. App'x at 753. It is not a legitimate purpose.

Berkeley, for its part, has repeatedly disavowed that the notice is based on any scientific evidence regarding cell phone safety. *See* ER 69–70, 107–08, 115. Instead, Berkeley attempted to justify the Ordinance by a vague asserted need to ensure that "consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation." BMC § 9.96.010(I). But courts have consistently held that "the public's 'right to know'" is "insufficient to justify compromising protected constitutional rights." *Amestoy*, 92 F.3d at 73 (quotation marks omitted); *see also*, *e.g.*, *Ameri-*

*can Meat*, 760 F.3d at 23 ("satisfying consumers' 'idle curiosity'" is not a legitimate government interest). "Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose." *Amestoy*, 92 F.3d at 74.

The district court ignored both of these governmental purposes—the one evidenced by the Ordinance's record of enactment and the one that Berkeley offered—and held instead that the Ordinance served a legitimate interest because it would "[p]romot[e] consumer awareness of the government's testing procedures and guidelines." ER 27.

In any event, the Ordinance is not reasonably related to promoting knowledge of the FCC's procedures: It contradicts the FCC's regulatory scheme and dramatically distorts both the FCC's own statements and manufacturers' existing disclosures. Without any evidence that exceeding the guidelines presents an actual safety concern—and the FCC possesses "no evidence" that excess exposure from an approved phone poses "any significant health risk," *Reassessment*, ¶ 251—Berkeley can offer nothing but "speculation or conjecture," *Edenfield*, 507 U.S. at 770.

For these reasons, the Ordinance is not like ordinary governmental disclosure obligations such as securities disclosures, required disclosures in prescription drug advertising, or tobacco and nutritional labeling. Every one of those mandates is justified by a substantial government interest, and requires only the disclosure of accurate, uncontroversial facts. This Ordinance, in sharp contrast, is justified by nothing

43

but unfounded superstition, and it requires CTIA's members to convey a particular, misleading opinion. *See Schwarzenegger*, 556 F.3d at 967.

### d. The Ordinance Is Unduly Burdensome

Finally, the Ordinance fails under *Zauderer* because it imposes an undue burden on CTIA's members. The district court doubted there could be any harm to CTIA's members from Berkeley's compelled notice because they are free "to engage in counter-speech." ER 25; ER 33. Yet it is *precisely* this "pressure to respond" that is "antithetical to the free discussion that the First Amendment seeks to foster." *Pacific Gas & Electric*, 475 U.S. at 15–16. Even in the commercial speech context, federal circuit courts have consistently held that "[r]equiring a private party to give significant space to a third party whose message potentially conflicts with the plaintiff's was the very Government action the Supreme Court found to be unconstitutional in *Pacific Gas & Electric*." *Blagojevich*, 469 F.3d at 653; *see also National Ass'n of Manufacturers*, 748 F.3d at 373 ("[T]he right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation."), *adhered to on reh'g*, 800 F.3d at 530. The Supreme Court has never suggested that government can force speakers who would rather stay silent on a topic to enter the debate. *See Wooley*, 430 U.S. at 714 (the First Amendment includes "the right to refrain from speaking at all."); *United Foods*, 533 U.S. at 410–11.

Berkeley's argument brings to mind the old adage about loaded questions: It is cold comfort that a person, when publicly asked when he stopped beating his spouse, is free to explain that he has never done so. So, too, cell phone retailers should not be forced to explain to their customers, in the wake of the City's baseless and misleading message, why exposing them to "radiation" does not create a "safety" issue. At that point, the damage has been done.

\* \* \*

The district court held that Berkeley's Ordinance escapes First Amendment scrutiny because it found no "authority involving the combination of (1) commercial speech, (2) compelled disclosure (as opposed to restriction or suppression), and (3) speech clearly and expressly attributed to the government to support its position." ER 40. But *San Francisco* combines all three. This Ordinance is just as unconstitutional as the one this Court previously struck down.

## B. Berkeley's Ordinance Is Preempted

The City's Ordinance is illegal for an additional reason: It is preempted by the FCC's federal system of cell phone regulation. Berkeley would impermissibly disrupt the FCC's goal of uniform federal regulation and rebalance the FCC's competing priorities.

Federal law preempts any state law that stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of

45

Congress." *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quotation marks omitted). And "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Where, as here, federal regulations strike a balance between competing national priorities, state prescriptions in the same area can impose an "obstacle" to achievement of the federal goals because federal law serves as a regulatory ceiling as well as a floor. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000). "A state-law standard that is more protective of one objective may result in a standard that is less protective of others." *Farina*, 625 F.3d at 123.

## 1. The Ordinance Conflicts With The FCC's Goals Of Encouraging Wireless Technology And Uniform National Regulation

For over a century, wireless communications have been subject to continuous, pervasive, and uniform regulation by the federal government. *See Farina*, 625 F.3d at 105–06. To promote "'a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges,'" Congress "established the FCC" and granted it "broad authority to license and regulate radio communications." *Id.* at 105 (quoting 47 U.S.C. § 151). And it expressly charged the FCC with regulating cell phones, including RF energy. *Id.* at 105–06; *see also* Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152.

46

Congress tasked the FCC with a balance: a "responsibility to both protect the public from *established* [*i.e.*, genuine] adverse effects due to exposure to RF energy and allow industry to provide telecommunications services to the public in the most efficient and practical manner possible." *Reassessment*, ¶ 6 (emphasis added). "[A]n essential characteristic of an efficient network is nationwide accessibility and compatibility." *Farina*, 625 F.3d at 105–06. Another critical objective of Congress was "uniformity in regulation." *Id.* at 124; *see also* H.R. Rep. No. 104-204, at 94 (1995) (because "decisions by non-federal units of government [had] created an inconsistent, and, at times, conflicting patchwork of requirements" regarding RF emissions, it was in "the national interest" to establish "uniform, consistent requirements"). "Were the FCC's standards to constitute only a regulatory floor upon which [municipalities] c[ould] build," each municipality "could rebalance the FCC's statutory objectives and inhibit the provision of quality nationwide service." *Farina*, 625 F.3d at 125.

In *Farina*, the Third Circuit refused to allow plaintiffs to sue cell phone manufacturers on the claim that the manufacturers should have made additional disclosures about RF emissions because the phones were unsafe. Berkeley's Ordinance is based on exactly the same type of contention: there must be additional disclosures at the point of sale, so that customers have enough information to "protect themselves." BMC § 9.96.010(G). The FCC absolutely disagrees and has stated that en-

47

couraging "adoption of extra precautionary measures," like those that Berkeley recommends, "may have the unintended consequence of 'opposition to progress and the refusal of innovation, ever greater bureaucracy, ... [and] increased anxiety in the population.'" *Reassessment*, ¶ 240 (citation omitted; alterations in original).

Berkeley believes that consumers must be warned that they may be at risk of "exceed[ing] the federal guidelines for exposure to RF radiation," and must be exhorted to carry their phones in a particular way in order to "use [the] phone[s] safely." BMC § 9.96.030. To that end, the Ordinance informs consumers that cell phones are *unsafe* if they do not maintain a particular separation distance. But that safety warning *contradicts* the FCC's views: "[T]he FCC has stated that any cell phone legally sold in the United States is a 'safe' phone." *Farina*, 625 F.3d at 105. Accordingly, "exceeding the SAR limit does *not* necessarily imply unsafe operation," and "exposure well about the specified SAR limit should *not* create an unsafe condition." *Reassessment*, ¶ 251 (emphasis added). Berkeley's unfounded notices would give consumers a mistaken and exaggerated impression of the risk to them from cell phones' RF energy, which in turn would frustrate the development of wireless technology that Congress wanted the FCC to encourage. *See*, *e.g.*, H.R. Rep. No. 103-111, at 260 (1993) (Congress's goal was "[t]o foster the growth and development of mobile services").

Approving the Ordinance would also eviscerate the FCC's goal of

*uniform* nationwide cell phone regulation. *See Farina*, 625 F.3d at 126. If Berkeley's effort to second-guess the FCC's decisions on RF emissions is upheld, then mandatory disclosure obligations from other state and local governments will soon follow, creating the very crazy-quilt of cell phone regulation that Congress tried to eliminate.

### 2. The Ordinance Does Not Merely Amplify The FCC's Pronouncements Or Recommendations On RF Energy

The district court held that Berkeley's Ordinance "is consistent with the FCC's statements and testing procedures" and with the FCC's "requirement that cell phone manufacturers disclose to consumers information and advice" about RF energy. ER 14. As shown above, that is wrong. The Ordinance strikes a dramatically different balance than the FCC: It describes a safety risk that the FCC has denied in order to provoke unfounded anxiety in consumers and change their behavior, both of which would undercut the FCC's goals.

Moreover, Berkeley insists on a scripted warning label, whereas the FCC made a deliberate decision *not* to require *any* warning label regarding RF energy for cell phones. *Compare* 47 C.F.R. § 2.1093(d)(1), *with id.* § 2.1093(d)(2). That is because the RF energy standard for "general population" settings (*i.e.*, for consumers) is set low enough to make awareness of RF exposure unnecessary. *Id.* § 2.1093(d)(2)(i) (general population guidelines apply where persons "may not be fully aware of the potential for exposure"). For RF energy-emitting devices that are

49

used in "occupational" or "controlled" settings, by contrast, the FCC has created an RF exposure limit five-times higher (in other words, allowing more exposure to RF energy), provided that the persons exposed are "fully aware" of their exposure. *Id.* § 2.1093(d)(1); *see also Reassessment*, ¶ 75 ("The fundamental purpose" of the FCC's rules in those settings "is to require that workers at the higher permitted levels of exposure have the appropriate level of awareness.").

In occupational settings, the FCC has given manufacturers a choice between ensuring "[a]wareness of exposure" to RF energy through "visual advisories" or other "appropriate means." 47 C.F.R. § 2.1093(d)(1)(i). Those visual advisories mirror Berkeley's Ordinance: They must "refer the user to specific information on RF exposure, such as that provided in a user manual" and "must provide the user with information on how to use the device in order to ensure compliance with the occupational/controlled exposure limits." *Id.* § 2.1093(d)(3)(ii). But the FCC does not dictate the content of warning labels like Berkeley's, even in occupational settings. *Id.* § 2.1093(d)(1)(ii) ("Visual advisories … *can be used* as part of an applicant's evidence of the device user's awareness." (emphasis added)). That approach reflects a careful balance between ensuring safety and "avoiding any unnecessary burden in complying with our RF exposure rules." *In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, 18 FCC Rcd. 13187, 13188 (2003). And it pre-

50

serves manufacturer "flexibility," which is "the most cost-effective way to reliably achieve awareness." *Reassessment*, ¶ 63.

Where, as here, "manufacturer choice was an important regulatory objective," any local law "restrict[ing] that choice" is preempted. *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1137 (2011). Berkeley undermines the FCC's goals by requiring warning labels for cell phones, a requirement the FCC has deliberately declined to impose even for devices with a much higher RF emissions limit. Accordingly, Berkeley's Ordinance is preempted.

The district court dismissed all of these concerns because there is no "FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone." ER 14. But that confuses the distinct doctrines of express preemption and conflict preemption. Conflict preemption cases like this one (and *Farina*) *never* involve a pronouncement that the agency disapproves of state regulation. Rather, the FCC's disagreement with Berkeley's approach is evident from its determinations about what to require and *not* to require. *See Farina*, 625 F.3d at 123. Berkeley impermissibly seeks to disrupt the FCC's balance, and pave the way for every other state, county, and municipality to impose its own view of what other notices are necessary.

## II. The Other Preliminary Injunction Factors Tip Sharply In Favor Of CTIA

### A. CTIA Will Suffer Irreparably Without An Injunction

"'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Sammartano*, 303 F.3d at 973 (quoting *Elrod*, 427 U.S. at 373). In particular, a statute like this one, that "indisputably requires [the plaintiffs] to speak when they would rather not," "contravenes core First Amendment values," and the burden of that mandate alone satisfies the irreparable injury "requirement for securing injunctive relief." *Amestoy*, 92 F.3d at 72 (quotation marks and alteration omitted).

In fact, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a *colorable* First Amendment claim." *Sammartano*, 303 F.3d at 973 (emphasis added; quotation marks omitted). At minimum, CTIA has raised a "colorable" claim that the Ordinance violates the First Amendment. Allowing the Ordinance to take effect would force CTIA's members to devote time with their customers and space in their stores in order to counter and correct Berkeley's misleading statements—a further irreparable burden under the First Amendment. *See Pacific Gas & Electric*, 475 U.S. at 16.

Similarly, CTIA's members face imminent enforcement of a likely preempted ordinance, and "th[at] constitutional violation alone ... can

suffice to show irreparable harm." *Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009).

The Ordinance would also irreparably harm CTIA's members' customer goodwill. By requiring CTIA's members to disparage their own products at the critical point of sale, the Ordinance will create unfounded fear over cell phone safety and could cause consumers to rethink their purchasing decisions. And even if customers later learn the truth that FCC-approved cell phones are safe, their trust in CTIA's members will be diminished when they learn that their retailer force-fed them Berkeley's anti-science views. These threats to "reputation and goodwill ... constitute[ ] irreparable harm." *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015) (mem.).

## B. The City Has No Legitimate Countervailing Interests

The City has never demonstrated any reason why it would be harmed by a preliminary injunction. Nor did the district court find any such basis: It denied a preliminary injunction simply because it disagreed with CTIA on the merits. ER 34–35. In fact, the City has effectively conceded that there is no harm in waiting to enforce the Ordinance, by voluntarily staying its enforcement for over ten months while the preliminary injunction and subsequent stay proceedings in this Court played out, as well as by seeking a month-long postponement of the district court's hearing on its motion to dissolve the injunction be-

cause the City's attorney did not wish "to fly in [to San Francisco] from the East Coast during the holiday season." ER 117.

More important, the public will not suffer any harm from an injunction. As the City admits, FCC-approved phones pose no threat to public safety: Every cell phone model that the FCC approves for sale must be tested for compliance with the agency's RF standard, which includes a 50-fold safety factor. *See Farina*, 625 F.3d at 105 ("any cell phone legally sold in the United States is a 'safe' phone"). And one of the chief proponents of the Ordinance effectively conceded the lack of urgency in getting the City's safety message out—indeed, he conceded the lack of any threat at all to public safety—when he acknowledged that he does not himself follow Berkeley's recommendation for how to "safely" carry a cell phone. *See* ER 69, 109 ("How I carry it is how people should not carry it. … I carry it in my back pocket.") (Testimony of Attorney Lawrence Lessig). Moreover, the FCC's regulations governing cell phones' emission of RF energy have been in place for nearly twenty years, and the City by its own admission has no evidence that they will not be sufficient while this litigation is pending.

If Berkeley thinks its residents need more information about RF energy, then Berkeley can point them to the FCC's *actual* public statements or put out its own message. There is nothing to be gained for consumers by forcing retailers to hand them an inflammatory and misleading notice at the point of sale.

## C. The Public Interest Favors An Injunction

The public interest will be harmed by the City's unscientific and misleading message. While concededly not offering *any benefits* in increased safety, the Ordinance could frighten consumers into changing the way they use their cell phones or reducing their use altogether—thereby decreasing the public's full use of wireless technology and the many benefits it brings, such as 911 alerts and other warnings regarding true safety issues.

Cell phone services are an "increasingly significant part of the lives of American consumers … [and] are used for a variety of both personal and business purposes, including back-up communications during emergencies and for accessibility." *In re Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 26 FCC Rcd. 5411, 5418 (2011). The Federal Emergency Management Agency has recognized cellphones as "life-saving tool[s]." Jane L. Levere, *FEMA Promotes Its Wireless Emergency Alert System*, N.Y. Times (May 28, 2013), http://goo.gl/ISzajI. Among other things, they provide immediate access to emergency dispatchers and information about public safety threats. *See*, *e.g.*, FCC, *Wireless Emergency Alerts (WEA)*, http://goo.gl/ca7kfA (last updated Nov. 13, 2015). Reduced use of cell phones would impair the effectiveness of these services. Moreover, enforcement of the Ordinance would harm the public by stoking unfound-

ed fear and generating needless stress and anxiety about a product that they use every day.

Enforcement would also dilute the efficacy of warnings about genuine dangers to public safety. *See* Lars Noah, *The Imperative to Warn: Disentangling the "Right to Know" from the "Need to Know" About Consumer Product Hazards*, 11 Yale J. on Reg. 293, 383 (1994) ("Whatever their degree of sophistication, consumers can attend only to a limited number of information signals in a given period of time."). As Congress and federal agencies have recognized, when consumers are deluged with warnings, they "tend more and more to disregard label warnings, thus inviting indifference to cautionary statements [regarding] substances presenting a real hazard of substantial injury or illness." H.R. Rep. No. 86-1861, at 6 (1960); *see also*, *e.g.*, *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg. 49,603, 49,605–06 (2008) (over-warning may "overshadow more important warnings"); *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 796 (8th Cir. 2001) (en banc) ("[W]arnings about dangers with less basis in science or fewer hazards could take attention away from those that present confirmed, higher risks."); *Doe v. Miles Labs., Inc.*, 927 F.2d 187, 194 (4th Cir. 1991) ("If … companies were required to warn of every suspected risk that could *possibly* attend the use of a [product], the consuming public would be so barraged with warnings that it would undermine the effectiveness of these warnings."). Warnings are particu-

56

larly harmful "when[, as here,] the primary purpose of such efforts is nothing more than fulfilling an amorphous 'right to know.'" Noah, *supra*, at 384.

Finally, just as the City can suffer no harm from the inability to enforce an unconstitutional law, the "public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional." *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. Unit B June 1981); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding that the public has an interest in "prevention of enforcement of ordinances which may be unconstitutional").

## Conclusion

This Court should reverse the district court's order dissolving a preliminary injunction and remand with instructions to enjoin all Defendants from enforcing or causing to be enforced BMC Chapter 9.96.

Dated: February 29, 2016               Respectfully submitted,

                                       s/ Theodore B. Olson

Joshua S. Lipshutz                     Theodore B. Olson
Joshua D. Dick                         Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP            Michael R. Huston
555 Mission Street                     Jacob T. Spencer
San Francisco, CA 94105-0921           GIBSON, DUNN & CRUTCHER LLP
Telephone: 415.393.8233                1050 Connecticut Avenue, N.W.
Facsimile: 415.374.8469                Washington, DC 20036-5306
                                       Telephone: 202.955.8500
                                       Facsimile: 202.467.0539

*Counsel for Plaintiff-Appellant CTIA – The Wireless Association®*

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing Brief for Appellant CTIA – The Wireless Association® is proportionately spaced in New Century Schoolbook font, has a typeface of 14 points, and contains 13,151 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the word count feature of Microsoft Word 2010 used to generate this brief.

s/ Theodore B. Olson

## Statement of Related Cases

Pursuant to Ninth Circuit Rule 28-2.6, CTIA – The Wireless Association® states that it is not aware of any related cases.

s/ Theodore B. Olson

**Certificate of Service**

I hereby certify that on February 29, 2016, I filed the foregoing Brief for Appellant CTIA – The Wireless Association® with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<u>s/ Theodore B. Olson</u>

# Statutory Addendum

# TABLE OF CONTENTS

Page

U.S. Const. art. VI, § 2 ...................................................................... Add. 1

U.S. Const. amend I. ........................................................................ Add. 1

28 U.S.C. § 1292 ................................................................................ Add. 2

28 U.S.C. § 1331 ................................................................................ Add. 2

47 U.S.C. § 151 .................................................................................. Add. 3

Telecommunications Act of 1996, Pub. L. No. 104-104,
    110 Stat. 56................................................................................. Add. 4

Berkeley Municipal Code Chapter 9.96 – Requiring Notice
    Concerning Radio Frequency Exposure of Cell Phones ......... Add. 5

47 C.F.R. § 2.915 ............................................................................... Add. 8

47 C.F.R. § 2.919 ............................................................................... Add. 8

47 C.F.R. § 2.1033 ............................................................................. Add. 8

47 C.F.R. § 2.1093 ............................................................................. Add. 9

**U.S. Const. art. VI, § 2**

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

**U.S. Const. amend I.**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**28 U.S.C. § 1292**

**§ 1292. Interlocutory decisions**

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

\* \* \*

**28 U.S.C. § 1331**

**§ 1331. Federal question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**47 U.S.C. § 151**

## § 151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

**Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56**

\*   \*   \*

**§ 704. Facilities siting; radio frequency emission standards**

\*   \*   \*

(b) RADIO FREQUENCY EMISSIONS.—Within 180 days after the enactment of this Act, the [Federal Communications] Commission shall complete action in ET Docket 93–62 to prescribe and make effective rules regarding the environmental effects of radio frequency emissions.

\*   \*   \*

## Berkeley Municipal Code Chapter 9.96 – Requiring Notice Concerning Radio Frequency Exposure of Cell Phones

### § 9.96.010. Findings and Purpose

A. Requirements for the testing of cell phones were established by the federal government in 1996.

B. These requirements established "Specific Absorption Rates" (SAR) for cell phones.

C. The protocols for testing the SAR for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time. Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10-15 millimeters.

D. To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.

E. Consumers are not generally aware of these safety recommendations.

F. Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.

G. Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.

H. While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself.

I. The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation. (Ord. 7404-NS § 1 (part), 2015)

### § 9.96.020. Definitions

For the purposes of this Chapter, the following terms shall have the following meanings, unless the context requires otherwise.

A. "Cell phone" means a portable wireless telephone device that is designed to send or receive transmissions through a cellular radiotelephone service, as defined in Section 22.99 of Title 47 of the Code of Federal Regulations. A cell phone does not include a wireless telephone device that is integrated into the electrical architecture of a motor vehicle.

B. "Cell phone retailer" means any person or entity that sells or leases, or offers to sell or lease, Cell phones to the public, where the sale or lease occurs within the City of Berkeley, including Formula cell phone retailers. "Cell phone retailer" shall not include: (1) anyone selling or leasing Cell phones over the telephone, by mail, or over the internet; or (2) anyone selling or leasing Cell phones directly to the public at a convention, trade show, or conference, or otherwise selling or leasing Cell phones directly to the public within the City of Berkeley on fewer than 10 days in a year.

C. "Formula cell phone retailer" means a Cell phone retailer that sells or leases cell phones to the public, or which offers Cell phones for sale or lease, through a retail sales establishment located in the City of Berkeley that, along with eleven or more other retail sales establishments located in the United States, maintains two or more of the following features: a standardized array of merchandise; a standardized facade; a standardized decor and color scheme; a uniform apparel; standardized signage; or, a trademark or service mark. (Ord. 7404-NS § 1 (part), 2015)

### § 9.96.030. Required notice

A. A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:

The City of Berkeley requires that you be provided the following notice:

To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked

into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

B. The notice required by this Section shall either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased. If provided to the customer, the notice shall include the City's logo, shall be printed on paper that is no less than 5 inches by 8 inches in size, and shall be printed in no smaller than a 18-point font. The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section. If prominently displayed at a point of sale, the notice shall include the City's logo, be printed on a poster no less than 8-1/2 by 11 inches in size, and shall be printed in no small than a 28-point font. The City shall make its logo available to be incorporated in such notices.

C. A Cell phone retailer that believes the notice language required by subdivision (A) of this Section is not factually applicable to a Cell phone model that retailer offers for sale or lease may request permission to not provide the notice required by this Section in connection with sales or leases of that model of Cell phone. Such permission shall not be unreasonably withheld. (Ord. 7443-NS § 1, 2015; Ord. 7404-NS § 1 (part), 2015)

## § 9.96.040. Violation – remedies

A. Each individual Cell phone that is sold or leased contrary to the provisions of this Chapter shall constitute a separate violation.

B. Remedies for violation of this Chapter shall be limited to citations under Chapter 1.28.

**47 C.F.R. § 2.915**

**§ 2.915. Grant of application.**

(a) A Commission recognized TCB will grant an application for certification if it finds from an examination of the application and supporting data, or other matter which it may officially notice, that:

(1) The equipment is capable of complying with pertinent technical standards of the rule part(s) under which it is to be operated; and,

(2) A grant of the application would serve the public interest, convenience and necessity.

\*    \*    \*

**47 C.F.R. § 2.919**

**§ 2.919 Denial of application.**

If the Commission is unable to make the findings specified in § 2.915(a), it will deny the application. Notification to the applicant will include a statement of the reasons for the denial.

**47 C.F.R. § 2.1033**

**§ 2.1033. Application for certification.**

\*    \*    \*

(b) Applications for equipment operating under Parts 11, 15 and 18 of the rules shall be accompanied by a technical report containing the following information:

\*    \*    \*

(3) A copy of the installation and operating instructions to be furnished the user. A draft copy of the instructions may be submitted if the actual document is not available. The actual document shall be furnished to the FCC when it becomes available.

\*    \*    \*

**47 C.F.R. § 2.1093**

**§ 2.1093. Radiofrequency radiation exposure evaluation: portable devices.**

\*     \*     \*

(d) The limits to be used for evaluation are based generally on criteria published by the American National Standards Institute (ANSI) for localized specific absorption rate ("SAR") in Section 4.2 of "IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," ANSI/IEEE C95.1–1992, Copyright 1992 by the Institute of Electrical and Electronics Engineers, Inc., New York, New York 10017. These criteria for SAR evaluation are similar to those recommended by the National Council on Radiation Protection and Measurements (NCRP) in "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," NCRP Report No. 86, Section 17.4.5. Copyright NCRP, 1986, Bethesda, Maryland 20814. SAR is a measure of the rate of energy absorption due to exposure to an RF transmitting source. SAR values have been related to threshold levels for potential biological hazards. The criteria to be used are specified in paragraphs (d)(1) and (d)(2) of this section and shall apply for portable devices transmitting in the frequency range from 100 kHz to 6 GHz. Portable devices that transmit at frequencies above 6 GHz are to be evaluated in terms of the MPE limits specified in § 1.1310 of this chapter. Measurements and calculations to demonstrate compliance with MPE field strength or power density limits for devices operating above 6 GHz should be made at a minimum distance of 5 cm from the radiating source.

(1) The SAR limits for occupational/controlled exposure are 0.4 W/kg, as averaged over the whole body, and a peak spatial-average SAR of 8 W/kg, averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the parts of the human body treated as extremities, such as hands, wrists, feet, ankles, and pinnae, where the peak spatial-average SAR limit for occupational/controlled exposure is 20 W/kg, averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube). Exposure may be averaged over a time period not to exceed 6 minutes to determine compliance with occupational/controlled SAR limits.

(i) Occupational/Controlled limits apply when persons are exposed as a consequence of their employment provided these persons are fully aware of and exercise control over their exposure. Awareness of exposure can be accomplished by use of visual advisories (such as labeling, embossing, or on an equivalent electronic display) or by specific training or education through appropriate means, such as an RF safety program in a work environment.

(ii) Visual advisories on portable devices designed only for occupational use can be used as part of an applicant's evidence of the device user's awareness of occupational/controlled exposure limits.

(A) Such visual advisories shall be legible and clearly visible to the user from the exterior of the device.

(B) Visual advisories must indicate that the device is for occupational use only, refer the user to specific information on RF exposure, such as that provided in a user manual and note that the advisory and its information is required for FCC RF exposure compliance.

(C) Such instructional material must provide the user with information on how to use the device in order to ensure compliance with the occupational/controlled exposure limits.

(D) A sample of the visual advisory, illustrating its location on the device, and any instructional material intended to accompany the device when marketed, shall be filed with the Commission along with the application for equipment authorization. Details of any special training requirements pertinent to limiting RF exposure should also be submitted.

(E) Holders of grants for portable devices to be used in occupational settings are encouraged, but not required, to coordinate with end-user organizations to ensure appropriate RF safety training.

(2) The SAR limits for general population/uncontrolled exposure are 0.08 W/kg, as averaged over the whole body, and a peak spatial-average SAR of 1.6 W/kg, averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the parts of the

human body treated as extremities, such as hands, wrists, feet, ankles, and pinnae, where the peak spatial-average SAR limit is 4 W/kg, averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube). Exposure may be averaged over a time period not to exceed 30 minutes to determine compliance with general population/uncontrolled SAR limits.

(i) General Population/Uncontrolled limits apply when the general public may be exposed, or when persons that are exposed as a consequence of their employment may not be fully aware of the potential for exposure or do not exercise control over their exposure.

(ii) Visual advisories (such as labeling, embossing, or on an equivalent electronic display) on consumer devices such as cellular telephones will not be sufficient reason to allow these devices to be evaluated subject to limits for occupational/controlled exposure in paragraph (d)(1) of this section.

(3) Compliance with SAR limits can be demonstrated by either laboratory measurement techniques or by computational modeling. The latter must be supported by adequate documentation showing that the test device and exposure conditions have been correctly modeled in accordance with the operating configurations for normal use. Guidance regarding SAR measurement techniques can be found in the Office of Engineering and Technology (OET) Laboratory Division Knowledge Database (KDB). The staff guidance provided in the KDB does not necessarily represent the only acceptable methods for measuring RF exposure or emissions, and is not binding on the Commission or any interested party.

(4) For purposes of analyzing portable transmitting devices under the occupational/controlled criteria, the time-averaging provisions of the MPE guidelines identified in § 1.1310 of this chapter can be used in conjunction with typical maximum duty factors to determine maximum likely exposure levels.

(5) Time-averaging provisions of the MPE guidelines identified in § 1.1310 of this chapter may not be used in determining typical exposure levels for portable devices intended for use by consumers, such as hand-held cellular telephones, that are considered to operate in general

population/uncontrolled environments as defined above. However, "source-based" time-averaging based on an inherent property or duty-cycle of a device is allowed. An example of this would be the determination of exposure from a device that uses digital technology such as a time-division multiple-access (TDMA) scheme for transmission of a signal. In general, maximum average power levels must be used to determine compliance.