No. 16-15141

# In the
# United States Court of Appeals for the Ninth Circuit

———————————

CTIA – THE WIRELESS ASSOCIATION,

*Plaintiff-Appellant,*

v.

CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL,
CITY MANAGER OF BERKELEY, CALIFORNIA, in her official
capacity,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
Northern District of California
Honorable Edward M. Chen ~ Case No. 3:15-cv-02529-EMC

———————————

## ANSWERING BRIEF OF APPELLEES CITY OF BERKELEY
## AND CHRISTINE DANIEL

———————————

ZACH COWAN
  City Attorney
SAVITH IYENGAR
  Deputy City Attorney
Berkeley City Attorney's Office
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6998
Facsimile: (510) 981-6960

LESTER LAWRENCE LESSIG III
1563 Massachusetts Avenue
Cambridge, MA 02138

AMANDA SHANOR
127 Wall Street
New Haven, CT 06511

Counsel for Appellees CITY OF BERKELEY and CHRISTINE DANIEL

# TABLE OF CONTENTS

**Page(s)**

Introduction ................................................................................1

Statement of the Case ...............................................................4

    A.    The FCC's Regulations And The Science Behind Them .............4

    B.    Berkeley's Ordinance Is Based On This Existing Scientific Consensus And The FCC's Existing Regulations.......................7

    C.    Skepticism About The Existing Scientific Consensus ...............9

Summary of Argument................................................................11

Standard of Review ...................................................................13

Argument ..................................................................................14

    I.  CTIA Will Not Succeed On The Merits ........................................14

        A. Berkeley's Ordinance Does Not Violate the First Amendment..........................................................................14

            1. *Zauderer* Sets The Standard For Regulations Requiring The Disclosure Of Commercial Speech...............14

            2. The First Amendment Standard As Applied To Berkeley's Ordinance ............................................................18

                (a)Berkeley's Ordinance Is Factual......................................18

                (b)Berkeley's Ordinance Is "Reasonably Related" To A Substantial Governmental Interest...................................23

                (c) CTIA Has Made No Showing That The Requirement Of A Leaflet Is "Unduly Burdensome" So As To "Chill[] Protected Commercial Speech" ........................................27

i

# Table of Contents (Con't.)

**Page(s)**

    3. The Supreme Court Does Not Require Disclosures Be "Uncontroversial," Though If It Did, Berkeley's Ordinance Would Plainly Satisfy That Standard As Well ...................... 30

    4. The District Court's Finding That the Ordinance Was Not "Misleading" Is Not "Clearly Erroneous" .............................. 32

    5. *Zauderer*'s Deferential Standard Reaches Beyond Cases Of "Deception" .................................................................... 34

    6. Berkeley's Ordinance Survives *Central Hudson* .................. 36

  B. This Court Should Decline CTIA's Invitation To Radically Remake The Scope Of The First Amendment ........................... 38

    1. *Reed* Did Not Repeal The Commercial Speech Doctrine ...... 40

    2. Cases Policing *Restrictions* On Commercial Speech — like *Sorrell* — Do Not Apply To Mandated Disclosures .............. 43

    3. CTIA's Approach Would Draw Courts Into Endless And Uncertain Review Of Safety Standards ................................ 47

  C. Berkeley's Ordinance Is Not Preempted ..................................... 52

II. None of the Remaining Preliminary Injunction Factors Even Lean In Favor of CTIA ............................................................................ 59

  A. CTIA Will Not Be "Irreparably Injured" By The Denial Of An Injunction .................................................................................. 59

  B. Berkeley Has A Substantial Interest In The Enforcement Of Its Ordinance .................................................................................. 64

  C. The Balance Of Harm Militates Against Granting An Injunction .................................................................................. 65

## Table of Contents (Con't.)

**Page(s)**

D. The Public Interest Is Not Advanced By Interfering With This Local Ordinance ......................................................................... 66

Conclusion ................................................................................. 68

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Meat Inst. v. USDA,*
  760 F.3d 18 (D.C. Cir. 2014) (en banc) ............................ 24, 28, 34, 38

*BBL, Inc. v. City of Angola*
  809 F.3d 317 (7th Cir. 2015) ............................................................ 39

*Bd. of Trs. of SUNY v. Fox*
  492 U.S. 469 (1989) ........................................................ 16, 34, 40, 59

*Cal–Almond, Inc. v. United States Dep't of Agric.*
  14 F.3d 429 (9th Cir. 1993) .............................................................. 62

*Cal. Outdoor Equity Partners v. City of Corona*
  No. CV 15-03172 MMM, 2015 WL 4163346 (C.D. Cal. July
  9, 2015) ............................................................................................. 42

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*
  563 F.3d 847 (9th Cir. 2009), *vacated on other grounds,*
  132 S. Ct. 1204 (2011) ..................................................................... 33

*Cent. Hudson Gas & Electric Corp. v. Public Service*
  *Commission of New York*
  447 U.S. 557 (1980) .................................................................. *passim*

*Centro Tepeyac v. Montgomery County*
  722 F.3d 184 (4th Cir. 2013) .............................................................. 5

*Chamber of Commerce of United States of Am. v. Nat'l Labor*
  *Relations Bd.*
  118 F. Supp. 3d 171 (D.D.C. 2015) ................................................... 19

*Contest Promotions v. City & Cty. of San Francisco*
  No. 15-cv-00093-SI, 2015 WL 4571564 (N.D. Cal. July 28,
  2015), *appeal filed* (9th Cir. 2015) .................................................. 42

# Table of Authorities (Con't.)

**Page(s)**

*Coyote Pub., Inc. v. Miller*
  598 F.3d 592 (9th Cir. 2010).........................................16, 43

*Crazy Ely Western Village v. City of Las Vegas*
  618 Fed. Appx. 904 (9th Cir. 2015)...............................35, 36

*CTIA – Wireless Ass'n v. City & County of San Francisco*
  494 Fed. Appx. 752 (9th Cir. 2012)..................................8, 35

*Disc. Tobacco City & Lottery, Inc. v. United States*
674 F.3d 509 (6th Cir. 2012) ....................................24, 31, 34

*Dwyer v. Cappell*
  762 F.3d 275 (3d Cir. 2014) ........................................28, 44

*Edenfield v. Fane*
  507 U.S. 761 (1993)....................................................24, 25

*In re Excel Innovations, Inc.*
  502 F.3d 1086 (9th Cir. 2007)......................................63-64

*Farina v. Nokia Inc.*
  625 F.3d 97 (3d Cir. 2010) ................................................54

*Friends of the Wild Swan v. Weber*
  767 F.3d 936 (9th Cir. 2014)..............................................14

*In re Guidelines for Evaluating the Envtl. Effects of
  Radiofrequency Radiation*
  11 FCC Rcd. 15123 (1996) ...........................................5, 20

*Holmes v. Johnson & Johnson*
  617 F. App'x 639 (9th Cir. 2015).......................................60

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*
  512 U.S. 136 (1994)....................................................28, 59

## Table of Authorities (Con't.)

**Page(s)**

*International Dairy Food Association v. Amestoy*
   92 F.3d. 67 (2d Cir. 1996) ............................................................ 60, 61

*Johanns v. Livestock Marketing Ass'n*
   544 U.S. 550 (2005)............................................................................ 62

*Kansas v. United States*
   16 F.3d 436 (D.C. Cir. 1994) ................................................ 24, 38, 65

*King v. Governor of N.J.*
   767 F.3d 216 (3d Cir. 2014) .............................................................. 24

*Milavetz, Gallop & Milavetz, P.A. v. United States*
   559 U.S. 229 (2010).................................................................... *passim*

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*
   556 F.3d 114 (2d Cir. 2009) ........................................................ 24, 60

*Nat'l Ass'n of Mfr.s v. Perez*
   103 F. Supp. 3d 7 (D.D.C. 2015) ............................................ 16-17, 19

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001) ...................................................... *passim*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
   422 F.3d 782 (9th Cir. 2005)............................................................. 64

*Ohralik v. Ohio State Bar Ass'n*
   436 U.S. 447 (1978)...................................................................... 16, 43

*Pacific Gas & Electric Co. v. Public Utilities Commission*
   475 U.S. 1 (1986)......................................................................... 29, 61

*Pharm. Care Mgmt. Assoc. v. Rowe*
   429 F.3d 294 (1st Cir. 2005) ................................................. 31, 50, 51

## Table of Authorities (Con't.)

**Page(s)**

*In re Reassessment of FCC Radiofrequency Exposure Limits*
*& Policies et al.*
*28 FCC Rcd. 3498 (2013)* ........................................................ 10, 52, 53

*Reed v. Town of Gilbert*
135 S. Ct. 2218 (2015) .......................................................... 40, 41, 42

*Retail Digital Network, LLC v. Appelsmith*
810 F.3d 638 (9th Cir. 2016) ...................................................... *passim*

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*
490 U.S. 477 (1989) ............................................................... 39

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*
547 U.S. 47 (2006) ............................................................. 17, 19

*Safelite Group v. Jepsen*
764 F.3d 258 (2d Cir. 2014) .................................................... 24-25

*Sarver v. Chartier*
813 F.3d 891 (9th Cir. 2016) ....................................................... 42

*Sorrell v. IMS Health Inc.*
131 S. Ct. 2653 (2011) .......................................................... *passim*

*United States v. Frame*
885 F.2d 1119 (3d Cir. 1989), *cert. denied*, 493 U.S. 1094
(1990) ........................................................................... 62

*United States v. Schiff*
379 F.3d 621 (9th Cir. 2004) ....................................................... 18

*United States v. United Foods, Inc.*
533 U.S. 405 (2001) ....................................................... 18, 45-46, 61

*Video Software Dealers Ass'n v. Schwarzenegger*
556 F.3d 950 (9th Cir. 2009) ....................................................... 18

# Table of Authorities (Con't.)

**Page(s)**

*Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*
425 U.S. 748 (1976) ........................................................ 15, 41

*Virginia State Bd. of Ed. v. Barnette*
319 U.S. 624 (1943) ........................................................ 16-17

*Wag More Dogs, LLC v. Cozart*
680 F.3d 359 (9th Cir. 2012) ........................................... 45, 64

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008) .................................................................. 13

*Wisconsin Educ. Ass'n Council v. Walker*
705 F.3d 640 (7th Cir. 2013) ................................................. 45

*Wooley v. Maynard*
430 U.S. 705 (1977) ........................................................ 17, 39

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*
471 U.S. 626 (1985) ..................................................... *passim*

# Table of Authorities (Con't.)

**Page(s)**

## Statutes

15 U.S.C. § 78l ...................................................................50

15 U.S.C. § 1604 ...............................................................50

21 U.S.C. § 343 .................................................................50

27 U.S.C. § 215 .................................................................50

Berkeley Municipal Code § 9.96.030............................ 8, 28, 53

## Regulations

14 C.F.R. § 135.117 ...........................................................50

21 C.F.R. § 201.57(a)(4) .....................................................23

21 C.F.R. § 202 .................................................................50

21 C.F.R. § 369.21 .............................................................23

21 C.F.R. § 1030.10(c)(4)(iii)(a) ...........................................23

21 C.F.R. § 1250.38(b) .......................................................23

47 C.F.R. § 2.803(b)(1)....................................................... 4

47 C.F.R. § 2.1093(d) .................................................... 20, 48

## Other Authorities

Am. Soc'y of Civil Eng'rs, Safety Code for Elevators and Escalators 68
(2004), http://bit.ly/ElevatorStandards ............................... 45

## Table of Authorities (Con't.)

**Page(s)**

FCC Office of Engineering and Technology Laboratory Division, *Mobile and Portable Devices RF Exposure Procedures and Equipment Authorization Policies*, 447498 D01 General RF Exposure Guidance v05r02 (2014), § 4.2.2 (Feb. 7, 2014) ......................................... 6, 8, 20

*In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*,
11 FCC Rcd. 15123 (1996) .............................................. 5, 20

*In re Reassessment of FCC Radiofrequency Exposure Limits & Policies et al., FCC Rcd. 3498 (2013)* ............................................................ 11

In the Matter of Reassessment of FCC Radiofrequency Exposure Limits and Policies, ET Docket No. 13-84, at 4–5 (September 3, 2013) http://bit.ly/FCC-CTIA-20130903 .................................................... 4, 11

*Industry Still Says Tobacco Doesn't Kill*, San Jose Mercury News, April 21, 1997 ...................................................................... 31

*iPhone 3G manual*,
http://manuals.info.apple.com/en_US/iPhone_3G_Important_Product _Information_Guide.pdf .................................................... 21

Gina Kolata, *No Benefit Seen in Sharp Limits on Salt in Diet*, N.Y. Times (May 14, 2013) ...................................................... 51

*LG Electronics 300G Cell Phone User Manual*,
http://cellphone.manualsonline.com/manuals/mfg/lg/lg300g.html?p=9 .................................................................................... 22

Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 879-81 (2015) ........................................................... 17

G. Zhang, *et al.*, *Effects of cell phone use on semen parameters: Results from the MARHCS cohort study in Chongqing, China*, 91 Environ Int. 116 (2016), http://bit.ly/cellphones-sperm ...................................... 9

## Introduction

The City of Berkeley requires *retailers* of cell phones to provide customers with the same information that the federal government, through the Federal Communications Commission (FCC), requires *manufacturers* of cell phones include in their cell phone manuals. This disclosure is factual. It is designed to give consumers the information they need to make a choice about how they will use their phones. Through survey research, Berkeley determined that its residents did not have that information—and that they wanted it. The City Council responded to this demonstrated need by passing a local ordinance.

Cell phone manufacturers have never challenged the FCC's mandated disclosure. Through their trade organization, CTIA, however, they now challenge Berkeley's. CTIA characterizes Berkeley's ordinance as a war on science. Evoking the struggles of Jehovah's Witnesses, it protests that its members have been "conscript[ed]" to utter "anti-science views." Appellant's Br. at 1 (Dkt. No. 30). It insists that Berkeley's requirement that retailers echo what the FCC requires of manufacturers somehow conflicts with the FCC's purpose. Appellant's Br. at 43. And it asks this Court to radically remake the scope of First

1

Amendment law on its way to striking Berkeley's ordinance. Appellant's Br. at 17-24.

The City of Berkeley has launched no war on science. Its ordinance rests exclusively upon the FCC's regulations, which themselves rest upon thirty-year old science. That science justifies the FCC in its expert decision to limit RF radiation, and to mandate disclosures to give consumers the information they need to use their phone without exceeding those radiofrequency (RF) limits. Berkeley's ordinance reaches no further than the FCC's own regulation.

In CTIA's view, however, there is no need for consumers to pay attention to federal RF limits, or to information about how to use a cell phone without exceeding the FCC's maximum. As CTIA sees it, RF radiation exposure is as natural as sunlight—and better, since no sunscreen is needed. It would rather keep consumers in the dark, and it asserts that the First Amendment entitles it to do so.

CTIA is entitled to its view. But under well-established First Amendment law, the ordinance is constitutional. In fact, obviously so. And until CTIA convinces the FCC that there is no reason for the federal government to regulate RF emissions, Berkeley is entitled to

rely on the FCC's judgments that (1) RF exposure should be limited and (2) consumers should be given the information that they might want to use their phones consistently with those limits. Based on that judgment, and the science that stands behind it, there is no First Amendment bar to Berkeley's ordinance. Nor is Berkeley's ordinance preempted by existing FCC regulations.

At issue here is more than a municipal ordinance. CTIA advances a radical view of the First Amendment that would not only render Berkeley's disclosure unconstitutional, but would subject a range of ordinary, and heretofore unquestionable, federal, state, and local regulatory programs to heightened scrutiny—thereby rendering them presumptively unconstitutional—including health and safety warnings (such as alcohol pregnancy warnings, drug interaction and side-effect disclosures, and California's Prop 65), the simple 'compelled speech' of filing tax returns, and even prohibitions on commercial and securities fraud, child pornography, perjury, and conspiracy. CTIA has recruited learned counsel for that project, which it undoubtedly hopes to advance at the Supreme Court. But under established law, CTIA has no constitutional interest in keeping consumers in the dark. CTIA's hope

for a new First Amendment is not the law today.

## Statement of the Case

### A.    The FCC's Regulations And The Science Behind Them

Twenty years ago, and based on almost a two decades long review by related health and safety agencies, the FCC established RF radiation limits for cell phones. *See* Comments of CTIA, In the Matter of Reassessment of FCC Radiofrequency Exposure Limits and Policies, ET Docket No. 13-84, at 4–5 (September 3, 2013), http://bit.ly/FCC-CTIA-20130903 (hereinafter "*CTIA 2013 Comments*") ("When the Commission adopted its 1996 regulations, it grounded them in the weight of scientific evidence as then expressed in the work of international standard-setting bodies and federal health and safety agencies."); *id.* at 4 (noting "inquiry into the potential biological impact of RF emissions from Commission-licensed devices began in 1979."). Those limits (referred to as "specific absorption rates" or "SAR") restrict manufacturers in their design and production of cell phones. No cell phone can be sold in America that exceeds FCC-specified SAR limits. 47 C.F.R. § 2.803(b)(1).

The SAR limits are safety standards. ER 28 ("The SAR limits were established by the FCC in the interests of safety in view of the potential

4

risks of RF radiation exposure."). As with any safety standard, they incorporate a significant "'safety' factor." ER 8. What a "'safety' factor" means—in this case, and in *every case* involving a safety standard—is that probable deviations from that standard are unlikely to pose any immediate safety risk. *See IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz,* IEEE Std C95.1-2005, at 114 ("The term 'safety factor' is commonly interpreted to be the ratio of an exposure level causing an adverse effect to the corresponding allowable exposure limit."). Yet that fact has not led anyone anywhere ever to challenge these mandated safety disclosures as unconstitutional under the First Amendment because their caution was unnecessary.[1]

---

[1] Nor has it lessened the FCC's diligence in policing the SAR standards. In 1996, for example, the FCC was asked to exempt certain "low-power devices" that met a proposed ANSI/IEEE radiated power exclusion. In comments to the FCC, the FDA objected to the exclusion. The FDA was concerned about recently published research demonstrating that those devices could well exceed the regulated SAR limits. *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15141-42 (¶ 49) (1996). Yet even the worst case cited by the FDA would still leave a 10-fold "safety factor" for RF emissions. Nonetheless, the FCC took the FDA's concern seriously, and "[b]ased on the concerns expressed by the FDA," rejected the low-power device exclusion. *Id.* at 15150 (¶ 71).

The FCC's regulations go beyond policing the design and production of devices. As well as setting limits on RF emissions, the FCC also requires manufacturers to give consumers information about how they can use their phones so as not to exceed those RF limits. At first, the FCC simply advised manufacturers to provide such information with their user manuals. OET Bulletin 65 Supplement C at 3 (June 2001) ("*This supplement is not intended, however, to establish mandatory procedures.*"). In a revision, the FCC has now made that advice mandatory. *See* FCC Office of Engineering and Technology Laboratory Division, *Mobile and Portable Devices RF Exposure Procedures and Equipment Authorization Policies*, 447498 D01 General RF Exposure Guidance v05r02 (2014), § 4.2.2(d) (Feb. 7, 2014) (hereinafter "*FCC RF Exposure Guidance*"); *see also id.* at § 1 ("The guidance in this document and the *published RF exposure KDB procedures* must be applied for equipment to qualify for [*Telecommunications Certification Body*] approval."). Today, the FCC requires that:

> Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum *test separation distance* requirements. Users must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-

worn accessories to maintain compliance. Instructions on
how to place and orient a device in body-worn accessories, in
accordance with the test results, should also be included in
the user instructions. All supported body-worn accessory
operating configurations must be clearly disclosed to users
through conspicuous instructions in the user guide and user
manual to ensure unsupported operations are avoided.

*FCC RF Exposure Guidance* § 4.2.2(4).

No cell phone can be sold in America that exceeds the FCC's RF

limits, or that fails to give consumers the information they need to be

able to use their cell phone without exceeding those limits.

### B. Berkeley's Ordinance Is Based On This Existing Scientific Consensus And The FCC's Existing Regulations

In early 2015, and based on survey research conducted by a

commercial survey firm, the City of Berkeley determined that its

residents (1) were not aware of the FCC's RF limits, (2) did not

understand that how they used their phones could affect whether they

exceeded the FCC's mandated RF limits, and (3) wanted information

about how to use their phones so as not to exceed those limits. ER 165.

Following that determination, Berkeley enacted its cell phone disclosure ordinance. As that ordinance now states:[2]

> The City of Berkeley requires that you be provided the following notice:
>
> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A) (2015).

Unlike the ordinance passed in San Francisco and invalidated by this Court, *CTIA – Wireless Ass'n v. City & County of San Francisco*, 494 Fed. Appx. 752, 753-54 (9th Cir. 2012), this ordinance does not advise anyone to restrict cell phone use. It does not state that cell phones are unsafe or otherwise limit their sale or the ways that customers can use their cell phones. It simply advises consumers about how their use of cell phones might affect their RF exposure, and if they

---

[2] As originally enacted, Berkeley's ordinance included a statement referencing the use of cell phones by children. The District Court found that statement to be preempted. The City Council subsequently amended the ordinance to remove that statement. ER 36.

so desire, directs them to their user manual, where the FCC requires they be provided further information about how "to ensure unsupported operations are avoided." *FCC RF Exposure Guidance* § 4.2.2(4).

## C. Skepticism About The Existing Scientific Consensus

Some are skeptical about the current scientific consensus on the risks created by RF exposure. Among these skeptics, some believe the current view is not protective enough. *See, e.g.*, G. Zhang, et al., *Effects of cell phone use on semen parameters: Results from the MARHCS cohort study in Chongqing, China*, 91 Environ Int. 116 (2016), http://bit.ly/cellphones-sperm (finding non-ionizing radiation affects semen health). Some, like CTIA, believe it is too protective. *See* CTIA 2013 Comments at 14 (existing RF "standards are, if anything, *overly* conservative"). Those who believe the consensus is not sufficiently protective have pressed international agencies to further restrict RF exposure. *See, e.g.*, International EMF Scientist Appeal to the United Nations, May 11, 2015, http://bit.ly/EMFScientistAppeal (more than 200 scientists internationally raising concerns about inadequate regulations of non-ionizing radiation). Those who believe the consensus is too protective have pressed the FCC to modify its regulations, and relax

restrictions on RF exposure. *See, e.g.*, CTIA 2013 Comments, at 34 ("Given the lack of scientific evidence … there is no basis for requiring disclosures or warnings on RF safety.").

*The City of Berkeley takes no side in this contest.* Its regulation rests exclusively upon existing FCC regulations. Whether those regulations are too protective or not protective enough, Berkeley has relied on the federal government's regulatory judgment. It was in precisely this sense that Councilmember Maxwell Anderson asserted "[t]he issue before us tonight is not the science itself." ER 107, *cited by* CTIA, Appellant's Br. at 38. And it was for this reason that the city attorney, in introducing this ordinance, adverted to the ongoing debate about whether, under the existing RF limits, cell phones are safe, but indicated expressly that Berkeley's ordinance "is not related to that debate." ER 99.

CTIA may disagree with the FCC's current limits for RF exposure or with the requirement that manufacturers provide consumers with information about how they can use their phones without exceeding those limits. But the City of Berkeley agrees with the District Court that if CTIA has a problem with the existing FCC exposure limits or

disclosure requirements, it ought to sue the FCC. ER 47 ("CTIA's beef should be with the FCC. If CTIA believes that the safety margin is too generous because there is no real safety concern at that level, it should take that matter up with the FCC administratively. It has not done so."). CTIA should not be permitted through this litigation to do a constitutional end-run around the FCC's jurisdiction.[3]

## Summary of Argument

The District Court properly refused to enjoin Berkeley's ordinance. All four of the relevant factors weigh against a preliminary injunction.

**I.**     CTIA will not prevail on the merits, because the ordinance does not violate the First Amendment and is not preempted by federal law.

---

[3] The FCC has begun reconsideration of what its RF exposure limits should be—and "whether [FCC] limits should be more restrictive, less restrictive, or remain the same." *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies et al., 28 FCC Rcd. 3498 (2013),* ¶ 207. CTIA seeks to short circuit that reconsideration by asking this Court to hold as a constitutional matter that it is irrational to require the disclosure of current RF exposure limits. If this Court holds that Berkeley is constitutionally precluded from mandating disclosure about current FCC limits, the FCC could not constitutionally require manufacturers to disclose those limits either. CTIA thus asks this Court to cripple in advance the FCC's administrative process.

**A**. The District Court rightly held that Berkeley's disclosure ordinance does not violate the First Amendment. Under settled Supreme Court and Ninth Circuit law, Berkeley has the power to mandate factual disclosures of commercial speech, so long as they are not so unduly burdensome as to chill Appellant's own commercial speech. Appellant has made no effort to demonstrate that its own speech has been chilled. Nor has it made any effective showing that an obligation that retailers provide a leaflet at the point of sale is burdensome.

**B**. The District Court rightly held that Berkeley's ordinance is not preempted. Though the FCC has clear authority to set regulatory standards for the *manufacturers* of cell phones, nothing in its exercised jurisdiction indicates that it intends to preempt state and local regulation of cell phone *retailers* — nor even that it could. To the contrary, complementary regulations like Berkeley's advance the FCC's regulatory purpose. They are not preempted.

**II**. None of the other factors for a preliminary injunction favor CTIA.

**A**. CTIA will suffer no irreparable harm from Berkeley's ordinance. The only consequence of compliance with Berkeley's ordinance is that residents will better understand the information CTIA's members are already required to include in their manuals. A better understanding of information already mandated by the FCC cannot constitute cognizable First Amendment harm.

**B**. Berkeley has a substantial interest that its ordinance go into effect.

**C**. There can be no public interest in continued ignorance either about FCC regulations or about ways to use a cell phone without exceeding RF limits.

## Standard of Review

As the Supreme Court has described, a party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). A district court has wide discretion to deny a preliminary injunction, and its judgment can be displaced by

a reviewing court only if that court concludes the lower court abused its discretion. Such abuse occurs "when the district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (citations omitted). In this case, the District Court's findings were plainly supported by the evidence, and its view of the law was clearly correct.

## Argument

The District Court rightly denied Appellant's motion for a preliminary injunction. Under well-settled Supreme Court and Ninth Circuit law, CTIA could suffer no cognizable First Amendment harm from Berkeley's ordinance. Neither is the ordinance preempted.

## I. CTIA Will Not Succeed On The Merits

### A. Berkeley's Ordinance Does Not Violate the First Amendment

#### 1. *Zauderer* Sets The Standard For Regulations Requiring The Disclosure Of Commercial Speech

The First Amendment treats *restrictions* on commercial speech differently from how it treats requirements to *disclose*. Restrictions are subject to a form of heightened review. *Cent. Hudson Gas & Electric*

14

*Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980) (applying intermediate scrutiny to commercial speech restriction); *see also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2264 (2011) (applying heightened scrutiny to Vermont law prohibiting dissemination of commercial information). Disclosures typically are not. So long as a regulated disclosure is "factual" and "reasonably related" to a legitimate government interest, a plaintiff's "rights are adequately protected"—unless that regulation is so "unjustified or unduly burdensome" so as to "chill[] protected [commercial] speech." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)); *see also Zauderer*, 471 U.S. 626, 647-51 (applying "reasonably related" standard to mandated disclosure but *Central Hudson* test to restrictions on advertising).

This standard makes sense of the purposes animating the First Amendment's protection of commercial speech generally—"the value *to consumers* of the information such speech provides." *Zauderer*, 471 U.S. at 651 (emphasis added); *see also Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976); *Cent.*

*Hudson*, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on [its] informational function"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *Bd. of Trs. of SUNY v. Fox*, 492 U.S. 469, 478 (1989); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 598 (9th Cir. 2010). The commercial speech doctrine is listener, not speaker focused. Indeed, as *Zauderer* put it, almost dismissively of Appellant's claims, a commercial speaker's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." 471 U.S. at 651. As the Second Circuit explained:

> Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas."

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-14 (2d Cir. 2001) (footnote omitted).

This *listener-based* informational interest is distinct from the *speaker-based* autonomy interest identified by the Court in *Virginia*

16

*State Bd. of Ed. v. Barnette,* 319 U.S. 624 (1943) and *Wooley v. Maynard*, 430 U.S. 705 (1977), on which CTIA heavily relies. *See generally* Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 879-81 (2015). Based on that interest, the Supreme Court has consistently protected an individual's right to speak or *not* to speak, as the Court is rightly skeptical whenever the state purports to require an individual to affirm any creed or particular set of views.

Yet for commercial speech, the Supreme Court has been clear that this speaker-based autonomy interest does not apply. As the Court remarked in a related context, "it trivializes the freedom protected in *Barnette* and *Wooley*" to liken the interests at stake in those cases to the interest of a commercial entity trying to avoid revealing factual information that might enable consumers to better use a product or to trade in the marketplace. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 48 (2006). While the First Amendment protects the right of an individual to affirm a creed or not, the First Amendment does not limit the power of the state to compel factual commercial speech — *unless* that requirement "unduly burdens[]" a commercial speaker "by chilling protected commercial speech."

17

*Zauderer*, 471 U.S. at 651.

## 2. The First Amendment Standard As Applied To Berkeley's Ordinance

Under this standard, Berkeley's point-of-sale ordinance is plainly constitutional. The ordinance is clearly "factual." It is "reasonably related" to the substantial state interest of informing Berkeley residents about FCC mandated information. CTIA has not demonstrated how a simple requirement to provide a flyer could possibly be deemed burdensome. Nor has it even tried to show that the ordinance "chills" its protected speech.

### (a) Berkeley's Ordinance Is Factual

*Zauderer* applies to the mandated disclosure of commercial speech that is factual in nature. *See, e.g., United States v. Schiff*, 379 F.3d 621, 631 (9th Cir. 2004) ("[M]andated disclosure of factual, commercial information does not offend the First Amendment."). It does not apply to the compelled publication of opinion. *See United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) (invalidating mandated subsidy funding compelled opinion about "whether a branded mushroom is better than just any mushroom"); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 953 (9th Cir. 2009).

Every sentence of Berkeley's required disclosure is factual, accurate, and objectively verifiable—as is the disclosure as a whole. No sentence could qualify as mere "opinion."

### [1] The City of Berkeley requires that you be provided the following notice:

This statement is factual and obviously true. The City of Berkeley is the source of this requirement. As Judge Chen noted, by identifying Berkeley as requiring the notice, the ordinance reduces any potential confusion about the source of the notice. *Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 63-65 (2006) (source of speech obligation will be understood to be the government); *Nat'l Ass'n of Mfr.s v. Perez*, 103 F. Supp. 3d 7, 16-17 (D.D.C. 2015) (government mandated statement of employee rights does not violate First Amendment); *Chamber of Commerce of United States of Am. v. Nat'l Labor Relations Bd.*, 118 F. Supp. 3d 171 (D.D.C. 2015) (same). By clearly identifying the government as the source of the required disclosure, the ordinance strengthens the opportunity for any contrary speech. Judge Chen was correct to identify this factor as a reason that First Amendment interests are even "less obvious." ER 24.

**[2]** *"To assure safety, the Federal*
*Government requires that cell phones*
*meet radio frequency (RF) exposure*
*guidelines."*

There is no dispute that the FCC has established RF exposure

limits. There is no dispute that all cell phones marketed, distributed, or

sold in the United States must comply with these limits. There is no

dispute that the federal government sets these limits in the interests of

public health and safety. 47 C.F.R. § 2.1093(d) ("SAR values have been

related to threshold levels for potential biological hazards."). When it

adopted the current RF limits, the FCC explicitly did so "[t]o protect

public health with respect to RF radiation from FCC-regulated trans-

itters." *In Re Guidelines for Evaluating the Environmental Effects of*

*Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15184 (¶ 169) (1996); *id.*

at 15124 (¶ 2) ("[W]e believe that these guidelines represent a consensus

view of the federal agencies responsible for matters relating to the

public safety and health."). These facts are acknowledged by Appellant

itself. ER 140 ("The FCC has established comprehensive, nationwide

standards to protect against any adverse health effects from cell phones'

emission of RF energy." (citing Compl. ¶¶ 32-43, ER 57-58)). They are

"factual," and there is no controversy about whether they are true.

20

> **[3]** *"If you carry or use your phone in a*
> *pants or shirt pocket or tucked into a*
> *bra when the phone is ON and*
> *connected to a wireless network, you*
> *may exceed the federal guidelines for*
> *exposure to RF radiation."*

There is no dispute that the level of RF exposure depends in part on how a cell phone is used. There is no dispute that holding a cell phone against one's body risks RF exposure beyond the FCC's limits. Appellant acknowledges as much in its complaint: "'exposure in excess of [FCC] limits might result,' if a cell phone 'transmitting continuously and at maximum power' is carried against the body." Compl. ¶ 111, ER 73 (quoting *Reassessment*, ¶ 248). Cell phone manufacturers expressly indicate that device-to-body exposure can exceed federal SAR limits. For example, as one Apple iPhone manual states:

> iPhone's SAR measurement may exceed the FCC exposure guidelines for body-worn operation if positioned less than 15 mm (5/8 inch) from the body (e.g. when carrying iPhone in your pocket).[4]

The manual provided by the LG Shine states:

---

[4] *See* iPhone 3G manual, at 7,
http://manuals.info.apple.com/en_US/iPhone_3G_Important_Product_In
formation_Guide.pdf.

To comply with FCC RF exposure requirements, a minimum separation distance of 0.6 inches (1.5 cm) must be maintained between the user's body and the back of the phone.[5]

Appellant insists, however, that cell phones remain safe even if RF exposure exceeds SAR limits. That may well be true. But nothing in the ordinance contradicts that proposition. The ordinance states only what is uncontested: that device-on-body exposure "may exceed the federal guidelines for exposure to RF radiation."

### [4] *"Refer to the instructions in your phone or user manual for information about how to use your phone safely."*

It is a fact the FCC mandates that cell phone "[u]sers must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain [RF exposure] compliance." *FCC RF Exposure Guidance* § 4.2.2(d). The ordinance directs consumers to these same federally required instructions, written by CTIA's members themselves. The final sentence of the ordinance is thus not an opinion—there are instructions in the user manual. The

---

[5] See *LG Electronics 300G Cell Phone User Manual*, at 9, http://cellphone.manualsonline.com/manuals/mfg/lg/lg300g.html?p=9.

sentence is a simple hortatory statement, directing consumers to accurate relevant information. Its character is analogous to countless disclosures required by the federal government, *see*, *e.g.*, 21 C.F.R. § 1250.38(b) (mandating signs "directing food-handling employees to wash their hands after each use of toilet facilities"); 21 C.F.R. § 1030.10(c)(4)(iii)(a) ("Do not attempt to operate this [microwave] oven with the door open since open-door operation can result in harmful exposure to microwave energy."), and disclosures directing individuals to additional resources and information, *see*, *e.g.*, 21 C.F.R. § 369.21 ("Keep out of reach of children. In case of overdose, get medical help or contact a Poison Control Center right away."); 21 C.F.R. § 201.57(a)(4) ("See full prescribing information for complete boxed warning.").

### (b) Berkeley's Ordinance Is "Reasonably Related" To A Substantial Governmental Interest

Berkeley's objective in enacting its ordinance was to inform its residents about existing federal RF exposure limits, and to give them the same information that the FCC requires manufacturers to provide consumers about how to use their cell phones without exceeding those limits.

Informing residents about existing federal law is plainly a substantial interest for any state or local government.[6] Requiring retailers to give consumers a leaflet that contains that information is plainly "reasonably related" to that substantial interest.

Berkeley's ordinance thus satisfies the standard applied to regulations that require the disclosure of commercial speech found in *Zauderer*, which the Courts of Appeal have characterized as a form of rational basis review. *See, e.g., Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009); *King v. Governor of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014); *Safelite Group v.*

_____

[6] *Zauderer* does not expressly require the state to have a "substantial" purpose before compelling commercial speech, a requirement that is articulated in *Central Hudson*, 447 U.S. at 565, and applicable to restrictions on commercial speech. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Some courts have, nonetheless, questioned whether they might require such a showing. *See Am. Meat Inst.*, 760 F.3d 18, 23 (D.C. Cir. 2014) (en banc) ("Because the interest motivating [the challenged regulation] is a substantial one, we need not decide whether a lesser interest could suffice under *Zauderer*."). Because Berkeley's interest is substantial, this court need not decide the question. And in any event, "the pedestrian nature of those interests affirmed as substantial [under *Central Hudson*] calls into question whether *any* governmental interest—except those already found trivial by the Court—could fail to be substantial." *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994).

*Jepsen*, 764 F.3d 258, 259 (2d Cir. 2014); *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 189 (4th Cir. 2013). Under black letter law, the burden is on the plaintiff in rational basis cases to demonstrate that the government has no rational basis. The Supreme Court's approach in both *Zauderer* and *Milavetz* confirms that principle applies here because in neither case did the Court require the government to proffer any evidence about its interest. *See Milavetz*, 559 U.S. at 251 (rejecting argument that the government had "adduced no evidence" as foreclosed by *Zauderer*); *Zauderer*, 471 U.S. at 652–53.

But Berkeley's ordinance would also satisfy the stricter version of rational review insisted upon by Appellant — namely, that the actual motive of the ordinance was as it is represented in litigation.[7] Appellant has worked hard throughout this litigation to mischaracterize the purpose of Berkeley's City Council in developing and enacting this

---

[7] CTIA attempts to place a heavier burden on the government than is proper by conflating the evidentiary burdens under *Zauderer* (rational basis type review for disclosures) and *Central Hudson/Sorrell* (intermediate/heightened review for speech restrictions). *See* Appellant's Br. at 41-44 (quoting evidentiary standard from two speech restriction cases, *Edenfield*, 507 U.S. at 771 and *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 648 (9th Cir. 2016), in section regarding *Zauderer* review). It points to no authority to support that proposition, and *Zauderer* and *Milavetz* foreclose it.

ordinance. CTIA tries to link Berkeley to growing skepticism about the adequacy of the existing FCC regulations. In the court below, as a way to link Berkeley to this growing debate, it repeatedly cited the testimony of a city attorney referencing that debate while introducing the ordinance. As CTIA stated in its complaint, the testimony "referred to a letter from 195 scientists to the United Nations recommending further study of the safety of cell phones." Comp. ¶90, ER 68. Yet each time they repeated this claim, CTIA failed to include the next sentence within that testimony: "how ever-significant that debate is, the ordinance that is before you tonight is not related to that debate." ER 99.

Likewise, CTIA has cited repeatedly City Councilmember Anderson's comments insisting that in considering the ordinance, "the issue … is not the science itself." ER 107. From those statements, CTIA argues Berkeley's concern is either baseless, or aims to ratify a fear unsupported in science. But in every case, what the members of the City Council were saying was that its ordinance was not meant to take sides in a growing fight about whether more recent science justifies the FCC in strengthening its twenty-year-old regulations. Instead, what

Councilmember Anderson meant was that Berkeley's ordinance rests upon existing FCC limits, which themselves rest on decades-old science.[8]

The actual motive of Berkeley's carefully crafted ordinance is to inform its citizens about existing federal requirements. That actual motive plainly establishes a substantial interest to which the ordinance is "reasonably related."

> **(c)  CTIA Has Made No Showing That The Requirement Of A Leaflet Is "Unduly Burdensome" So As To "Chill[] Protected Commercial Speech"**

The Supreme Court emphasized that a commercial entity's "constitutionally protected interest in *not*" providing a factual disclosure is "minimal." *Zauderer*, 471 U.S. at 651. But it "recognize[d] that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech." *Id.*

CTIA has made no effort to meet this standard. Indeed, it does not

---

[8] CTIA points to the opinions of citizens testifying in support of the ordinance, as well as to newspaper articles that link the ordinance to the fear that cell phones cause cancer. But Berkeley's right to legislate cannot be determined based on comments made by citizens at a public hearing or stray articles, which CTIA may have solicited.

even use the word "chill" once in its brief, let alone purport to demonstrate that the "detail required in the disclaimer . . . effectively rules out" a particular attempt at speech —the only burden the Supreme Court has ever found to be undue. *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994); *see also Dwyer v. Cappell*, 762 F.3d 275, 282 (3d Cir. 2014). Neither, as the District Court noted, did CTIA argue it had been "chilled" below. *See* ER 33 ("CTIA has not made any argument that the City ordinance would chill its or its members' speech."). The disclosure is simply not "so burdensome that it essentially operates as a restriction on constitutionally protected speech," the sort of burden cognizable under *Zauderer*. *Am. Meat Inst.*, 760 F.3d at 27.

Had it tried to advance the claim that its speech were chilled, CTIA would not have prevailed.

The ordinance requires retailers to either provide customers who buy or lease a cell phone with a 5 x 8 inch sheet of paper containing the notice OR post a single 8.5 x 11 inch notice at the point of sale. Berkeley Municipal Code § 9.96.030(B). That minimal disclosure requirement does not restrict CTIA's speech or "effectively rule[ it] out." Nor does

28

Berkeley require that the provided leaflet state the words of the disclosure exclusively. *Id.* That means retailers are permitted to add whatever other information they would like. If retailers believe it important that customers know that exceeding the FCC's RF exposure limits is unlikely to create any risk, they can state as much.

As any consumer recognizes, retailers regularly provide flyers or other notices at the point of sale. Such information is read—if at all— when the sale is made. That is precisely the moment when the state's interest in consumer reflection is at its highest—for that is the moment at which consumers are likely to consider how to use their cell phones, in light of the FCC's RF standards. Nothing in the ordinance chills CTIA's protected speech or approaches the unduly burdensome standard.[9]

---

[9] Despite CTIA's argument to the contrary, the issue raised here is fundamentally different from that in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1 (1986). As *Pacific Gas* itself explains, the challenged order in that case was "readily distinguishable from orders requiring appellant to carry various legal notices" because "[t]he State, of course, has substantial leeway in determining appropriate information disclosure requirements for business corporations." *Id.* at 15 n.12 (citing *Zauderer*, 471 U.S. at 651).

3. **The Supreme Court Does Not Require Disclosures Be "Uncontroversial," Though If It Did, Berkeley's Ordinance Would Plainly Satisfy That Standard As Well**

When the Court announced its standard for reviewing required disclosures of commercial speech in 1985, it used the term "uncontroversial" only once to characterize the disclosure at issue in that case as "factual and uncontroversial." *Zauderer*, 471 U.S. at 651. Elsewhere in the opinion, the Court used the term "factual" only. *Id.* (describing "appellant's constitutionally protected interest in *not* providing any particular factual information"). When the Supreme Court reaffirmed the *Zauderer* standard twenty-five years later in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250-53 (2010), it did not repeat the term "uncontroversial." Instead, the Court said only that the disclosure must be "factual" and "accurate." *E.g. id.* at 250 (discussing again the "constitutionally protected interest in *not* providing . . . factual information"); *id.* ("[T]he disclosures entail only an accurate statement.")

The Sixth Circuit has understood this difference as significant. In its view, the only requirement for required disclosures is that they be "factual." As the Court wrote:

30

> Plaintiffs' argument that *Zauderer* applies to only "purely factual and noncontroversial" disclosures is unpersuasive. This language appears in *Zauderer* once and the context does not suggest that the Court is describing the characteristics that a disclosure must possess for a court to apply *Zauderer*'s rational-basis rule. That language instead merely describes the disclosure the Court faced in that specific instance.

*Disc. Tobacco*, 674 F.3d at 559 n.8 (citation omitted).

This interpretation of *Zauderer*'s requirement—that a disclosure be "factual," not that it be "factual and uncontroversial"—makes perfect sense. There will always be plaintiffs eager to dispute a regulation they would rather not meet, and interests eager to deny or obscure what scientists have established. For example, that cigarettes cause cancer is a fact, whether or not tobacco companies contest it (as they did, publicly, as late as 1997 (*Industry Still Says Tobacco Doesn't Kill*, San Jose Mercury News, April 21, 1997, at 8A)). And rather than requiring courts to determine a standard of controversy to separate "controversial" from "uncontroversial" factual claims, the Court in *Milavetz*, like *Zauderer* before it, only required those claims to be factual and accurate.

Under this standard, the only question for this Court is whether the required disclosure is factual—which it plainly is.

Nonetheless, even if this Court were to construe "uncontroversial" as necessary to the Supreme Court's test, Berkeley's ordinance plainly suffices. The ordinance rests on the FCC's regulations that themselves stand upon decades-old science. It strains credulity to suggest that Berkeley's disclosure is "controversial" in any constitutionally relevant sense—at least where CTIA has failed to challenge the FCC's underlying disclosure.

On CTIA's account, because it does not like Berkeley's ordinance, it must be controversial. But *Zauderer* does not cease to apply because a commercial entity objects to its own regulation. Certainly the opposition of a regulated party cannot constitutionally suffice to require heightened scrutiny—the regulation in *Zauderer* itself was "controversial" in that sense. And commercial speech does not receive greater constitutional protection if it "links a product to a current public debate" because "many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety." *Cent. Hudson*, 447 U.S. at 563 n.5.

### 4. The District Court's Finding That the Ordinance Was Not "Misleading" Is Not "Clearly Erroneous"

In the Court below, CTIA argued that the disclosures required by

32

Berkeley's ordinance were "misleading." ER 151. Specifically, that the use of the word "safety" and "radiation" would "scare" consumers, by creating the impression that cell phones were unsafe. ER 151-52, 161.

CTIA provided no evidence for that claim. The District Court considered those arguments twice. It rejected them twice. The District Court found that "[n]o one seriously contends that consumers are likely to believe cell phones emit nuclear radiation or something akin to that." ER 32. As that conclusion by the District Court is a reading about how the words of the ordinance would likely be understood by the residents of Berkeley, it is a finding that this Court can reverse only if clearly erroneous. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849 (9th Cir. 2009), *vacated on other grounds*, 132 S. Ct. 1204 (2011).

CTIA has made no showing that could bear that burden on review. Beyond its repeated (and misleading) assertion that Berkeley's ordinance says that cell phones are unsafe (which it does not), CTIA has no evidence for its speculation that the language of the ordinance will slander cell phones. Berkeley has gone beyond the burden that the Supreme Court has imposed for a sovereign to justify its required disclosure regulation, by offering this Court a survey to demonstrate the

33

informational need that the disclosure served. ER 163; *Zauderer*, 471 U.S. at 652-53 (stating that the state need not conduct a survey). CTIA's qualms with the disclosure do not render it any less factual and accurate.

### 5. *Zauderer*'s Deferential Standard Reaches Beyond Cases Of "Deception"

CTIA argues that *Zauderer* should only apply to cases of misleading advertising or deception.[10] Appellant's Br. at 25-28. But every Circuit that has considered this argument has rejected it, because, as the D.C. Circuit held *en banc*, "[t]he language with which *Zauderer* justified its approach . . . sweeps far more broadly than the interest in remedying deception." *Am. Meat Inst.*, 760 F.3d at 22; *see also Nat'l Elec. Mfrs. Ass'n*, 272 F.3d 104, 115 (2d Cir. 2001) (applying *Zauderer* beyond consumer deception); *Pharm. Care Mgmt. Assoc. v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (noting that "we have found no cases limiting *Zauderer* [to potentially deceptive advertising directed at consumers]"); *Disc. Tobacco*, 674 F.3d 509, 556-57 (6th Cir. 2012) (same).

---

[10] In the court below, CTIA insisted as well that *Zauderer* only reached "voluntary advertising." ER 41-44. Appellant has apparently withdrawn that narrowing of *Zauderer* for purposes of appeal.

This Circuit has also applied *Zauderer* beyond cases of deception. In *Crazy Ely Western Village v. City of Las Vegas*, 618 Fed. Appx. 904 (9th Cir. 2015), this Court upheld a notice requirement that "requires that the stores post signs informing customers that it is prohibited to open or consume alcohol purchased at the store on the pedestrian mall." *Id.* at 905. There was no suggestion in that case that the notice had anything to do with deception. Nonetheless, this Court upheld the compelled speech, applying the standard articulated in *Zauderer*. *Id*. at 906. So too did Appellant's favorite case, *CTIA – Wireless Ass'n v. City & County of San Francisco*, 494 Fed. Appx. 752 (9th Cir. 2012), apply *Zauderer* to interests beyond deception.

The reason for the Circuits' uniform rejection of CTIA's cramped reading of *Zauderer* is because "[p]rotection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114. There can be no First Amendment interest in silencing govern-mental disclosures that add factual information to the marketplace, because the First Amendment interest guiding commercial speech

doctrine is in its informational value to the public. That's true for regulations designed to avoid deception. It's also true for regulations designed to add other factual information to the commercial marketplace. No doubt there is a limit. But that limit is the one announced in *Zauderer*: that the disclosure requirement not be "unduly burdensome" so as to "chill[] protected commercial speech." 471 U.S. at 651.

CTIA has provided no reason for this Court to deviate from that limit or the uniform position of the Courts of Appeal.

### 6. Berkeley's Ordinance Survives *Central Hudson*

The proper standard of review for mandatory disclosures of factual commercial speech is the one articulated in *Zauderer*. CTIA has pointed to no authority otherwise—because none exists. But even were *Central Hudson*'s test for bans on commercial speech to apply, which it does not, and even if the *Central Hudson* test was made more stringent by *Sorrell* in a way applicable here, CTIA's claim would fare no better.

*Central Hudson* articulated the following four-part analysis:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both

36

> inquiries yield positive answers, we must determine whether
> the regulation directly advances the governmental interest
> asserted, and whether it is not more extensive than is
> necessary to serve that interest.

447 U.S. at 566; *Retail Dig.*, 810 F.3d at 648 (following *Sorrell*,

"[h]eightened judicial scrutiny may be applied using the familiar

framework of the four-factor *Central Hudson* test."). CTIA's claim fails

that test.

The Berkeley ordinance mandates a disclosure that concerns a

lawful activity—the use of a cell phone. The ordinance mandates

disclosures that are accurate and factual, not misleading. CTIA's

contention that revealing the existence of the federal regulation of RF

energy and federally mandated disclosures will somehow mislead

consumers about the safety of cell phones is properly directed to the

FCC, not the City of Berkeley.

Berkeley's interest in ensuring that its citizens know of federal

health and safety regulations and possess the information necessary to

adhere to those federal standards if they so choose is plainly

substantial. "Indeed, the pedestrian nature of those interests affirmed

as substantial [under, *inter alia*, *Central Hudson*] calls into question

whether any governmental interest—except those already found trivial

37

by the Court—could fail to be substantial." *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994); *see also, e.g.*, *Fox*, 492 U.S. at 475.

Finally, mandated commercial disclosures by definition satisfy the final two prongs of *Central Hudson*. Under *Central Hudson*, courts have "commonly required evidence of a measure's effectiveness" but "such evidentiary parsing is hardly necessary when the government uses a disclosure mandate" due to the "self-evident tendency of a disclosure mandate to assure that recipients get the mandated information." *Am. Meat Inst.*, 760 F.3d at 26.[11]

## B. This Court Should Decline CTIA's Invitation To Radically Remake The Scope Of The First Amendment

This case is easily resolved on the basis of existing First Amendment law. That fact is apparently even clear to Appellant's amicus, who insists this Court should strike Berkeley's ordinance not on the basis of existing First Amendment law, but on the "clear trajectory of the Supreme Court's jurisprudence." Br. of the Association of

---

[11] Were this Court to conclude that a more robust standard is controlling, which Appellees maintain it is not, a remand to develop the factual record would be appropriate. *Retail Dig.*, 810 F.3d at 651-52 (remanding for development of factual record).

National Advertisers, Inc. in Supp. of CTIA—The Wireless Association Urging Reversal at 7 (Dkt. No. 33).[12]

But the law that restricts a sovereign's power to regulate is today's law, not the future limits of some interested party's fantasies. And whether or not this Court believes the Supreme Court would change the law (which it will not), "Courts of Appeals," as the Supreme Court has advised, should "leav[e] to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Under existing law, CTIA plainly has no constitutional basis for interfering with Berkeley's reserved power to regulate.

Recognizing this fact, CTIA invokes a raft of authority that: (1) is unrelated to commercial speech cases, *see, e.g.*, Appellant's Br. at 17, 31, 44 (citing *Wooley v. Maynard*, 430 U.S. 705 (1977) (a non-commercial speech case)); *id.* at 20 (citing *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781,

---

[12] CTIA likewise engages in a game of legal precedent. Throughout its brief, it cites dissenting and concurring opinions as if they represent the authority of the court invoked. *See, e.g.*, Appellant's Br. at 21 (citing *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 480−81 (1997) (Souter, J., dissenting)); *id.* at 28 (citing *Am. Meat Inst.*, 760 F.3d at 33 (Kavanaugh, J., concurring)).

795 (1988) (a non-commercial speech case), or (2) involves commercial speech regulations that *restrict* (rather than *compel*) commercial speech, *see* Appellant's Br. at 19-21 (citing *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011)), or (3) CTIA reads to obliterate *sub silentio* the commercial speech doctrine altogether, *see* Appellant's Br. at 20 (citing *Reed*, 135 S. Ct. 2218), when the cases suggest no such thing.

The Court should decline CTIA's invitation to radically remake the First Amendment doctrine.

### 1. *Reed* Did Not Repeal The Commercial Speech Doctrine

In *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), the Supreme Court invalidated a local sign ordinance that triggered special regulatory burdens based on the content of the sign. Those content-based distinctions, the Court held, triggered the application of strict-scrutiny. As the Court wrote,

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.

135 S. Ct. at 2227.

CTIA now asks this Court to transform an opinion about a clumsy local sign ordinance into a case that fundamentally remade the contours

of First Amendment law. Because any regulation of commercial speech "applies to particular speech because of the topic discussed," every regulation of commercial speech, CTIA insists, must now survive strict scrutiny. Appellant's Br. at 21. Thus did the Supreme Court reverse forty years of jurisprudence applying a distinctive test to regulation of "commercial speech," CTIA claims, without even bothering to mention that change in the opinion (and without its extraordinary effect being even noticed by the dissenting justices).

*Reed* does not bear this weight. There is nothing to indicate the Court understood itself to be reversing the commercial speech doctrine. Indeed, the Court doesn't even cite the core authority CTIA would have it to be overturning, from *Virginia Bd. of Pharmacy*, 425 U.S. 748, to *Central Hudson*, 447 U.S. 557, to *Zauderer*, 471 U.S. 626. Only Justice Breyer, concurring in the results but not in the reasoning, even cites *Central Hudson*, and not for the purpose of suggesting the Court was abolishing the commercial speech doctrine. 135 S.Ct. at 2235 (Breyer, J, concurring in the judgment). None of the other three opinions in *Reed* even recognize the possible question raised by the Court's simple description of content-based speech doctrine.

Lower courts have recognized the absurdity of reading *Reed*'s language out of context. This Court, for example, has suggested a commonsense limit to *Reed* in *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016), when it noted that its application of *Reed* was in a case that did "not concern a law that governs commercial speech or speech that falls within one of a few traditional categories which receive lesser First Amendment protection." *Id.* at 903, n.5 (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010) [enumerating such First Amendment categories]; *Cent. Hudson,* 447 U.S. at 562–63);[13] *cf. BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) (declining to extend *Reed* to the regulation of sexually explicit entertainment, saying while *Reed* "clarified the concept of 'content-based' laws, which are presumptively unconstitutional and get strict scrutiny[,] . . . [w]e don't think *Reed*

---

[13] Lower court decisions are in accord. *See, e.g.*, *Contest Promotions v. City & Cty. of San Francisco*, No. 15-cv-00093-SI, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015), *appeal filed* (9th Cir. 2015) ("*Reed* does not concern commercial speech, and therefore does not disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test."); *Cal. Outdoor Equity Partners v. City of Corona*, No. CV 15-03172 MMM (AGRx), 2015 WL 4163346, at *10 (C.D. Cal. July 9, 2015) ("*Reed* does not concern commercial speech, let alone bans on off-site billboards. The fact that *Reed* has no bearing on this case is abundantly clear from the fact that *Reed* does not even *cite Central Hudson*, let alone apply it.").

upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection.").

Nor is CTIA's radical interpretation constitutionally plausible: it would render unconstitutional the regulation of outright fraud, the criminalization of child pornography (certainly a content-based distinction), conspiracy, solicitation, and perjury, as well as much of the traditional domains of the administrative state from the mandated disclosure of information in tax returns to nutrition labels. *Cf. Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 116. Appellant is wrong to ask this Court to remake the First Amendment in this way.[14]

### 2. Cases Policing *Restrictions* On Commercial Speech — like *Sorrell* — Do Not Apply To Mandated Disclosures

As Appellee has described, commercial speech doctrine

---

[14] CTIA's similarly broad and novel contention that commercial speech should enjoy constitutional protection on par with core political speech, Appellant's Br. at 20–21 n.1, is without any support in the case law. It has long been the law that commercial speech is afforded "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *see also Fox*, 492 U.S. at 478; *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 598 (9th Cir. 2010).

distinguishes fundamentally between laws that restrict speech and laws that require disclosure. *Dwyer v. Cappell*, 762 F.3d 275, 282 (3d Cir. 2014) ("The takeaway: there exist different frameworks for analyzing restrictions on speech and disclosure requirements."). Restrictions are subject to heightened review; disclosure requirements ordinarily are not.

Throughout its brief, CTIA either ignores this distinction or denies it—repeatedly citing commercial speech restriction cases as if they are controlling here. *See, e.g.*, Appellant's Br. at 18-23 (citing *Retail Dig.*, 810 F.3d 638 (speech restriction case); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) (speech restriction case)).

*Sorrell v. IMS Health Inc.,* remarkably cited by CTIA as authority for rejecting Berkeley's argument that the law governing disclosures is different from the law governing restrictions, Appellant's Br. at 21-22, was a speech restriction case. Vermont had banned the sale of prescription drug data. *Sorrell*, 131 S. Ct. at 2659. The Court applied heightened scrutiny to that restriction. *Id.* Nothing in *Sorrell* purports to reach the question of the standard of review for regulations mandating disclosure. The case doesn't even cite *Zauderer*.

Moreover, this Court has already noted that "the Supreme Court's decision in *Sorrell* did not signal the slightest retrenchment from its earlier content-neutrality jurisprudence," *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 366 n.4 (9th Cir. 2012)—jurisprudence that has for decades subjected compelled commercial disclosures (a form of regulation that by definition requires the disclosure of certain subject matter) to a type of rational basis review under *Zauderer*.[15] And sister Circuits have likewise rejected analogous arguments that *Sorrell's* discussion of content discrimination *sub silentio* overruled other First Amendment subdoctrines. *See, e.g.*, *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648 (7th Cir. 2013) ("While *Sorrell* and *Citizens United* support the unconstitutionality of speaker-based discrimination in statutes that prohibit or burden speech, *Regan* controls on government subsidies of speech: speaker-based distinctions are permissible.").

Likewise with CTIA's reliance on *United States v. United Foods,*

---

[15] The disclosures in *Zauderer* and *Milavetz* were content- and viewpoint- and speaker-based in the sense CTIA uses the terms, but the Supreme Court did not hesitate to apply relaxed review. *Milavetz*, 559 U.S. at 249-50; *Zauderer*, 471 U.S. at 650-51.

45

*Inc.*, 533 U.S. 405 (2001), Appellant's Br. at 21, 22, 27, 44: The "mandate" at issue in that case was not a disclosure requirement. Rather, the issue was a requirement that competitors subsidize generic advertising suggesting there was no difference in quality among the competitors. *United Foods, Inc.*, 533 U.S. at 411. These "subsidized speech" cases do not draw *Zauderer* into doubt. Unlike the ordinance at issue in this case, those subsidized disclosures involved opinions about competitors' products. *See id.* (subsidy of compelled opinion about "whether a branded mushroom is better than just any mushroom"). They did not involve statements of fact.

This Court's decision in *Retail Digital*, on which CTIA relies heavily, does not suggest otherwise. That too is a speech restriction case. Its holding was that *Sorrell* increased the quantum of scrutiny required under *Central Hudson*—the leading commercial speech restriction case. *See Retail Dig.,* 810 F.3d at 647-48 ("[R]estrictions on commercial speech have been subject to intermediate scrutiny under the four-part test set forth in *Central Hudson* . . . . In *Sorrell,* however, the Supreme Court held that content- or speaker-based restrictions on non-misleading commercial speech regarding lawful goods or services

must survive 'heightened judicial scrutiny.' . . . Consistent with *Sorrell's* plain language, we rule that *Sorrell* modified the *Central Hudson* test for laws burdening commercial speech."). But as the District Court below rightly noted, "[w]hile *Retail Digital* is undoubtedly a significant case, it does not address the critical issue here which is what impact *Sorrell* should have on the *Zauderer* line of cases." ER 39. And nothing in its language or reasoning suggests it was meant to obliterate the distinction between the standard of review for restrictions of speech and disclosure rules. As the District Court continued:

> [T]he *Retail Digital* court emphasized that heightened security was designed to check the raw paternalism of laws which "keep people in the dark," slip. op. at 18 (quoting *Sorrell*) and which allowed the government to "silence truthful speech." Slip. op. at 22. [But] laws requiring *disclosure* of accurate information does not silence truthful speech or keep people in the dark; disclosures are designed precisely to accomplish the opposite. Thus, nothing in *Retail Digital*'s holding or reasoning suggests *Sorrell* did away with the Supreme Court's distinction (as articulated in *Zauderer* and embraced in *Milavetz*) between restrictions on commercial speech and compelled disclosure of such speech.

ER 40.

### 3. CTIA's Approach Would Draw Courts Into Endless And Uncertain Review Of Safety Standards

The essence of CTIA's argument is that because deviations from

the FCC's RF exposure limit cannot be shown to cause harm, Berkeley (and presumptively, the FCC) cannot mandate that cell phone retailers inform customers about how to avoid exposure beyond the FCC's RF limits.

This argument, if accepted, would radically undermine the ability of the government to mandate safety warnings generally. For with every mandated safety warning, a court would have to determine whether the risk identified was sufficient to justify the requirement as a matter of constitutional law.

Within the context of the jurisdiction of the FCC, for example, this argument would presumptively invalidate warning requirements for RF exposure in "controlled" RF environments. As CTIA describes, Appellant's Br. at 49-51, in controlled environments, such as workplaces with significant RF exposure, the FCC requires employers to post warning notices or otherwise educate employees about potential exposure to RF emissions. 47 C.F.R. § 2.1093(d)(1); *see also Reassessment*, ¶ 75 ("The fundamental purpose" of the FCC's rules in those settings "is to require that workers at the higher permitted levels of exposure have the appropriate level of awareness.").

48

Those RF emissions, as with cell phones, are non-ionizing. But the exposure in those contexts is greater than the ordinary exposure from cell phones. Current FCC standards incorporate a safety factor of 25x—half as great as the safety factor with cell phones. But if CTIA is right that a notice about cell phone exposure is unconstitutional because deviations from the safety standard cannot be shown to cause harm, *then the very same reasoning would invalidate the "controlled" environment warning as well*. If a 50x safety factor is too large, why is a 25x safety factor not too large? On CTIA's argument, courts would be drawn into endless review of safety standards to determine whether the safety factors were "too safe" for the First Amendment.

The same question would be raised in many other regulatory contexts. Elevators, for example, typically have a safety factor of 11.9x. *See* The Am. Soc'y of Civil Eng'rs, Safety Code for Elevators and Escalators 68 (2004), http://bit.ly/ElevatorStandards. That means an elevator that states it can carry 2,000 lbs. can actually carry close to 24,000 lbs. CTIA's argument, if accepted, would give elevator manufacturers a constitutional argument against elevator weight warnings. The riders of an elevator might get "scared" if the number of

49

people on the elevator approach the weight limit. Under CTIA's

reasoning, the warning of a weight limit would therefore be

unconstitutional, since the actual danger of failure does not exist

anywhere near the stated maximum load. Courts would thus be drawn

into an endless line drawing exercise to determine how conservative the

First Amendment requires a safety standard to be. As the First Circuit

described in a related context:

> There are literally thousands of similar regulations on the
> books—such as product labeling laws, environmental spill
> reporting, accident reports by common carriers, SEC
> reporting as to corporate losses and (most obviously) the
> requirement to file tax returns to government units who use
> the information to the obvious disadvantage of the taxpayer.

*Pharm. Care Mgmt. Ass'n*, 429 F.3d at 316. Appellant's contention

would subject to heightened review innumerable irreproachable laws

that serve interests other than preventing consumer deception—laws

like those that require nutritional labels, 21 U.S.C. § 343; disclosure of

information related to securities, 15 U.S.C. § 78l; Truth in Lending Act

disclosures, 15 U.S.C. § 1604; disclosures in prescription drug

advertisements, 21 C.F.R. § 202; warnings for pregnant women on

alcoholic beverages, 27 U.S.C. § 215; and airplane safety information,

14 C.F.R. § 135.117. "The idea that these thousands of routine

regulations require an extensive First Amendment analysis is mistaken." *Pharm. Care Mgmt. Ass'n*, 429 F.3d at 316; *see also Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 116.

Perhaps the simplest illustrative analogy—to demonstrate just how radical and misguided CTIA's argument is—is to salt. One of the nutrients tracked by food labels is "sodium," which in most foods comes in the form of salt. No one would claim that "salt is unsafe." Yet among scientists and nutritionists, there is a fierce debate about how much salt consumption is healthy. *See* Gina Kolata, *No Benefit Seen in Sharp Limits on Salt in Diet*, N.Y. Times (May 14, 2013), http://bit.ly/NTTimes-SaltControversy. That debate notwithstanding, the Nutrition Labeling and Education Act, 21 U.S.C. 343 (1990), requires that the amount of salt in a serving be reported, as well as the percentage that amount is of the recommended daily intake of salt.

The purpose of this regulation is to give consumers the information they need to make a choice. By requiring that food processors report the amount of salt, the label does not condemn salt as unhealthy. The only objective of nutrition labeling requirements is to provide information that consumers need in order to choose how much

of a particular product to consume.

In every relevant respect, the ordinance at issue in this case is the equivalent of Congress's Nutrition Labeling and Education Act. The ordinance does not imply that cell phones are unsafe, any more than congressionally mandated nutritional labels imply that salt is unsafe. The ordinance responds to a demonstrable lack of information about how cell phones may be used in a manner consistent with how they have been tested to comply with federally established RF exposure limits. The First Amendment does not bar Berkeley from informing its residents about those limits, any more than it block Congress from requiring food processors to tell consumers the recommended daily intake of salt.

## C.   Berkeley's Ordinance Is Not Preempted

CTIA argues that federal law preempts Berkeley's ordinance. As the District Court held, it grounds that claim on conflict preemption, not field preemption. ER 11. More specifically, within the doctrine of conflict preemption, CTIA argues Berkeley's ordinance is an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Appellant's Br. at 45-46 (quoting *Wyeth v. Levine*, 555 U.S.

555, 563–64 (2009)). That "full purpose[] and objective[]," CTIA
maintains, is exclusive "uniform federal regulation," Appellant's Br. at
2, which is essential, CTIA argues, to the task of "encouraging the
efficient provision of telecommunications services to the public."
Appellant's Br. at 8.

But Berkeley's ordinance does not conflict with the FCC's
regulation, nor does it create any obstacle to the FCC's regulatory
purpose. To the contrary, the ordinance simply complements the
regulation of the FCC. The FCC regulates *manufacturers* of cell phones.
Berkeley regulates *retailers*. And while some manufacturers are also
retailers, the vast majority of the entities governed by this ordinance
are not.

With respect to retailers that are not manufacturers, it is not even
clear that the FCC could regulate these local businesses. Certainly
nothing in the record of the FCC proceedings indicates that it intended
to reach local retailers. Even more certainly, nothing in the record
indicates the FCC was balancing a choice not to regulate local retailers
as part of an overall balance of regulatory effect.

Indeed, the very idea of such a balance in the context of

53

information regulations makes no First Amendment sense. If the FCC has as its purpose the spread of certain information, there could be no showing that its purpose was actually the ineffectual spread of that information. The FCC may well have determined that regulating the manuals of cell phone manufacturers was a sufficient burden on manufacturers. CTIA has offered no evidence that the FCC was simultaneously deciding that it didn't want the information it was requiring manufacturers to provide spread beyond cell phone manuals.

With respect to entities that are manufacturers, Berkeley does not purport to regulate the manufacturing of the cell phones, or the content of any cell phone manual. The burdens and obligations of manufacturers *qua* manufacturers are left untouched by Berkeley's ordinance. The only obligation that CTIA's members face is as retailers.

Yet there are plenty of regulatory burdens that retailers face independent of regulations that affect manufacturers. A retailer of a cell phones might face a special tax; that tax is a burden on all retailers, including those regulated by the FCC as manufacturers. But that link cannot render the tax illegal. Absent a policy adopted by the FCC to exempt those within its jurisdiction from taxes, the additional local

54

regulation is not preempted.

The same analysis applies here. All that Berkeley has done is to impose a slight obligation on retailers to provide information that complements the obligation the FCC imposes on manufacturers. That obligation has the purpose and the effect of making the FCC's own regulations more broadly known. There is no showing that the FCC has any interest in obscuring its regulations. There is no showing that the FCC balanced the burden of its regulation in the context of entities it does not (and possibly cannot) regulate. As the District Court found, while *Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010) "persuasively identifies the purposes underlying the [federal statute] at issue, the limited disclosure mandated by the Berkeley ordinance does not . . . impose an obstacle to those purposes." ER 13. As the District Court continued:

> This disclosure . . . simply refers consumers to the fact that there are FCC standards on RF energy exposure — standards which assume a minimum spacing of the cell phone away from the body — and advises consumers to refer to their manuals regarding maintenance of such spacing. The disclosure mandated by the Berkeley ordinance is consistent with the FCC's statements and testing procedures regarding spacing. . . . It is also consistent with the FCC's own requirement that cell phone manufacturers disclose to consumers information and advice about spacing. . . . Thus,

55

the ordinance does not ban something the FCC authorizes or mandates. And CTIA has failed to point to any FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone. Moreover, the City ordinance, because it is consistent with FCC pronouncements and directives, does not threaten national uniformity.

ER 13-14.

CTIA insists the District Court erred by ignoring FCC pronouncements that show that the FCC believes it was preempting regulations like Berkeley's. But CTIA has mischaracterized the authority it cites. On pages 47-48 of its brief, it writes:

> The FCC absolutely disagrees and has stated that encouraging "adoption of extra precautionary measures," **like those that Berkeley recommends**, "may have the unintended consequence of 'opposition to progress and the refusal of innovation, ever greater bureaucracy . . . [and] increased anxiety in the population.'"

Appellant's Br. at 47-48 (emphasis added) (alterations in original) (quoting *Reassessment*, ¶ 240).

But the regulations that the FCC was referring to at ¶ 240 in the *Reassessment* are not "like those that Berkeley recommends." The section within which ¶ 240 appears concerns efforts by some governments to adopt "Exposure Reduction Policies" — governments like New Zealand, and the City of San Francisco. Those governments

56

"have suggested measures of 'prudent avoidance' — undertaking only those avoidance activities which carry modest costs" including "extra 'precautionary' environmental limits for fixed transmitters far below the prevailing scientifically-based values, sometimes limited to specific locations." *Reassessment,* ¶ 237. In the *Reassessment,* the FCC is skeptical about "prudent avoidance," *Reassessment,* ¶ 238, but it nonetheless "request[ed] comment on whether any general technical approach to reduce exposure below our limits in some situations is appropriate or feasible, particularly in cases in which there is no specific quantitative goal for improvement." *Reassessment,* ¶ 238.

As a question is not a statement, a request for comment by the FCC is not a policy statement. CTIA has cited no authority for the proposition that an ordinance echoing *existing* FCC policies somehow conflicts with the FCC's own policies. It may be that ¶ 240 stands for the proposition that local governments cannot adopt "exposure reduction policies." Whether they can or not, however, ¶ 240 says nothing about whether they can adopt policies to inform residents about existing FCC requirements in precisely the way the FCC already has.

Likewise, CTIA writes "the ordinance informs consumers that cell phones are unsafe if they do not maintain a particular separation distance." Appellant's Br. at 48. Once again, CTIA misstates the facts. Nowhere does the ordinance say "cell phones are unsafe." What it says is precisely what the FCC mandates manufacturers say — that use within the separation distance "may exceed the federal guidelines for exposure to RF radiation." Berkeley Municipal Code § 9.96.030(A)-(B). The FCC's whole purpose in mandating the disclosure of that information is to give consumers a choice about how they might use their cell phones—a choice the FCC believed might well be affected by whether the use exceed the FCC's RF exposure limits.

The *actual* ordinance that Berkeley has passed does not conflict with the *actual* authority the FCC has promulgated. To the contrary, Berkeley's ordinance extends the FCC's policy into a context it is not even clear that the FCC could reach directly. The District Court was correct that this complementing regulation is not preempted by either the questions the FCC has asked (in the context of requesting comments in the *Reassessment*), or the rules the FCC has promulgated.

58

## II.   None of the Remaining Preliminary Injunction Factors Even Lean In Favor of CTIA

### A.   CTIA Will Not Be "Irreparably Injured" By The Denial Of An Injunction

As the District Court held, the only consequence of denying an injunction is that cell phone purchasers in Berkeley will be better notified of the advisory that the FCC already mandates be included within cell phone manuals. ER 47. That cannot constitute irreparable injury, as there is no First Amendment interest in obscurity. If the FCC's mandate is constitutional—and again, CTIA has never argued otherwise—then a notification of the existence and content of that mandate is certainly constitutional as well.

CTIA objects, however, because in its view, the ordinary consumer will be "scare[d]" by Berkeley's advisory (though apparently not scared by the manufacturers' disclosure). Appellant's Br. at 2. This alleged fear—which, again, CTIA failed to demonstrate as a matter of fact to the District Court below—does not establish "irreparable injury."

CTIA made no showing in the District Court—beyond the argument of counsel—that consumers would be "scare[d]" by the Berkeley disclosure; it has offered no evidence in this Court to show

that the District Court's finding is clearly erroneous. Likewise, it failed to show Berkeley's ordinance comes anywhere close to "effectively rul[ing] out" its ability to speak at all, the only burden the Supreme Court has ever found to be "unduly burdensome." *Ibanez*, 512 U.S. at 146. And CTIA has never once suggested that the ordinance "chill[s] their] protected commercial speech." Thus CTIA has waived the only ground it has to complain about any failure of Berkeley's ordinance to protect its First Amendment interest. *Holmes v. Johnson & Johnson*, 617 F. App'x 639, 644 (9th Cir. 2015) (appellant "did not present this argument to the district court, which did not address it; we therefore deem this argument waived"). That waiver decides this case.

CTIA argues nonetheless that it is entitled to a finding of "irreparable injury" if it establishes even a "colorable First Amendment claim," citing *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002). Appellant's Br. at 52. To support its argument, CTIA invokes an unrelated case from outside this Circuit. That case is not apposite.

In *International Dairy Food Association v. Amestoy*, 92 F.3d. 67 (2d Cir. 1996), the Second Circuit held that Vermont's compelled

disclosure of the use of a growth hormone (rBST) in milk production raised a colorable First Amendment claim. The FDA had approved the use of rBST; it had concluded that "the dairy products derived from herds treated with rBST [were] indistinguishable from products derived from untreated herds," and it had therefore "declined to require labeling of products derived from cows receiving" the hormone. *Amestoy*, 92 F.3d. at 69. The only interest that Vermont could thus be serving was the potential consumer interest in a fact that the FDA had determined was not material.

That FDA determination, however, distinguishes *Amestoy* fundamentally. Here, the FCC *has* determined that RF radiation should be limited. It *has* determined that manufacturers should inform consumers about how to use their cell phones consistent with those limits. The FCC had ample justification for these two important requirements. Berkeley has expressly adopted that justification as the reason for its very similar requirement. CTIA has thus not established that mere "idle curiosity" justifies the FCC's regulation—nor Berkeley's. Appellant's Br. at 43. And as the Second Circuit has held that *Amestoy* is limited to cases where the only interest supporting a disclosure

requirement is "consumer curiosity" (*N.Y. State Rest. Ass'n*, 556 F.3d at 132-34 (limiting *Amestoy* to mere 'consumer curiosity' cases)), it is not relevant here.

*Amestoy* draws support for its conclusion in part from a distinct line of First Amendment cases, in which the government forced competitors to subsidize or disseminate opinion messaging. *See, e.g., Cal–Almond, Inc. v. United States Dep't of Agric.*, 14 F.3d 429, 434 (9th Cir. 1993) (mandatory assessment on almond handlers to fund almond marketing program); *United States v. Frame*, 885 F.2d 1119, 1132–33 (3d Cir. 1989) (federal Beef Promotion & Research Act required that producer help fund commercial message to which producer did not necessarily subscribe), *cert. denied*, 493 U.S. 1094 (1990), *cited in Amestoy*, 92 F.3d at 72. But those cases are not governed by *Zauderer*— for the same reason that *United Foods*, 533 U.S. 405, and *Pacific Gas*, 475 U.S. 1, were not. The compelled speech or subsidy in those cases was not of or for factual governmental disclosures. The regulation in those cases supported opinion advertising—and opinion advertising that was the speech of a third party, not the government. *See, e.g., Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 559 (2005) ("In all

62

of the cases invalidating exactions to subsidize speech, the speech was, or was presumed to be, that of an entity other than the government itself. Our compelled-subsidy cases have consistently respected the principle that '[c]ompelled support of a private association is fundamentally different from compelled support of government.' 'Compelled support of government'—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest.") (citations omitted). That is why those cases were not subject to the standard of *Milavetz* and *Zauderer*, and why they do not control here.

To the extent CTIA's concern about consumer fear is offered as an "irreparable injury" independent of the First Amendment analysis, it has given neither this Court nor the court below any basis on which to find such injury. Its argument that consumers will be afraid of cell phones, or scared about potential "radiation," was rejected by the District Court. ER 47. It is mere speculation in this Court. And as this Court has held, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.,* 502 F.3d 1086, 1098 (9th Cir. 2007) (citing *Goldie's Bookstore, Inc. v. Superior Court,* 739

F.2d 466, 472 (9th Cir. 1984)).

CTIA has thus failed to sustain an even "colorable" First Amendment claim and it has failed to offer anything beyond speculation about why the effect of this ordinance would be to "irreparably harm" CTIA. This Court must therefore find that CTIA has established no "irreparable harm" that would justify a preliminary injunction against Berkeley's ordinance. That conclusion alone should resolve the motion before this Court. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005).

## B. Berkeley Has A Substantial Interest In The Enforcement Of Its Ordinance

Berkeley has a substantial interest in ensuring its residents know of federal health and safety standards and information that federal policy requires be disclosed to them. Berkeley also maintains a health and safety interest, but *only* to the degree that the FCC's regulations reflect the consensus of the health and safety agencies, and *only* contingent on the FCC maintaining such an interest. See ER 6-8 (FCC drawing safety standard from consensus of "health and safety agencies"). And though *Zauderer* expressly stated that the state need not conduct a survey of the public to establish its interest, 471 U.S. at

652-53, Berkeley did, and found through its research that its residents did not know that the federal government limits the RF radiation that cell phones emit. It found, through survey research, that its residents did not know that ordinary use of cell phones might exceed those limits. And it found, through survey research, that its residents wanted to know these facts, and wanted to know how they could use their cell phone without exceeding the federal standards. ER 163.

It strains credulity to suggest that ensuring that residents are aware of federal health and safety standards is an insufficiently substantial interest to justify local regulation. Certainly, CTIA has provided this Court with no such authority. *Cf. Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994) (noting the insubstantial nature of interests deemed sufficiently substantial under the more stringent *Central Hudson* test); *see also*, *e.g.*, *Fox*, 492 U.S. at 475 (governmental interest in banning Tupperware parties in dorms "substantial" under *Central Hudson*).

### C.    The Balance Of Harm Militates Against Granting An Injunction

Berkeley has established that its residents do not know about RF exposure limits, and that they would likely change their behavior if

they did. *See* ER 165. Appellant argued below that residents *could* know. In the District Court, it argued that "accurate and balanced disclosures regarding RF energy are already available (and will remain so) to any consumer interested in the information." ER 160.

Appellant's assurance is meant to be comforting. But it fails to acknowledge that *in fact* consumers are not presently aware of this information. *See* ER 160. Because CTIA's members are already obligated to provide "accurate and balanced disclosures regarding RF energy," they can suffer no harm when Berkeley acts to ensure that its residents in fact have *more* "accurate and balanced disclosures regarding RF energy." Whatever the harm there might be from the public more certainly understanding what manufacturers are already required to reveal, it cannot outweigh the strong benefit of the public more fully understanding information that they have indicated they want to know, and that the FCC mandates CTIA's members already provide.

### D. The Public Interest Is Not Advanced By Interfering With This Local Ordinance

Appellant asks this Court to use its federal power to displace the actions of a municipality regulating local retailers about providing

consumer information—an extraordinary step within a federal system. But the most compelling policy reason it can cite for this extraordinary remedy is the reflections of a law review article arguing that consumer warnings have gone too far. Appellant's Br. at 56 (citing Lars Noah, *The Imperative to Warn: Disentangling the "Right to Know" from the "Need to Know" About Consumer Product Hazards*, 11 Yale J. on Reg. 293, 383 (1994)).

This argument captures perfectly what this case is really about. Having failed to persuade either the FCC or the Berkeley City Council that true information about RF exposure need not be provided to consumers, CTIA now seeks to constitutionalize routine consumer information law to avoid regulation. It invites this Court to displace the judgment of a federal agency and a City Council, both accountable democratic branches, after a judicial determination of which safety risks are sufficiently risky to permit a government to warn consumers about, and which risks are not.

This is the ghost of *Lochner* in the guise of the First Amendment. Whether there are too many warnings or too few is an important question. It is not a judicial question. The only constitutional issue

67

before this Court is whether Berkeley's effort to emphasize what federal law *already requires* Appellant's members to say violates federal law. It does not—and thus it could not advance the public's interest to further interfere with the power of a municipality to provide information that its residents desire.

## Conclusion

For the foregoing reasons, this Court should deny Appellant's motion for a preliminary injunction.


Dated: April 4, 2016          Respectfully submitted,

LESTER LAWRENCE LESSIG, III
AMANDA SHANOR
ZACH COWAN, City Attorney
SAVITH IYENGAR, Deputy City Attorney


/s/ Lester Lawrence Lessig, III

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing Appellee's Brief is proportionately space in Century Schoolbook font, has a typeface of 14 points, and contains 13,554 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the word count feature of Microsoft Word 2013 used to generate this brief.

<u>    /s/   Lawrence Lessig     </u>

## Statement of Related Cases

Pursuant to Ninth Circuit Rule 28-2.6, City of Berkeley and
Christine Daniel state that they are not aware of any related cases.


    /s/  Lawrence Lessig    

## Certificate of Service

I hereby certify that on April 4, 2016, the foregoing Answering Brief of Appellees City of Berkeley and Christine Daniel was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<u>     /s/   Lawrence Lessig     </u>