No. 16-15141

IN THE
# United States Court of Appeals for the Ninth Circuit

CTIA – THE WIRELESS ASSOCIATION®,

*Plaintiff-Appellant*,

v.

THE CITY OF BERKELEY, CALIFORNIA, AND CHRISTINE DANIEL, CITY
MANAGER OF BERKELEY, CALIFORNIA, IN HER OFFICIAL CAPACITY,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
The Honorable Edward M. Chen | Case No. 3:15-cv-02529-EMC

**REPLY BRIEF FOR APPELLANT CTIA – THE WIRELESS ASSOCIATION®**

Joshua S. Lipshutz
Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone: 415.393.8233
Facsimile: 415.374.8469

Theodore B. Olson
Helgi C. Walker
Michael R. Huston
Jacob T. Spencer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff-Appellant CTIA – The Wireless Association®*

# Table of Contents

**<u>Page</u>**

Introduction.................................................................................................1

Argument....................................................................................................4

    I. CTIA Is Likely To Succeed On The Merits.................................................4

    A. Berkeley's Ordinance Violates The First Amendment ........................4

        1. The Ordinance Is A Presumptively Unconstitutional
           Burden On Commercial Speech ........................................5

           a. Heightened Scrutiny Applies To The Ordinance ......................5

           b. Berkeley's Arguments For Applying *Zauderer* Are
              Unavailing...................................................................8

           c. Berkeley's Ordinance, Unlike Many Routine Disclosures,
              Fails The Commercial Speech Test........................................ 10

        2. The Ordinance Is Unconstitutional Under *Zauderer* ................. 12

           a. The Ordinance Is Not Justified By Any Legitimate
              Government Interest ................................................ 14

           b. The Ordinance Is Not Purely Factual .................................... 17

           c. The Ordinance's Message Is Not Uncontroversial.................. 20

           d. The Ordinance Is Unduly Burdensome ................................... 22

      B. The Ordinance Is Preempted By Federal Law................................ 24

    II. The Other Preliminary Injunction Factors Tip Sharply In Favor
      Of CTIA .......................................................................... 28

    A. CTIA Will Suffer Irreparably Without An Injunction ...................... 28

    B. Berkeley Has No Legitimate Countervailing Interests.................... 29

    C. The Public Interest Favors An Injunction........................................ 30

Conclusion .......................................................................................... 31

# Table of Authorities

**Pages**

## Cases

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*
  *Comm'n of N.Y.*,
  447 U.S. 557 (1980) ................................................................. 5

*Crazy Ely W. Village v. City of Las Vegas*,
  618 F. App'x 904 (9th Cir. 2015) ......................................... 6

*CTIA–The Wireless Ass'n v. City & Cty. of S.F.*,
  494 F. App'x 752 (9th Cir. 2012) ............................ 1, 2, 4, 5, 20, 22, 23

*Disc. Tobacco City & Lottery, Inc. v. United States*,
  674 F.3d 509 (6th Cir. 2012) .......................................... 20, 21

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ............................................. 28

*Evergreen Ass'n v. City of N.Y.*,
  740 F.3d 233 (2d Cir. 2014) ............................................... 23

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ................................................. 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ............................................................ 20

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) ......................................... 9, 11, 29

*Joelner v. Village of Washington Park*,
  378 F.3d 613 (7th Cir. 2004) ............................................. 30

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) .......................................... 30

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ............................................ 28

**Table of Authorities**
(continued)

**Pages**

*Lorillard Tobacco Co. v. Reilly*,
　533 U.S. 525 (2001)........................................................................ 8

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
　559 U.S. 229 (2010).................................................................. 3, 13

*Nat'l Ass'n of Mfrs. v. SEC*,
　800 F.3d 518 (D.C. Cir. 2015).................................................. 13, 23

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
　475 U.S. 1 (1986).................................................................. 9, 12, 23

*Pharm. Care Mgmt. Ass'n v. Rowe*,
　429 F.3d 294 (1st Cir. 2005) ....................................................... 10

*Reed v. Town of Gilbert*,
　135 S. Ct. 2218 (2015).................................................................. 7

*Retail Digital Network, LLC v. Appelsmith*,
　810 F.3d 638 (9th Cir. 2016)................................................. 7, 9, 11

*Riley v. Nat'l Fed'n of Blind*,
　487 U.S. 781 (1988)..................................................................... 22

*Sorrell v. IMS Health Inc.*,
　131 S. Ct. 2653 (2011).............................................................. 7, 31

*Thalheimer v. City of San Diego*,
　645 F.3d 1109 (9th Cir. 2011)...................................................... 12

*United States v. United Foods, Inc.*,
　533 U.S. 405 (2001)...................................................................... 6

*Video Software Dealers Ass'n v. Schwarzenegger*,
　556 F.3d 950 (9th Cir. 2009)..................... 2, 6, 8, 11, 16, 18, 20, 23, 30

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008)........................................................................ 29

**Table of Authorities**

(continued)

**Pages**

*Wyeth v. Levine,*
    555 U.S. 555 (2009)...................................................................24

*Zauderer v. Office of Disciplinary Counsel of S. Ct. of Ohio,*
    471 U.S. 626 (1985)...................................................2, 13, 20

**Statutes**

Berkeley Municipal Code § 9.96.030 ......................................27

**Legislative Authorities**

H.R. Rep. No. 103-111 (1993)..................................................25

**Regulations**

47 C.F.R. § 2.803......................................................................25

47 C.F.R. § 2.1093.............................................................14, 26

**Administrative Authorities**

FCC, KDB 447498, *General RF Exposure Guidance*
    § 4.2.2(d) (2015)...................................................................27

FCC, Office of Eng'g Tech. Website ........................................14

*In re Reassessment of FCC Radiofrequency Exposure Limits
    & Policies,*
    28 FCC Rcd. 3498 (2013) .............................................14, 15

## Introduction

This Court should enjoin Berkeley's ordinance for the same reasons that it enjoined a substantially similar speech mandate in *CTIA–The Wireless Ass'n v. City & County of San Francisco*, 494 F. App'x 752 (9th Cir. 2012) ("*San Francisco*"). A law that forces citizens to utter the government's preferred message about the safety of cell phones is unconstitutional unless the government can carry its burden to show a substantial interest and, at minimum, that the mandated message is "'purely factual and uncontroversial.'" *Id*. at 753 (citation omitted). Berkeley has not come close to satisfying that standard here.

Berkeley's entire defense of its Ordinance "rests exclusively," Berkeley Br. 10, on two premises: (1) The Federal Communications Commission (FCC) already "requires" cell phone manufacturers to disclose information about RF energy to consumers; and (2) the Ordinance conveys "the same" information. *Id*. at 1. Berkeley repeats these two contentions over and over again. *See*, *e.g.*, *id.* at 2, 3, 6, 18, 22, 23, 55, 57, 58, 59, 66, 68.

But as CTIA has shown, both contentions are false. The FCC does not *require* any disclosures to consumers regarding RF energy—it merely suggests that cell phone manufacturers provide, voluntarily, information in user manuals about RF-energy testing. And the FCC's assessment of RF energy—that cell phones approved for sale in the United States are safe no matter how carried—is *directly contrary* to the

1

message of Berkeley's Ordinance—that consumers should change their behavior because cell phones carried against the body emit dangerous radiation that creates a safety hazard. As Berkeley concedes, it is unconstitutional to force retailers to inform consumers that cell phones are potentially unsafe (*see* Berkeley Br. 8), because that message is false, and there is "no legitimate reason to force retailers to affix false information on their products." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd by* 131 S. Ct. 2729 (2011). Yet that is precisely what the Ordinance conveys. At the very least, that is how it "*could prove* to be interpreted by consumers." *San Francisco*, 494 F. App'x at 753 (emphasis added).

No one denies that the government can require scientifically grounded safety disclosures on consumer products. But where, as here, the expert federal regulator has publicly announced—based on the overwhelming weight of scientific evidence—that a product is *not* linked to any known health problems, and the regulator has *for that reason* declined to require a warning to consumers, Berkeley may not force CTIA's members to mislead consumers by saying the opposite. Thus, this case does not implicate alcohol pregnancy warnings, tobacco labels, elevator load limits, or drug side-effect notices. *Contra*, *e.g.*, Berkeley Br. 3, 47–52; NRDC Br. 2–7; Att'y Gen. Br. 10–12. And it has nothing to do with prohibitions on commercial or securities fraud: Unlike the petitioners in *Zauderer v. Office of Disciplinary Counsel of Supreme Court*

2

*of Ohio*, 471 U.S. 626 (1985), and *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010), nobody has ever hinted that CTIA's members have deceived consumers about RF energy. The fact that Berkeley hyperbolically equates CTIA's argument with a defense for corporate fraudsters, perjurers, and child pornographers, Berkeley Br. 3, 43, only shows the weakness of the City's legal position under existing precedent.

The City purports to "rely on the FCC's judgments" about cell phone testing procedures and specific absorption rate ("SAR") guidelines. Berkeley Br. 3. But Berkeley's brief (like its Ordinance) studiously avoids the FCC's many statements that run contrary to Berkeley's preferred view on those issues, especially the FCC's concern that the term "radiation" is likely to confuse consumers. Berkeley's rhetoric of deference to the FCC notwithstanding, the City claims to know better than the FCC whether a warning about RF energy is necessary for consumers, and what information consumers need "to better protect themselves and their children." ER 3.

Berkeley is free to hold its opinions and to use its resources to express them. But because Berkeley disagrees with the FCC's position both on whether FCC-approved cell phones are a safety hazard and whether consumers need a warning about RF energy, Berkeley cannot hide behind the FCC to justify its compelled speech mandate. Berkeley's attack on the FCC's regulatory judgment is also preempted, because the

3

cell phone industry is subject to uniform federal regulations, not whatever information every city, town, or county happens to think consumers should receive.

Forcing CTIA's members to put the City's poster in their stores or hand out its flyers to customers requires them to wade into a debate about RF energy that they do not wish to have. Worse, Berkeley's position—that RF energy from body-worn cell phones is a safety issue that should cause consumers to change their behavior—has been rejected by federal regulators based on overwhelming scientific consensus. As the Supreme Court has repeatedly recognized, such inaccurate, misleading, and controversial compelled-speech mandates violate the Constitution, and First Amendment violations constitute per se irreparable injury.

The Ordinance cannot survive review under the First Amendment or federal preemption doctrine, and it should be enjoined.

## Argument

## I. CTIA Is Likely To Succeed On The Merits

### A. Berkeley's Ordinance Violates The First Amendment

Berkeley concedes that, in light of *San Francisco*, a speech mandate that potentially conveys the view that "cell phones are unsafe" is unconstitutional. Berkeley Br. 8. That is so because *any* compelled speech requirement "must be," at minimum, "'purely factual and uncontroversial.'" *San Francisco*, 494 F. App'x at 753 (quoting *Zauderer*, 471

U.S. at 651). The message that 'cell phones are unsafe,' however, is an "opinion" that contravenes the FCC's findings, which are based on the overwhelming consensus of scientific authorities. *Id.* at 753–54.

Yet that is precisely the message that Berkeley's Ordinance seeks to convey, echoing the views of certain vocal Berkeley residents. ER 102, 105, 107. The Berkeley City Council hopes to convince consumers that cell phones' RF energy is a safety issue, and to motivate them to "change their behavior to better protect themselves and their children." ER 3. Because Berkeley's Ordinance "*could* prove to be interpreted by consumers," at the very least, "as expressing [Berkeley's] opinion that using cell phones [potentially exceeding the SAR guideline] is dangerous," the Ordinance offends well-settled First Amendment principles. *San Francisco*, 494 F. App'x at 753 (emphasis added).

## 1. The Ordinance Is A Presumptively Unconstitutional Burden On Commercial Speech

### a. Heightened Scrutiny Applies To The Ordinance

As CTIA has shown, when the government regulates commercial speech, the standard of *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980), applies: The government must show a substantial interest, that its regulation directly advances that interest, and that it is not more extensive than necessary. Even when the government's regulation takes the form of a compelled disclosure, *Central Hudson* still provides the standard of review,

whereas *Zauderer* is an example of how that standard gets *applied* to a mandate aimed at curing deceptive speech. *See Schwarzenegger*, 556 F.3d at 966 (*Zauderer* applies where compelled disclosures "'are reasonably related to the State's interest in preventing deception of consumers'" (citation omitted)); *United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001) (the mandate in *Zauderer* advanced "the State's interest in 'preventing deception of consumers,'" so *Zauderer* did not apply because the statute at issue was not "necessary to make voluntary advertisements nonmisleading for consumers" (citation omitted)).

This Court's decision in *Crazy Ely Western Village v. City of Las Vegas*, 618 F. App'x 904, 906 (9th Cir. 2015), for example, upheld a commercial disclosure because it "satisf[ied] the *Central Hudson* test." The Court applied *Zauderer* under *Central Hudson* because "[c]ompelled disclosures" may be "justified by the need to dissipate the possibility of consumer confusion or deception." *Id.* (quotation marks omitted). Berkeley claims "[t]here was no suggestion in [*Crazy Ely*] that the notice had anything to do with deception," Berkeley Br. 35, but that is demonstrably wrong; the government justified its disclosure as necessary "to prevent [liquor] store cashiers from telling customers that drinking packaged liquor on the Pedestrian Mall was permissible," when in fact that conduct violated local law. Appellee Br., *Crazy Ely*, 2015 WL 309259, at *16 (9th Cir. Jan. 15, 2015). There is no suggestion

here that the Ordinance is necessary to prevent *any* deceptive speech by CTIA's members, so *Zauderer* is not on point.

In *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 650 (9th Cir. 2016), this Court explained how the Supreme Court modified the *Central Hudson* test in *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), for commercial speech regulations that are content-, viewpoint-, or speaker-based. Contrary to Berkeley's suggestion (Br. 44–47), neither *Retail Digital* nor *Sorrell* ever suggested that their holdings were limited to commercial speech prohibitions, or somehow did not apply to compelled commercial speech. Rather, those holdings are based on the general principle that the First Amendment requires courts to undertake more searching review when the government uses its coercive power to favor one side of a debate—like Berkeley's effort to force CTIA's members to support its side of the RF energy "debate"—or regulates precisely because it disagrees with a business's existing choices about what to say and how to say it. *See Sorrell*, 131 S. Ct. at 2663.[1] Whether the government seeks to accomplish these suspect ends by compelling speech or restricting it, judicial skepticism is warranted.

---

[1] Berkeley's extended discussion of *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), Berkeley Br. 40–43, tears down a straw man. CTIA's opening brief explained (at 20–21) why Berkeley's Ordinance is content-, viewpoint-, and speaker-based for reasons in addition to *Reed*.

### b. Berkeley's Arguments For Applying *Zauderer* Are Unavailing

Berkeley argues that this Court should apply *Zauderer* here because it has done so before. Berkeley Br. 35. But that was because *Zauderer*'s "purely factual and uncontroversial" requirements are the *bare minimum* necessary for a compelled speech requirement to be constitutional. Thus, this Court invalidated the ordinance in *San Francisco* without any need to reach the other *Central Hudson* factors. Similarly, in *Schwarzenegger*, the statute failed "*even under* the factual information and deception prevention standards set forth in *Zauderer*." 556 F.3d at 966 (emphasis added). The State's required disclosure on violent video games—a sticker that read "18"—was unconstitutional because it did not convey factual information and "would arguably … convey a false statement" about video games." *Id.* at 967.

Berkeley even goes so far as to argue that all disclosure requirements should receive *only* rational basis review, because "[t]he commercial speech doctrine" is supposedly only "listener, not speaker[,] focused." Berkeley Br. 16. It is *that* argument—not CTIA's—that is extreme. The Supreme Court has long recognized a First Amendment interest in "the speaker's ability to propose a commercial transaction," *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 565 (2001), and that right includes proposing a transaction (in non-deceptive terms) without the government dictating the speaker's message.

Berkeley also makes the sweeping claim that mandated consumer disclosures *always* contribute helpful information to the marketplace of ideas. Berkeley Br. 16, 35–36. Berkeley ignores the speech-burdening costs of its mandate: The Ordinance would require CTIA's members to "associate with speech with which [they] ... disagree," "forc[ing][them] either to appear to agree with [Berkeley's] views or to respond." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 15 (1986) (plurality op.); *accord Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d Cir. 1996) (compelled commercial speech mandates create First Amendment injury by forcing businesses "to speak when they would rather not"). "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster," and it applies "[f]or corporations as for individuals." *Pacific Gas & Electric*, 475 U.S. at 16.

Thus, it is *Retail Digital*, not *Zauderer*, that provides the controlling standard here: Berkeley "bears the burden of showing that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." 810 F.3d at 648 (quotation marks omitted). And Berkeley must "show[ ] that the challenged law 'is drawn to achieve [the government's substantial] interest.'" *Id.* (quoting *Sorrell*, 131 S. Ct. at 2668 (alteration in original)).

9

### c. Berkeley's Ordinance, Unlike Many Routine Disclosures, Fails The Commercial Speech Test

The Ordinance cannot meet the controlling standard of review for commercial speech. As CTIA has explained, that test is not a form of "rational basis" review. CTIA Br. 28–30. Rather, as *San Francisco* and *Schwarzenegger* show, it is a meaningfully speech-protective test that some mandates, like Berkeley's, will fail. But many other legitimate health and safety disclosures will pass this test, even without "extensive First Amendment analysis." *Contra* Berkeley Br. 50–51 (quoting *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, J., concurring)).

Berkeley and its amici are thus wrong to apocalyptically contend that this case threatens every consumer disclosure in America. *E.g.*, Berkeley Br. 3, 43. As to most tobacco warnings and nutrition labels, for example, the state has a substantial interest in alleviating some real harm to public health and it advances that interest by providing accurate information in a non-misleading way. Virtually all of the consumer disclosures cited by Berkeley and its amici are likely constitutional. Those types of disclosures—factual ones that science justifies—are simply not implicated here.

Berkeley's Ordinance, by contrast, flunks the commercial speech test. The City has been forced to concede, given the FCC's official conclusions, that FCC-approved cell phones pose *no* known safety risk,

10

even when carried against the body. The City lacks *any* interest in *misinforming* consumers about the FCC's actual views on RF energy. *See Schwarzenegger*, 556 F.3d at 967 (there is "no legitimate reason to force retailers to affix false information on their products"). And the City does not even attempt to show that its Ordinance has the "fit" necessary to be constitutional.

Instead, Berkeley tries to justify the Ordinance by arguing that consumers should have the information the City thinks they should have. But that is no test at all: It would authorize the government to force a business to say *anything* the government thinks is a good idea. *See Amestoy*, 92 F.3d at 73–74. Under existing law, Berkeley must show why, without this information, consumers face some sort of "real" harm. *Retail Digital*, 810 F.3d at 648. An elevator load-limit can satisfy that test, *contra* Berkeley Br. 49–50, because riders need to be aware that an over-filled elevator is a safety issue. But that is not true of approved cell phones; the FCC has already determined that such phones simply do not create any known safety issue for consumers, no matter how they are used. ER 61, 64.

Berkeley attempts to distinguish *Amestoy*, which held that Vermont could not force retailers to warn that their dairy products could contain milk from cows treated with the rBST hormone, 92 F.3d at 69–70, 74, by claiming that dairy products treated with rBST were, according to the FDA, "'indistinguishable'" from non-treated products, and

11

thus the FDA had "'declined to require labeling.'" Berkeley Br. 61 (quoting 92 F.3d at 69). But those same basic facts apply here: The FCC has *not* found any distinction, in terms of safety, between a cell phone carried against the body versus one carried in any other way. For that reason, the FCC has declined to require labeling about RF energy at the point of sale.

In short, the government may have substantial leeway in determining certain disclosure requirements for businesses. *See Pacific Gas & Electric*, 475 U.S. at 15 n.12. But under long-settled doctrine, that leeway does not include mandating speech about an alleged safety risk that the FCC and the scientific community have disclaimed, in a way that will only alarm consumers, not help them.

## 2. The Ordinance Is Unconstitutional Under *Zauderer*

Even if *Zauderer* supplies the governing legal standard, the Ordinance is still unconstitutional because it fails each of the Supreme Court's requirements. Berkeley's strategy is either to deny that these requirements exist or to misapply them.

As a threshold matter, Berkeley's argument rests on an erroneous premise—that it bears no burden to show that the Ordinance is lawful. Berkeley Br. 25. This is untenable in light of *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), which makes clear that, for a preliminary injunction, "the moving party bears the initial burden of

making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Accord Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 527 (D.C. Cir. 2015) (the government "had the burden of demonstrating that the [disclosure mandate] it adopted would in fact alleviate the harms it recited to a material degree" (quotation marks omitted)).

Berkeley responds that *Milavetz* and *Zauderer* did not require the government respondents to proffer evidence supporting those mandates. Berkeley Br. 25. But that was because the petitioners' advertisements that prompted the government to require corrective disclosures were *obviously* deceptive, so nothing further from the government was needed. *See Milavetz*, 559 U.S. at 251; *Zauderer*, 471 U.S. at 652–53. Again, there is nothing deceptive in CTIA's members' statements about RF energy, and Berkeley has never suggested otherwise, so Berkeley cannot bypass its burden to justify the Ordinance.

In any event, as discussed below, the Ordinance is unconstitutional for the same reasons that this Court struck down the speech mandates in *San Francisco* and *Schwarzenegger*: It is not supported by any legitimate interest, and it is neither factual nor uncontroversial.

13

### a. The Ordinance Is Not Justified By Any Legitimate Government Interest

Because the Ordinance is not about preventing consumer deception, Berkeley needs some other substantial government interest to justify its speech mandate. Berkeley offers only one: giving residents information that (according to Berkeley) is already "FCC mandated." Berkeley Br. 18. Berkeley repeats this claim again and again, arguing that the FCC previously *advised* cell phone manufacturers to provide information about RF energy, but now has "made that advice mandatory." *Id.* at 6; *see also*, *e.g.*, *id.* at 1, 2, 3, 18, 22, 23.

The claim is false. Berkeley's authority for the suggestion that the FCC mandates these disclosures is the Office of Engineering and Technology's (OET) Laboratory Division's Knowledge Database (KDB), entitled *General RF Exposure Guidance*. Berkeley Br. 6, 22. But according to controlling FCC regulations, "[t]he staff guidance provided in the KDB ... *is not binding* on the Commission or any interested party." 47 C.F.R. § 2.1093(d)(3) (emphasis added). As OET similarly recognizes on its own website: "The staff guidance provided in the KDB ... is not binding." *See* https://goo.gl/8KXk4T. And the full Commission has also confirmed that "[the KDB] is not mandatory. Rather, the [KDB] provide[s] non-binding policy statements." *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*, 28 FCC Rcd. 3498 (2013), ¶ 247. Although the FCC has sought comment on "whether [there is] some ma-

14

terial in the KDB that should be made mandatory, or in other words, is more appropriately included in the rules so that they would become enforceable requirements," *id.*, the KDB remains merely suggestive under the rules.

The Ordinance thus cannot be justified on the ground that it merely amplifies existing federally required disclosures. *Contra* Berkeley Br. 23. There *are no* federally required disclosures—the information in user manuals is "voluntarily provided." *Reassessment*, ¶ 234. Nor does the Ordinance simply provide information about the existing federal SAR guideline. Rather, the Ordinance is an attack on the judgments of the FCC about what type of information on RF energy is necessary for consumers, and whether there is cause for concern when a consumer exceeds the SAR guideline by wearing a cell phone against the body. The FCC has determined, based on the science, that ordinary consumers do not need any type of warning *at all*. To the extent the FCC suggests information for consumers, it suggests factual information in user manuals, not misleading and alarmist terminology. Importantly, even the OET's guidance leaves the language of the user manuals up to individual companies. And the FCC has confidently stated that it has "no evidence that [exceeding the SAR limit] poses any significant health risk." *Reassessment*, ¶ 251.

Berkeley alleges that CTIA seeks to "keep consumers in the dark," Berkeley Br. 2, but that is not true: CTIA's members simply wish to

avoid alarming consumers about a safety issue from "radiation" that the FCC has determined *does not exist*, and in terms the FCC has admonished are likely to confuse. Berkeley is not trying to enlighten consumers, only to force CTIA's members to give them misleading and confusing messages. The Ordinance is deliberately worded to obscure the truth about RF energy and what the FCC has said about it.

Berkeley also suggests that CTIA's real "beef" is with the FCC's regulatory program, or that enjoining the Ordinance would "short circuit" the FCC's administrative process regarding SAR guidelines. Berkeley Br. 10–11 & n.3. Not so. The FCC does not compel CTIA's members' speech, much less compel them to convey a misleading message. And CTIA does not object to setting the SAR guideline with a significant safety factor, so the outcome of the FCC's review of the SAR guideline is entirely irrelevant here. It is Berkeley—not CTIA—that thinks it knows better than the FCC what information consumers need about RF energy, and how they should get it. *See id.* at 52 ("The ordinance responds to a demonstrable lack of information[.]").

Berkeley lacks any legitimate government interest in this Ordinance, which dooms it under *Zauderer*. *See Schwarzenegger*, 556 F.3d at 967 (a commercial disclosure mandate is unconstitutional where the government "has no legitimate reason" for it).

### b. The Ordinance Is Not Purely Factual

Berkeley repeatedly says that it does not want to mislead consumers or take sides in a scientific debate, merely to "rest[ ]" on what the FCC says about RF energy by giving consumers "the same" information. Berkeley Br. 10, 23. If that were true, then Berkeley could simply repeat the FCC's actual statements, including the FCC's repeated findings that approved cell phones are safe and that "no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses." ER 61; *see also* ER 5. The fact that Berkeley's Ordinance does not convey those statements, as the City admits, ER 113, but requires communication of a City-scripted message reveals that the City is intent on slanting the presentation of this issue to the public and ignoring the numerous FCC findings that do not fit its "safety" narrative. Nor does the Ordinance merely "reveal[ ] the existence of the federal regulation of RF energy." *Contra* Berkeley Br. 37. The Ordinance, on its face, goes *much* further than that, editorializing in inflammatory language about supposed "safety" risks.

Berkeley argues that its message is literally true when parsed line-by-line. Even if that were correct, it would not save the Ordinance. As common sense indicates, ordinary consumers could well take from Berkeley's Ordinance the message that they should be concerned about how they carry their cell phones and alter their conduct, because RF energy is a safety issue; indeed, that is the message Berkeley *intended*

to impart to achieve its goal of "chang[ing] [residents'] behavior." Berkeley Br. 65. But the FCC has said exactly the opposite: RF energy from an approved cell phone is not connected to any known health risk, and there is no causal link between cell phones and any type of illness. ER 61; *see also* ER 5. Berkeley's Brief never once acknowledges these key statements by the FCC.

Thus, the Ordinance is misleading because it will potentially raise questions in the consumer's mind about RF energy, and then answer them in a way that directly contradicts the answer given by the FCC. The label in *Schwarzenegger* was unconstitutional for that very reason—it "would *arguably* now convey a false statement" to some consumers. 556 F.3d at 967 (emphasis added). Berkeley may *say* (in this litigation) that it just wants consumers to understand the FCC guidelines and how they relate to everyday cell phone use, but its disclosure *in fact* badly distorts the FCC's guidance. That is exactly why this Court previously struck down the similar ordinance in *San Francisco*.

Berkeley acknowledges that, under *San Francisco*, an ordinance conveying that cell phones are unsafe is unconstitutional. *See* Berkeley Br. 8. So Berkeley attempts to deny that its Ordinance conveys that message, by analogy to nutrition labels disclosing the amount of salt in food. *See id.* at 51. The analogy fails. A purely factual nutrition label does not use alarmist terminology that raises concern in consumers' minds. Berkeley's brief refuses to acknowledge and never attempts to

18

rebut the FCC's finding that the term "radiation" is likely to mislead. *See* CTIA Br. 36. Anyway, RF energy is not like salt. Everyone agrees that, at *some* point, too much salt is unhealthy. But for RF energy from an approved cell phone, the FCC says that the phone does not create any known safety hazard, regardless of how it is held.

Berkeley tries to salvage its case by arguing that this Court should defer to the district court on whether the Ordinance is factual and accurate. Berkeley Br. 32–33. But the district court heard no facts; it made a legal judgment, applying *Zauderer*, about whether the Ordinance is misleading. And the district court *did not* reject CTIA's argument that the Ordinance "gives rise to the implication that carrying or using your phone [in certain ways] is unsafe." ER 46. Rather, the district court mistakenly suggested that this message is consistent with the FCC's views, *see id.*, which, as CTIA has shown, it is not.

This Court is entitled to make its own, independent assessment of the Ordinance under *Zauderer*, by reading the Ordinance and comparing it to the FCC's statements on RF energy. *San Francisco* proves the point: There, the Court did not need evidentiary submissions in order to strike down that ordinance—on appeal of a motion for preliminary injunction—for misleading, rather than informing, the public. This case arises in the same posture. Berkeley's Ordinance is just as misleading as the one in *San Francisco*, and just as unconstitutional.

### c. The Ordinance's Message Is Not Uncontroversial

Berkeley makes the astounding contention that the government may compel speech *even when its message is controversial*. Berkeley Br. 30–32. The most obvious problem for Berkeley is *Zauderer* itself. *See* 471 U.S. at 651. The City's response is that the "uncontroversial" requirement appeared "only once" in the opinion, Berkeley Br. 30, as if the Supreme Court is obligated to repeat something over and over in order to make it binding on lower courts. In any event, the Supreme Court has repeated that *Zauderer* applies to "'purely factual and uncontroversial information.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citation omitted). The absence of discussion on the point in *Milavetz*—where there was no disagreement about whether the information to be disclosed was uncontroversial—did not silently overrule *Zauderer*'s test.

The Courts of Appeals—including this Court—have correctly understood *Zauderer* to include the "uncontroversial" requirement. *See*, *e.g.*, *Schwarzenegger*, 556 F.3d at 956 (*Zauderer* supports disclosure only of "'purely factual and uncontroversial information'" (citation omitted)); *San Francisco*, 494 F. App'x at 753 ("any governmentally compelled disclosures to consumers must be 'purely factual and uncontroversial'" (citation omitted)). Any confusion that may exist in the Sixth Circuit about the Supreme Court's "uncontroversial" requirement, *see* Berkeley Br. 30–31 (citing *Disc. Tobacco City & Lottery, Inc. v. United*

20

*States*, 674 F.3d 509 (6th Cir. 2012)), is irrelevant here. As CTIA has shown, the Second, Seventh, and D.C. Circuits all agree with this Court that only "uncontroversial" compelled disclosures are constitutional, and those courts have struck down compelled commercial speech mandates on that basis. CTIA Br. 29, 39–40. Even the Sixth Circuit's *Discount Tobacco* opinion is no help to Berkeley here, because that court acknowledged that—unlike Berkeley's message—the content required to be disclosed was "undisputed." 674 F.3d at 558.

Even if Berkeley's argument were not foreclosed by precedent, which it is, it espouses a dangerously narrow conception of the First Amendment. The City asks this Court to hold that the government can force retailers to make statements that have been rejected by all but the fringes of the scientific community. If Berkeley's view prevails, businesses will have no recourse if municipalities require, for example, vaccine manufacturers to disclose that "some studies have found vaccines to increase the risk of autism," or require solar panel manufacturers to state that "some scientists have questioned whether carbon emissions contribute to climate change." Those statements are *literally true*, and on Berkeley's theory, it would make no constitutional difference that they are extraordinarily controversial and hotly disputed.

To be sure, a business cannot unilaterally render a disclosure requirement controversial—and therefore impermissible under *Zauderer*—simply by taking issue with it or citing debunked science. *Contra*

21

Berkeley Br. 31–32. No court takes such a ridiculous position, and CTIA has not advanced it here. Thus, notwithstanding Berkeley's fear-mongering, invalidating this Ordinance will offer no aid to companies that deny legitimate safety risks.

The scientific consensus in *this* case overwhelmingly supports CTIA and the FCC, and stands flatly against Berkeley. The Ordinance rests on an opinion—cell phones pose a safety issue if they exceed the SAR guideline—that the FCC has rejected based on the scientific evidence. This Court need not go any farther than it did just a few years ago: "[T]here is a [lopsided] debate in the scientific community about the health effects of cell phones," and thus the Ordinance is not "*both* 'purely factual *and uncontroversial*.'" *San Francisco*, 494 F. App'x at 753–54 (emphasis added; citation omitted).

### d. The Ordinance Is Unduly Burdensome

Berkeley has shown no reason why it cannot use its own resources to "itself publish" its opinion on RF energy, thereby "communicat[ing] the desired information to the public without burdening" CTIA's members to disassociate from Berkeley's view or to wade into the debate. *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 800 (1988). Berkeley's failure to use such a "more benign and narrowly tailored option[ ]" further dooms the Ordinance. *Id.*

The City responds that CTIA's members have not been "chill[ed]" from other speech, and that a "chill" is the only type of undue burden that is cognizable under *Zauderer*. Berkeley Br. 17, 36. But CTIA's members have a First Amendment right not to be dragged into government-spurred debates about RF energy at the point of sale, and Berkeley is wrong to assert that the absence of a chill makes a constitutional difference. Speech will *never* be "chilled" when the government orders a business to say something new, as opposed to when it orders a business to add something to existing advertising (as in *Zauderer* and *Milavetz*). That does not mean that the government can compel whatever commercial speech it wants whenever there is no preexisting, voluntary speech. As this Court and other Circuits have held, forcing a business to speak without proper justification violates the First Amendment even without an adverse effect on *other* speech. *See*, *e.g.*, *San Francisco*, 494 F. App'x 752; *Schwarzenegger*, 556 F.3d 950; *National Ass'n of Manufacturers*, 800 F.3d 518; *Evergreen Ass'n v. City of N.Y.*, 740 F.3d 233, 245 n.6 (2d Cir. 2014).

Nor is there any precedent for Berkeley's contention that a compelled speech mandate can become constitutional just because the government identifies itself as the source of the message. *Contra* Berkeley Br. 19. As CTIA has shown (at 30–31), multiple circuits have expressly rejected that argument. So has the Supreme Court. *See Pacific Gas & Electric*, 475 U.S. at 15 n.11.

23

* * *

Berkeley's overall view of the First Amendment—from its extreme assertion that all that matters in the commercial speech arena are listener (not speaker) interests, to the remarkable claim that government may impose any speech mandates on businesses, no matter how controversial—would dramatically undermine existing First Amendment protections for commercial speakers. This Court should reject the City's attempts to do so.

## B. The Ordinance Is Preempted By Federal Law

Berkeley's Ordinance is preempted because it stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quotation marks omitted). Berkeley does not dispute that the FCC balanced competing priorities when it established a uniform national regime for the regulation of cell phones and when it made a deliberate choice not to require warning labels on cell phones. Berkeley Br. 52–58.

Instead, Berkeley's defense of the Ordinance proceeds from the misguided premise that the "FCC regulates manufacturers of cell phones," whereas "Berkeley regulates retailers." Berkeley Br. 53. To the contrary, under the FCC's rules, "[n]o person"—whether a manufacturer or retailer—may "offer[ ] for sale or lease, including advertising for sale or lease," any "radio frequency device unless" the device has been

authorized by the FCC "and is properly identified and labelled." 47 C.F.R. § 2.803(a), (b)(1); *see also Farina v. Nokia Inc.*, 625 F.3d 97, 107 (3d Cir. 2010) ("[A]ll cell phones sold in the United States must comply with th[e FCC's] regulations."). The City cannot escape federal preemption by supposedly leaving "manufacturers *qua* manufacturers" untouched, Berkeley Br. 54; the FCC regulates *all* sales of cell phones.

Furthermore, Berkeley's argument fails to grapple with the FCC's full purposes and objectives. Congress tasked the FCC with "ensuring the rapid development of an efficient and uniform network," *Farina*, 625 F.3d at 125, in order to "foster the growth and development of mobile services," H.R. Rep. No. 103-111, at 260 (1993); *see also* CTIA Br. 47–48. And Congress vested the FCC with responsibility to create "uniformity in regulation." *Farina*, 625 F.3d at 124. Varying regulations of cell phone sales by many different municipalities, whether targeting retailers or manufacturers, would impede those objectives. Suppose, for example, that Berkeley imposed a "special tax" (Berkeley Br. 54) on retailers who sell FCC-certified cell phone models that exceed the *City's* preferred RF-emissions guidelines. Such a tax would be preempted as an obstacle to the FCC's regulatory goals, even if the FCC did not adopt a policy exempting "those within its jurisdiction from taxes." *Id.* In the same way, Berkeley's restriction on the sale of FCC-certified phones unless the retailer includes a warning label that the FCC has deliberately declined to require (CTIA Br. 49–51) imposes an obstacle to Congress's

purposes and objectives. Thus, Berkeley's Ordinance would be preempted even if Berkeley were right that it merely "complement[ed]" the FCC's regulation by "extend[ing] the FCC's policy" to retailers. Berkeley Br. 58.

As shown above, moreover, the Ordinance does *not* complement existing FCC policy decisions; it contradicts them. The FCC does not require manufacturers "to provide information" about RF-emissions and testing separation distance to consumers. Berkeley Br. 55. While the FCC's regulations for devices in industrial settings, where exposure limits are higher, mandate worker "awareness of exposure," the regulations for the general population do not. CTIA Br. 49–51 (citing 47 C.F.R. § 2.1093(d)(1), (2)); *see also supra* 14–15. Those same regulations also make clear that any 'obligations' contained in the KDB are "not binding on the Commission or any interested party." 47 C.F.R. § 2.1093(d)(3). It is not surprising, therefore, that Berkeley fails to cite any authority to support its assertion that "[t]he FCC's whole purpose in mandating" RF-energy disclosures "is to give consumers a choice about how they might use their cell phones—a choice the FCC believed might well be affected by whether the use exceed[s] the FCC's RF exposure limits." Berkeley Br. 58. The FCC set the RF energy standard for consumers low enough to make awareness of RF exposure—and thus any mandatory disclosures—unnecessary. *See* CTIA Br. 49–50.

The City further insists that the Ordinance complements FCC regulations because it says "precisely what the FCC mandates manufacturers say" in their user manuals. Berkeley Br. 58. Even if the OET's guidance regarding user manuals were mandatory, Berkeley would not be correct. Berkeley has conceded that its scripted message does not repeat the information contained in cell phone user manuals. *See* ER 113. Nor does the OET recommend that manuals warn consumers that "use within the separation distance 'may exceed the federal guidelines for exposure to RF radiation,'" Berkeley Br. 58 (quoting BMC § 9.96.030(A)). *See General RF Exposure Guidance* § 4.2.2(d) (recommending basic information "to enable users to select body-worn accessories that meet the minimum test separation distance requirements" (emphasis omitted)).

Berkeley's message goes much further than warning that consumers might exceed the RF guidelines—it unmistakably conveys the message that cell phones are *unsafe* if they are carried in a particular manner *because* they might exceed the guidelines. *See supra* 17–18. Foisting that alarmist and anti-science message on either retailers or manufacturers "threatens to upset the balance struck by the FCC" because it could deter the adoption of beneficial technology. ER 15.

27

## II. The Other Preliminary Injunction Factors Tip Sharply In Favor Of CTIA

### A. CTIA Will Suffer Irreparably Without An Injunction

"Both this [C]ourt and the Supreme Court have repeatedly held that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quotation marks and alteration omitted). Berkeley does not and cannot dispute that "[a] colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (quotation marks omitted).[2] At the very least, CTIA has presented a colorable First Amendment claim, especially given its substantial similarity to the claim in *San Francisco*.

Berkeley's response merely rehashes its view of the merits. It repeats, for example, the inaccurate refrain that the Ordinance simply repeats FCC-mandated information in user manuals. Berkeley Br. 59. And it reiterates the radical view that CTIA's members have no "First Amendment interest[s]" merely because the Ordinance does not "chill" any existing commercial speech. *Id.* at 60. As demonstrated above, *see*

---

[2] Berkeley also does not dispute that CTIA's members will suffer irreparable injury if a likely-preempted Ordinance is enforced against them.

28

*supra* 23, that is not the law. Indeed, just as in *Amestoy*, Berkeley's Ordinance would "indisputably require[ ]" CTIA's members "to speak when they would rather not." 92 F.3d at 72. "Because compelled speech contravenes core First Amendment values," CTIA's members have "satisfied the initial requirement for securing injunctive relief"—irreparable harm. *Id.* (quotation marks and alteration omitted).

Finally, CTIA's common-sense observation that consumers are likely to be alarmed by a warning that a product they are about to purchase emits "radiation" is supported by the FCC's own findings. *See* CTIA Br. 35–36. Neither Berkeley's Brief (at 63), nor the district court (ER 47), has offered any explanation for disregarding the FCC's views on this (or any other) score.

## B. Berkeley Has No Legitimate Countervailing Interests

Berkeley generally maintains that it has a "substantial interest" justifying the Ordinance, Berkeley Br. 64–65, but it never claims that it will suffer any concrete harm if this Court enjoins the Ordinance until its legality can be finally determined, *see* CTIA Br. 53–54. The abstract interests that Berkeley asserts are thus irrelevant to the question whether a preliminary injunction would pose a hardship to the City. *See*, *e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("In each case, courts must balance the competing claims of injury and must

consider the effect on each party *of the granting or withholding of the requested relief*." (emphasis added; quotation marks omitted)).

In any event, the City's asserted interests could not possibly out-weigh the clear, irreparable harm to CTIA's members. The City suggests that it "maintains a health and safety interest" in the Ordinance, Berkeley Br. 64, but it does not dispute that FCC-approved phones pose no threat to public safety. Berkeley also insists that it wants residents to know about "RF exposure limits," which might cause them to "change their behavior." Berkeley Br. 65–66. Without any evidence that the FCC's regulations are insufficiently protective of public safety, the City cannot show any need for that information. Most important, Berkeley can *never* assert a "legitimate interest in enforcing an unconstitutional ordinance," *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006), or in demanding that CTIA's members convey an inaccurate and inflammatory message, *Schwarzenegger*, 556 F.3d at 967.

## C. The Public Interest Favors An Injunction

Berkeley complains that it would be an "extraordinary step" for this Court to enjoin its Ordinance. Berkeley Br. 66–67. But that is precisely the step this Court took in *San Francisco* in order to vindicate protected First Amendment rights. And "it is *always* in the public interest to protect First Amendment liberties." *Joelner v. Village of Washing-*

30

*ton Park*, 378 F.3d 613, 620 (7th Cir. 2004) (emphasis added; quotation marks omitted).

Because the City advances no real public safety concern—and cannot do so in light of the FCC's repeated statements—Berkeley must hyperbolically summon "the ghost of *Lochner*" (Berkeley Br. 67) to scare this Court away from scrutinizing the Ordinance. To be sure, "[t]he Constitution 'does not enact Mr. Herbert Spencer's Social Statics.' It does enact the First Amendment." *Sorrell*, 131 S. Ct. at 2665 (quoting *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting)).

## Conclusion

This Court should reverse the district court and remand with instructions to enjoin all Defendants from enforcing or causing to be enforced BMC Chapter 9.96.

Dated: May 9, 2016

Respectfully submitted,

s/ Theodore B. Olson

| | |
|---|---|
| Joshua S. Lipshutz | Theodore B. Olson |
| Joshua D. Dick | Helgi C. Walker |
| GIBSON, DUNN & CRUTCHER LLP | Michael R. Huston |
| 555 Mission Street | Jacob T. Spencer |
| San Francisco, CA 94105-0921 | GIBSON, DUNN & CRUTCHER LLP |
| Telephone: 415.393.8233 | 1050 Connecticut Avenue, N.W. |
| Facsimile: 415.374.8469 | Washington, DC 20036-5306 |
| | Telephone: 202.955.8500 |
| | Facsimile: 202.467.0539 |

*Counsel for Plaintiff-Appellant CTIA – The Wireless Association®*

31

**Certificate of Compliance**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing Reply Brief for Appellant CTIA – The Wireless Association® is proportionately spaced in New Century Schoolbook font, has a typeface of 14 points, and contains 6,982 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the word count feature of Microsoft Word 2010 used to generate this brief.

s/ Theodore B. Olson

**Certificate of Service**

I hereby certify that on May 9, 2016, I filed the foregoing Reply Brief for Appellant CTIA – The Wireless Association® with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/ Theodore B. Olson